**2022-1093**

IN THE

# United States Court of Appeals for the Federal Circuit

PROMPTU SYSTEMS CORPORATION,

*Appellant*,

v.

COMCAST CABLE COMMUNICATIONS, LLC,

*Appellee*.

Appeal from the United States Patent and Trademark Office, Patent Trial and Appeal Board in Case No. IPR2018-00344

**PRINCIPAL BRIEF FOR APPELLANT PROMPTU SYSTEMS CORPORATION**

Jacob A. Schroeder
FINNEGAN, HENDERSON, FARABOW, GARRETT & DUNNER, LLP
3300 Hillview Avenue
Palo Alto, CA 94304
(650) 849-6600

Joshua L. Goldberg
FINNEGAN, HENDERSON, FARABOW, GARRETT & DUNNER, LLP
901 New York Ave., N.W.
Washington, D.C. 20001
(202) 408-4000

Joseph M. Schaffner
FINNEGAN, HENDERSON, FARABOW, GARRETT & DUNNER, LLP
1875 Explorer Street, Suite 800
Reston, VA 20190-6023
(571) 203-2700

*Counsel for Appellant*

**Exemplary Claim Language at Issue**

1. A method of using a back channel containing a multiplicity of identified speech channels from a multiplicity of user sites presented to a speech processing system at a wireline node in a network supporting at least one of cable television delivery and video delivery, comprising the steps of:

receiving said back channel to create a received back channel;

partitioning said received back channel into a multiplicity of received identified speech channels;

processing said multiplicity of said received identified speech channels to create a multiplicity of identified speech content; and

responding to said identified speech content to create an identified speech content response that is unique, for each of said multiplicity of identified speech contents.

Appx159-160 at 50:62-51:10.

**UNITED STATES COURT OF APPEALS**
**FOR THE FEDERAL CIRCUIT**

## CERTIFICATE OF INTEREST

**Case Numbers** 2022-1093

**Short Case Caption** Promptu Systems Corporation v. Comcast Cable Communications, LLC

**Filing Party/Entity** Promptu Systems Corporation

**Instructions:** Complete each section of the form. In answering items 2 and 3, be specific as to which represented entities the answers apply; lack of specificity may result in non-compliance. **Please enter only one item per box; attach additional pages as needed and check the relevant box.** Counsel must immediately file an amended Certificate of Interest if information changes. Fed. Cir. R. 47.4(b).

I certify the following information and any attached sheets are accurate and complete to the best of my knowledge.

Date: March 17, 2022 Signature: */s/ Jacob A. Schroeder*

Name: Jacob A. Schroeder

| **1. Represented Entities.** Fed. Cir. R. 47.4(a)(1). | **2. Real Party in Interest.** Fed. Cir. R. 47.4(a)(2). | **3. Parent Corporations and Stockholders.** Fed. Cir. R. 47.4(a)(3). |
|---|---|---|
| Provide the full names of all entities represented by undersigned counsel in this case. | Provide the full names of all real parties in interest for the entities. Do not list the real parties if they are the same as the entities. | Provide the full names of all parent corporations for the entities and all publicly held companies that own 10% or more stock in the entities. |
| ☐ None/Not Applicable | ☒ None/Not Applicable | ☒ None/Not Applicable |
| Promptu Systems Corporation | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |

☐ Additional pages attached

**4. Legal Representatives.** List all law firms, partners, and associates that (a) appeared for the entities in the originating court or agency or (b) are expected to appear in this court for the entities. Do not include those who have already entered an appearance in this court. Fed. Cir. R. 47.4(a)(4).

☐ None/Not Applicable ☐ Additional pages attached

| | | |
|---|---|---|
| Cory C. Bell<br>Daniel Klodowski<br><br>Finnegan, Henderson, Farabow, Garrett & Dunner, LLP | John S. Ferrell<br>Wade C. Yamazaki<br><br>Carr & Ferrell LLP | |

**5. Related Cases.** Provide the case titles and numbers of any case known to be pending in this court or any other court or agency that will directly affect or be directly affected by this court's decision in the pending appeal. Do not include the originating case number(s) for this case. Fed. Cir. R. 47.4(a)(5). See also Fed. Cir. R. 47.5(b).

☐ None/Not Applicable ☐ Additional pages attached

| | | |
|---|---|---|
| *Promptu Sys. Corp. v. Comcast Corp.*, No. 2:16-cv-06516 (E.D. Pa.) | | |

**6. Organizational Victims and Bankruptcy Cases.** Provide any information required under Fed. R. App. P. 26.1(b) (organizational victims in criminal cases) and 26.1(c) (bankruptcy case debtors and trustees). Fed. Cir. R. 47.4(a)(6).

☒ None/Not Applicable ☐ Additional pages attached

| | | |
|---|---|---|
| | | |

# TABLE OF CONTENTS

**Page**


STATEMENT OF RELATED CASES .......... x

STATEMENT OF JURISDICTION .......... xi

I. PRELIMINARY STATEMENT .......... 1

II. STATEMENT OF THE ISSUES .......... 2

III. STATEMENT OF THE CASE .......... 3

A. The Parties .......... 3

1. Promptu .......... 3

2. Comcast .......... 5

B. Technological Background .......... 6

C. The ’196 Patent .......... 7

1. The Specification .......... 7

2. The Claims .......... 9

D. Procedural History .......... 9

1. Comcast’s Petition .......... 9

2. The Board’s Institution Decision .......... 10

3. Promptu’s Patent Owner Response .......... 10

4. The Parties’ Reply and Sur-Reply .......... 13

5. The Board’s Final Written Decisions .......... 14

6. Appeal to the Federal Circuit .......... 15

7. The Parties’ Remand Arguments .......... 15

8. The Board’s Remand Decision .......... 16

IV. SUMMARY OF THE ARGUMENT .......... 19

V. ARGUMENT .......... 20

A. Standard of Review .......... 20

B. The Board improperly relied on a legally deficient motivation to combine based on what “could” have been done, not what “would” have been obvious to do .......... 21

1. The Board's only articulated reason for combining Julia with Nazarathy and Quigley relies on sheer physical possibility ......................................................21

2. The Board further erred by justifying the combination of references with aspirational platitudes..25

C. The Board improperly disregarded Promptu's secondary consideration evidence .......................................................................28

1. Promptu established a proper nexus both by presumption and direct evidence ...................................28

2. The Board erred in rejecting a presumed nexus by adjudicating unbriefed issues and ignoring undisputed facts .............................................................30

3. The Board improperly discounted Promptu's direct secondary consideration evidence by relying on incorrect claim constructions and other legal errors ......36

VI. CONCLUSION...........................................................................................48

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Alacritech, Inc. v. Intel Corp.*,
966 F.3d 1367 (Fed. Cir. 2020) ....................31, 32

*Apple, Inc. v. Samsung Elecs. Co.*,
839 F.3d 1034 (Fed. Cir. 2016) ....................28

*Baxalta Inc. v. Genentech, Inc.*,
972 F.3d 1341 (Fed. Cir. 2020) ....................41

*Chemours Co. v. Daikin Indus.*,
4 F.4th 1370 (Fed. Cir. 2021) ....................*passim*

*Comcast Cable Commc'ns, LLC v. Promptu Sys.*,
838 F. App'x 551 (Fed. Cir. 2021) ....................x, 8, 15, 40

*Demaco Corp. v. F. Von Langsdorff Licensing Ltd.*,
851 F.2d 1387 (Fed. Cir. 1988) ....................32

*Dell Inc. v. Acceleron, LLC*,
818 F.3d 1293 (Fed. Cir. 2016) ....................31

*Dynamic Drinkware LLC v. Nat'l Graphics, Inc.*,
800 F.3d 1375 (Fed. Cir. 2015) ....................26

*Ecolochem, Inc. v. S. Cal. Edison Co.*,
227 F.3d 1361 (Fed. Cir. 2000) ....................23, 32

*Endo Pharm. Inc. v. Actavis LLC*,
922 F.3d 1365 (Fed. Cir. 2019) ....................22

*Gambro Lundia AB v. Baxter Healthcare Corp.*,
110 F.3d 1573 (Fed. Cir. 1997) ....................46

*Graham v. John Deere Co.*,
383 U.S. 1 (1966)....................21

*Heidelberger Druckmaschinen AG v. Hantscho Commercial Prods.*,
21 F.3d 1068 (Fed. Cir. 1994) ....................47

*Holmwood v. Sugavanam*,
948 F.2d 1236 (Fed. Cir. 1991) ....................................................................36

*Intellectual Ventures I LLC v. Motorola Mobility LLC*,
870 F.3d 1320 (Fed. Cir. 2017) ..............................................................20, 35

*In re IPR Licensing, Inc.*,
942 F.3d 1363 (Fed. Cir. 2019) ....................................................................30

*In re Lee*,
277 F.3d 1338 (Fed. Cir. 2002) ....................................................................25

*In re Magnum Oil Tools Int'l*,
829 F.3d 1364 (Fed. Cir. 2016) ........................................................26, 30, 31

*In re Nuvasive, Inc.*,
842 F.3d 1376 (Fed. Cir. 2016) ..............................................................25, 31

*In re Rouffet*,
149 F.3d 1350 (Fed. Cir. 1998) ....................................................................24

*In re Van Os*,
844 F.3d 1359 (Fed. Cir. 2017) ..............................................................25, 26

*InTouch Techs., Inc. v. VGO Commc'ns, Inc.*,
751 F.3d 1327 (Fed. Cir. 2014) ..............................................................22, 23

*J.T. Eaton & Co. v. Atl. Paste & Glue Co.*,
106 F.3d 1563 (Fed. Cir. 1997) ..............................................................29, 34

*KSR Int'l v. Teleflex Inc.*,
550 U.S. 398 (2007)........................................................................................27

*Medgraph, Inc. v. Medtronic, Inc.*,
843 F.3d 942 (Fed. Cir. 2016) ......................................................................38

*Metabolite Labs., Inc. v. Lab. Corp.*,
370 F.3d 1354 (Fed. Cir. 2004) ....................................................................46

*Mintz v. Dietz & Watson, Inc.*,
679 F.3d 1372 (Fed. Cir. 2012) ....................................................................46

*Ortho-McNeil Pharm., Inc. v. Mylan Labs., Inc.*,
520 F.3d 1358 (Fed. Cir. 2008) ....................................................................38

*Pers. Web Techs., LLC v. Apple, Inc.*,
848 F.3d 987 (Fed. Cir. 2017) ..................................................................*passim*

*Phillips v. AWH Corp.*,
415 F.3d 1303 (Fed. Cir. 2005) ....................................................................41

*Promptu Sys. Corp. v. Comcast Corp.*,
No. 2:16-cv-06516 (E.D. Pa.) .................................................................. iii, x, 6

*Qualcomm Inc. v. Intel Corp.*,
6 F.4th 1256 (Fed. Cir. 2021) .....................................................................40

*Quanergy Sys. v. Velodyne Lidar USA*,
24 F.4th 1406 (Fed. Cir. 2022) ..............................................................32, 36

*Regents of Univ. of Cal. v. Broad Inst., Inc.*,
903 F.3d 1286 (Fed. Cir. 2018) ....................................................................22

*SAS Inst., Inc. v. ComplementSoft, LLC*,
825 F.3d 1341 (Fed. Cir. 2016) ....................................................................40

*Shoes by Firebug LLC v. Stride Ride Children's Grp.*,
962 F.3d 1362 (Fed. Cir. 2020) ....................................................................47

*SIMO Holdings Inc. v. H.K. uCloudlink Network Tech.*,
983 F.3d 1367 (Fed. Cir. 2021) ....................................................................37

*SuperGuide Corp. v. DirecTV Enters., Inc.*,
358 F.3d 870 (Fed. Cir. 2004) ................................................................37, 38

*TQ Delta, LLC v. Cisco Sys.*,
942 F.3d 1352 (Fed. Cir. 2019) ..........................................................20, 21, 24

*Vicor Corp. v. SynQor, Inc.*,
869 F.3d 1309 (Fed. Cir. 2017) ....................................................................44

*WBIP, LLC v. Kohler Co.*,
829 F.3d 1317 (Fed. Cir. 2016) ..............................................................*passim*

*Zavaleta-Policiano v. Sessions*,
873 F.3d 241 (4th Cir. 2017) ....................................................................36

**Federal Statutes**

5 U.S.C. § 706 ..........................................................................................21

28 U.S.C. § 1295(a)(4)(A) ............................................................................xi

35 U.S.C. § 141(c) .......................................................................................xi

35 U.S.C. § 319 ............................................................................................xi

**Regulations**

37 C.F.R. § 42.6(a)(3) ..........................................................................10, 14

37 C.F.R. § 42.100(b) (2017)........................................................................15

**Other Authorities**

ANTONIN SCALA & BRYAN A. GARNER, READING LAW: THE INTERPRETATION OF LEGAL TEXTS (2012) ........................................................37

William F. Woo, *Paul Cook: Happiest when he's hard at work* (May 9, 2001), https://www.paloajltoonline.com/weekly/morgue/2001/2001_05_09.cook09.html ......................................................................3

**STATEMENT OF RELATED CASES**

An appeal from IPR2018-00344 was previously before this Court in *Comcast Cable Commc'ns, LLC v. Promptu Sys.*, Nos. 2019-2287, 2019-2288, 838 F. App'x 551 (Fed. Cir. Jan. 4, 2021) (Moore, Lourie, Schall). That appeal reflected a consolidated appeal from the United States Patent and Trademark Office Patent Trial and Appeal Board ("Board") in cases IPR2018-00344 and IPR2018-00345. There, this Court affirmed the Board's judgment that claims 14, 15, 17-19, 25, 26, 53-55, 61, 62, and 64-66 of U.S. Patent No. 7,047,196 ("the '196 patent") are valid. *Comcast*, 838 F. App'x at 553-54. The Court vacated the Board's patentability ruling as to claims 1, 2, 4-6, 12, 13, 27, 28, 30-32, and 38-42. On remand, the Board found claims 27, 28, 30-32, and 38-42 patentable. Appx88. This appeal concerns remaining claims 1, 2, 4-6, 12, and 13.

Promptu asserted the '196 patent (among others) against Comcast in *Promptu Sys. Corp. v. Comcast Corp.*, No. 2:16-cv-06516 (E.D. Pa. 2017). In addition to IPR2018-00344 and IPR2018-00345, Comcast also challenged the patentability of the '196 patent in *Comcast Cable Commc'ns, LLC v. Promptu Sys.*, CBM2018-00033 (PTAB). The Board denied institution of that petition on October 10, 2018.

Counsel for Promptu are not aware of any other case that will directly affect or be directly affected by this appeal under Fed. Cir. R. 47.5.

## STATEMENT OF JURISDICTION

The Board issued its decision following remand in IPR2018-00344 on August 25, 2021. Appx1-90. The Board had subject matter jurisdiction over the underlying proceedings under 35 U.S.C. §§ 6, 318(a). Appellant Promptu timely filed its notice of appeal on October 27, 2021. ECF No. 1. This Court has jurisdiction under 28 U.S.C. § 1295(a)(4)(A) and 35 U.S.C. §§ 141(c), 319.

## I. PRELIMINARY STATEMENT

This appeal asks whether hindsight alone can render a patent obvious. In its decision on appeal, the Board found claims 1, 2, 4-6, 12, and 13 of the '196 patent unpatentable over a combination of three references. But according to the Board, the only reason a skilled artisan would have combined these references is because they "*could be*" combined. Appx34 (emphasis added). Indeed, the Board expressly rejected every reason offered for why an artisan "*would* have been motivated . . . to make the proposed invention." Appx36 (emphasis added). These findings dictate the outcome of this appeal. Obviousness requires "a motivation to pick out . . . references and combine them to arrive at the claimed invention"—it is "not enough" that "they *could be* combined." *Pers. Web Techs., LLC v. Apple, Inc.*, 848 F.3d 987, 993-94 (Fed. Cir. 2017). Because the Board relied on a legally deficient motivation to combine, its decision as to claims 1, 2, 4-6, 12, and 13 should be reversed.

The Board further erred by ignoring the only remaining sentinel guarding against hindsight: ample and unrebutted objective evidence of nonobviousness. This evidence established that the invention claimed in the '196 patent, though commonplace today, was a significant advance at the turn of the millennium. The Board nevertheless sidestepped this relevant evidence using three flawed techniques. First, the Board raised and decided issues the parties never briefed, depriving Promptu a chance to respond. Second, the Board mistook a factual

declarant as an expert and improperly disregarded his unrebutted testimony. And third, the Board adopted implicit constructions the parties never raised to exclude features expressly claimed. Avoiding the record to arrive at a preordained conclusion is not an objective analysis—it is hindsight. The Board's decision on claims 1, 2, 4-6, 12, and 13 should be reversed.

## II. STATEMENT OF THE ISSUES

1. The Board categorically rejected Comcast's arguments for why a skilled artisan would have been motivated to combine three references. Nevertheless, the Board found certain claims obvious based solely on what "could be" or "can be" done. Did the Board err by combining references based on what "could be" done when this Court has consistently held this rationale "not enough" to support an obviousness finding? *Personal Web*, 848 F.3d at 993-94.

2. Unrebutted factual testimony established that Promptu's commercial product embodied the claimed invention. The Board nevertheless denied Promptu a presumed nexus on secondary considerations by deciding issues the parties never raised and mistaking a factual declarant as a foundationless expert. Did the Board err in its nexus analysis by raising, addressing, and deciding issues the parties never briefed and ignoring undisputed factual testimony?

3. Claim 1 of the '196 patent processes speech content within a network that supports cable television "and" video delivery. In its secondary considerations

analysis, the Board implicitly construed the claims to require neither (1) speech recognition technology nor (2) cable television. Did the Board err by ignoring evidence under implicit constructions that are inconsistent with the plain claim language, the specification, the parties' experts, basic grammar, and this Court's understanding of the patent?

# III. STATEMENT OF THE CASE

## A. The Parties

### 1. Promptu

In the early 2000s, Promptu[1] pioneered the field of speech recognition for cable television networks with a product called AgileTV. Appx763. This revolutionary system allowed users to search and retrieve video content over a cable network simply by speaking into their remotes:




[1] AgileTV changed its name to Promptu in 2006. Appx5223 ¶ 3. AgileTV was born out of Stanford Research Institute. *See* William F. Woo, *Paul Cook: Happiest when he's hard at work* (May 9, 2001), https://www.paloaltoonline.com/weekly/morgue/2001/2001_05_09.cook09.html (last accessed March 15, 2022).




Appx763 (citing Appx5117). At the time, nothing like AgileTV existed on the market. *E.g.*, Appx5415 (describing Promptu as "the first company to bring voice-activated remotes and program guide to market"); Appx5225 ¶ 8. While similar solutions are ubiquitous today, AgileTV remains the first product to ever use voice-enabled remotes to control the delivery of video content over a cable network. Appx5415; Appx5225 ¶ 8.

The AgileTV system included a microphone-equipped remote for receiving voice commands and sending speech data to a cable set-top box (STB). Appx5226 ¶¶ 9-10, 15. The cable television network connects STBs from various users via a back channel. *Id.* The system processed users' voice commands, fetched the relevant content, and returned it to the users' STBs. *Id.*

AgileTV quickly garnered industry praise. In 2005, it won the "Most Innovative Solution Award" from Speech Technology Magazine. *See* Appx4957. The Buckingham Research Group similarly touted Promptu's solution as intuitive

and efficient, promoting its ability to retrieve programming "far more quickly than the more conventional interface." Appx4991. And in 2004, Promptu's former CEO (Paul Cook) and current CTO (Harry Printz) were invited to CNBC's Kudlow and Cramer show to discuss the product to much fanfare.[2] Appx5231 ¶ 23.

### 2. Comcast

The success of AgileTV caught the attention of Comcast, who in 2003 asked Promptu to deploy AgileTV in portions of Comcast's television network. Appx5229 ¶ 19. Comcast licensed and installed the technology soon thereafter in hundreds of households. *See* Appx5233-5235 ¶¶ 27-32; Appx5006; Appx5084. The licenses included rights under the patent application that eventually matured into the '196 patent of this appeal (among others). Appx5083 (licensing U.S. Application No. 09/785,375 as "AGLE0001"); Appx97 (confirming the '196 patent issued from U.S. Application No. 09/785,375); *see also* Appx5013 ("Initial License Rights"); Appx5047-5048 (defining "AgileTV Patents").

---

[2] Both show hosts tested the product themselves and praised it on live television. Appx4979 ("JIM CRAMER, co-host: Right. I worked it earlier in the studio. KUDLOW: I know. It absolutely works. CRAMER: And I was able to actually speak into the darn thing and call up whatever the heck I wanted."); Appx4982 ("CRAMER: Isn't that great? KUDLOW: It's unbelievable. It's unbelievable."). Comcast criticized the product for allegedly not being online during the live broadcast (Appx885), apparently unaware that the hosts had already tested it. *See also* Appx3538-3542 at 96:9-99:25 (describing subsequent changes to the AgileTV voice remote to overcome IR interference caused by plasma TVs).

Following a successful launch, Comcast's executives praised AgileTV, declaring they "could fall in love with this" and that "[e]verybody loves this toy." Appx4965; Appx5229 ¶ 19. To Comcast, Promptu "ha[d] more knowledge than anyone else" in the field of voice recognition over cable. Appx5220.

Despite the parties' early collaboration, however, Comcast shelved these efforts and refused to further license Promptu's award-winning technology. And in 2015—almost a decade after field-testing AgileTV—Comcast released a strikingly-similar voice recognition tool as part of its X1 System. Appx5117.

Promptu soon filed suit against Comcast, alleging infringement of the '196 patent and others. *See Promptu Sys. v. Comcast Corp.*, No. 2:16-cv-06516 (E.D. Pa.). Exactly one year later, Comcast challenged the validity of the asserted patents in a series of post-grant proceedings at the Patent Office. *See* Appx2; Appx4. This appeal follows one of the IPR proceedings involving the '196 patent. Appx1.

**B. Technological Background**

By 2000, the amount of media content available to cable subscribers had been rapidly accelerating. *See* Appx5224-5225 ¶ 6. As these libraries grew, navigating and retrieving desired content among a sea of options became a cumbersome process. *Id.* Most existing tools required excessive use of remote controls to drive on-screen menus. *Id.*; *see also* Appx4991 (explaining how "conventional interface[s] . . . often involve[] hitting several keys on the remote"). Other tools

required clunky setups involving telephone calls to the cable company. Appx5225 ¶ 7. Neither approach proved satisfactory to customers. Appx5224-5225 ¶¶ 6-7.

Complicating these issues was the dearth of network bandwidth. Due to the comparably meager bandwidth available to cable companies in the early 2000s, many networks prioritized downstream transmissions running to customers so subscribers could receive content efficiently. Appx135-136 at 2:60-3:3. Upstream (e.g., back channel) bandwidth running back to the cable company proved much more restrictive. *Id.* This asymmetry frustrated centralized efforts to solve the content problem, especially those with higher processing demands serving thousands of users at each network node. *See* Appx135 at 1:63-2:3; *see also* Appx136 at 3:4-20, 3:33-41.

### C. The '196 Patent

#### 1. The Specification

The '196 patent addresses these concerns with systems for conducting speech recognition over a cable television network. *See* Appx97 at Abstract; Appx135 at 1:27-29. These techniques use speech analysis to help users locate and receive cable content more efficiently than existing methods. *E.g.*, Appx137 at 5:3-10. Rather than implement speech processing at each user's site, the '196 patent uses a centralized speech recognition engine overcoming the bandwidth issues of the past. *E.g.*, *id.*; Appx142 at 15:1-15; Appx143 at 17:35-54, 18:44-54.

In one embodiment, the system partitions an upstream "back channel" into multiple speech channels from various user sites in a cable network. *E.g.*, Appx145 at 22:8-15; Appx146 at 23:1-7. These speech channels carry the speech information from multiple users. *E.g.*, Appx147 at 25:58-64; Appx149 at 30:4-9. The system processes this information by conducting speech recognition at or near a network wireline node. *See* Appx145 at 22:29-35; *see also* Appx97 at Abstract; Appx135 at 1:27-29.

The system analyzes the spoken information to form speech content. *E.g.*, Appx145 at 22:29-35. Speech content generally reflects the output of a speech recognition process applied to a speech sample. *See, e.g.*, Appx142 at 15:16-24; Appx143 at 18:31-34. The system then generates a "speech content response" for responding to the commands received from each user site. Appx146 at 23:18-26, 24:3-11. These responses can include several types of information, such as content or menu responses. *E.g.*, Appx143 at 18:31-33; Appx147 at 25:19-21.

The speech recognition system can reside in several places within the network. Appx137 at 5:11-17. For example, it may be "centrally located in or near" a "wireline node," "a server farm[,] a web-site hosting facility[,] or a network gateway." *Id.* This Court has recognized how the '196 patent's speech recognition system may exist in several places within the cable network. *See Comcast Cable Commc'ns v. Promptu Sys.*, 838 F. App'x 551, 553 (Fed. Cir. 2021).

### 2. The Claims

The claims embody the above concepts. For example, independent claim 1 recites a "back channel" containing "speech channels from a multiplicity of user sites" that are "presented to a speech processing system at a wireline node." Appx159 at 50:62-67. The node resides in a network supporting "at least one of cable television delivery and video delivery." *Id.* The claim "partition[s]" the back channel into a multiplicity of speech channels, "process[es]" the speech channels to create "speech content," and "respond[s]" to the content with a unique "speech content response." Appx160 at 51:1-10.

## D. Procedural History

### 1. Comcast's Petition

Comcast's IPR2018-00344 petition challenged claims 1, 2, 4-6, 12, 13, 27, 28, 30-32, and 38-42 of the '196 patent as obvious over various combinations of Murdock or Julia with Nazarathy, Quigley, Banker, and/or Gordon. Appx514-515. There, Comcast provided a cursory, three-paragraph argument why a skilled artisan would have combined Nazarathy and Quigley with Julia. Appx571-572. The first two merely stated that the references fell within the same field and that combining them was physically possible. *Id.* (arguing that Julia "could be" implemented with aspects of Nazarathy or Quigley); *see also* Appx3193-3195 ¶ 443 (using the phrase "can be" six times to justify combining Julia with Nazarathy or Quigley). Comcast

also urged that a skilled artisan would have known how Julia would "reap the benefits" and "improve the user interface" of Nazarathy and Quigley, but it did not explain these statements or link them to the challenged claims. Appx572.

#### 2. The Board's Institution Decision

The Board instituted trial over Promptu's preliminary response. *See* Appx647-692; Appx604-643. In its decision, however, the Board ruled that Comcast had not proven Murdock's status as prior art. Appx670-673. The Board explained how Comcast could not establish Murdock's priority date by improperly incorporating over 170 paragraphs of an expert's declaration into just two sentences in the petition. Appx672. In the Board's view, this approach violated the rule prohibiting incorporation by reference, 37 C.F.R. § 42.6(a)(3). Appx672.

#### 3. Promptu's Patent Owner Response

Promptu submitted a patent owner response supported in part by the expert testimony of Mr. John Tinsman and the factual testimony of Dr. David Chaiken. *See* Appx759-805; Appx5222-5236; Appx5237-5266.

Promptu first explained how claim 1's "back channel" and "received back channel" reflected distinct elements. *E.g.*, Appx777. Because Comcast had mapped these limitations to the same feature of the prior art, Promptu urged, Comcast's petitions failed as a matter of law. *Id.*

Promptu also attacked Comcast's motivation to combine Julia, Nazarathy, and Quigley. *See* Appx783-785. Promptu explained how Comcast inadequately supported its unexplained theory that Julia would "reap the benefits" or improve Nazarathy or Quigley. Appx784. Comcast's remaining arguments amounted to the legally insufficient assertion that "a POSITA *could have* combined" the references. Appx785.

Finally, Promptu adduced significant evidence on objective indicia of nonobviousness. *See* Appx790-803. This evidence took various forms, including:

- factual declarations from Dr. Chaiken (Appx5222-5236) and Mr. Cook (Appx5418-5422);
- AgileTV documentation (*e.g.*, Appx4810-4870; Appx4903-4949; Appx4950-4955; Appx5126-5189);
- market research (*e.g.*, Appx4959-4964);
- awards (*e.g.*, Appx4957-4958);
- praise from CNBC personalities (*e.g.*, Appx4978; Appx4979-4984);
- contemporaneous communications (*e.g.*, Appx4965; Appx4969; Appx4970);
- license agreements between Promptu and Comcast (*e.g.*, Appx5006-5111),
- articles (*e.g.*, Appx5414-5416; Appx5112-5115; Appx5003-5005);
- and more (*see generally* Appx790-803).

Promptu's evidence established several facts. First, Promptu showed how it was entitled to a presumed nexus between the claimed invention and evidence on AgileTV. *E.g.*, Appx792-795. To support this contention, Promptu relied in part on

the testimony of Dr. Chaiken, Promptu's former Chief Technology Officer. Appx5223 ¶¶ 2-3. Dr. Chaiken pioneered much of the creation, development, and implementation of Promptu's speech recognition systems within cable networks. Appx5224 ¶ 5. He was also intimately familiar with the AgileTV product. Dr. Chaiken personally installed AgileTV in at least four cable television networks—including Comcast's. Appx5226-5230 ¶¶ 11, 19-21.

Dr. Chaiken testified how AgileTV embodied the invention described and claimed in the '196 patent. *See, e.g.*, Appx5227-5228 ¶¶ 14-16. He explained how, like the '196 patent, the AgileTV system partitioned a back channel into multiple speech channels, processed those channels to create speech content, and responded accordingly. *Id.* For example, the system would receive voice commands such as "Find CNN" or "Find ESPN," fetch the relevant content, and provide it to the appropriate users. *Id.* Other evidence corroborated his testimony. *E.g.*, Appx4810-4870; Appx4903-4949; Appx4950-4955.

Second, the evidence established how the claimed invention was nonobvious. Appx795-803. Promptu showed how the cable industry suffered from a long-felt need for centralized speech recognition systems. *See* Appx795-796 (citing, *e.g.*, Appx5224-5227 ¶¶ 6-12; Appx4800-4803; Appx4806; Appx5414-5416). The industry—and even Comcast itself—had widely praised Promptu's solution. *See* Appx797-799 (citing, *e.g.*, Appx5228-5232 ¶¶ 18-25; Appx4957-4958; Appx4974-

4984; Appx4991; Appx4964-4971). AgileTV had also been commercially successful, raising over $35 million in funding. Appx799-800 (citing, *e.g.*, Appx5232 ¶ 26; Appx4843; Appx4806; Appx5003-5005). In fact, Comcast itself had licensed the ’196 patent (among others) to deploy AgileTV within its cable network. Appx800-801 (citing, *e.g.*, Appx5233-5235 ¶¶ 27-32; Appx5006-5193).

#### 4. The Parties’ Reply and Sur-Reply

##### a. Comcast’s Reply

In reply, Comcast tried to salvage its Murdock grounds by reincorporating the improper material into its paper. Appx864-870. It also challenged the ’196 patent’s priority date for the first time despite never having done so before. Appx864-865.

On claim construction, Comcast disputed whether the claimed “back channel” and “received back channel” were distinct. Appx870-872. As for its motivation to combine, Comcast repeated the same arguments from its petition. Appx875-876 (stating that Julia “could be implemented” with the features of Nazarathy and Quigley). Finally, Comcast challenged the nexus between the objective indicia evidence and AgileTV with attorney argument alone. Appx880-887. And besides writing off Dr. Chaiken’s testimony in a footnote (Appx881 n.4), Comcast never disputed the substance of his testimony (Appx880-887).

#### b. Promptu's Sur-Reply

Promptu's sur-reply made the same claim construction arguments as the patent owner response. Appx939-942. Promptu also criticized Comcast for relying on new arguments in its reply to support Murdock's prior art status. Appx943-946.

Promptu then turned to secondary considerations. Appx949-956. There, Promptu described how Comcast had not tried to rebut the presumption of a nexus. Appx949-951. Promptu also discussed how Comcast's remaining arguments were unsupported, speculative, or misstated the record. *See, e.g.*, Appx952 (rebutting Comcast's argument that Promptu did not write code for AgileTV), Appx952-953 (discussing technical features of plasma TVs Comcast ignored), Appx953-956 (discussing Promptu's funding, the parties' license, and industry need).

### 5. The Board's Final Written Decisions

The Board agreed with Promptu. The Board first held that the claimed "back channel" and "received back channel" from claims 1 and 27 were separate elements. Appx1474-1478. Because Comcast had mapped these features to the same elements in the references, the Board found claims 1, 2, 4-6, 12, 13, 27, 28, 30-32, and 38-42 patentable. Appx1486. The Board saw no reason to address secondary considerations or Comcast's late arguments on Murdock, though it reaffirmed Comcast's petition violated 37 C.F.R. § 42.6(a)(3). Appx1479-1483.

### 6. Appeal to the Federal Circuit

This Court affirmed-in-part and vacated-in-part in a consolidated appeal.[3] *See Comcast*, 838 F. App'x 551. The Court ruled that the claimed "back channel" and "received back channel" did not necessarily refer to distinct elements. *Id.* at 554. Under the broadest reasonable construction,[4] the claimed "received back channel" could refer to the same "back channel" once it had been received. *Id.* Accordingly, the Court vacated the Board's decision as to claims 1, 2, 4-6, 12, 13, 27, 28, 30-32, and 38-42. *Id.*

### 7. The Parties' Remand Arguments

On remand, Comcast reurged the Julia combinations rendered the claims unpatentable under the Federal Circuit's construction. Appx1560-1562. Comcast also urged the Board to reconsider its treatment of Murdock. Appx1562-1563.

Promptu argued that the claims were patentable. Appx1543-1556; Appx1582-1594. For claims 27, 28, 30-32, and 38-42, Promptu relied on this Court's construction of "coupled to" from the prior appeal and explained how the claims were patentable for the same reasons. *See* Appx1545-1554. With respect to claim 1, Promptu repeated its contention that Murdock was not prior art. Appx1589-

---

[3] The Court's opinion affirmed the patentability of claims 14, 15, 17-19, 25, 26, 53-55, 61, 62, and 64-66 of the '196 patent from IPR2018-00345. Those claims are not the subject of this appeal.

[4] Then-applicable Board rules required construing claims under the broadest reasonable interpretation standard. *See* 37 C.F.R. § 42.100(b) (2017).

1590. And as for Julia, Promptu maintained that Comcast had relied on a facially insufficient motivation to combine. Appx1585-1589. Promptu also reraised the issue of secondary considerations. Appx1592-1593.

#### 8. The Board's Remand Decision

The Board's remand decision split the parties' positions. Adopting the Federal Circuit's construction of "coupled to," the Board held the claimed "speech recognition system" and "wireline node" of claim 27 reflected different components. Appx14-16. Because Comcast had mapped these elements to the same item in the cited references, the Board found claims 27, 28, 30-32, and 38-42 patentable. Appx63-66.

The Board also agreed with Promptu that Comcast had not established Murdock's prior art date. Appx66-78. The Board rejected Comcast's late attempt to challenge the '196 patent's priority (Appx70-75) as well as Comcast's late reliance on Murdock's provisional filing date (Appx76-78). On the latter point, the Board emphasized how "no reasonable application" of IPR rules permitted Comcast to incorporate by reference "over 170 paragraphs" of argument into its petition. *Id.*

As for claim 1, however, the Board found the claim unpatentable over the Julia combinations. Appx24-49. On the motivation to combine issue, the Board agreed with Promptu that Comcast had not shown why a skilled artisan "would" have combined the references. Appx36. Its denial was unequivocal. According to

the Board, skilled artisans would not have appreciated how Julia "*would* reap the benefits" or "*would* improve the user interface" of Nazarathy or Quigley. *Id.* (emphases added). On this record, the Board was "not persuaded that these benefits would have motivated an ordinary artisan to make the proposed combination." *Id.*

Nevertheless, the Board found a motivation to combine the references on the mere idea that they "could be" combined. Appx34 (stating that a skilled artisan would have known that multiplexing and then demultiplexing "*could be used*" to partition data). Since these methods "could be used" to arrive at the claimed invention, the Board reasoned, it would have been "logical" for a skilled artisan to know that Nazarathy and Quigley "can be used" within Julia. *Id.* (citing Appx3193-3195 ¶ 443 (using the phrase "can be" six times to justify the combination)); *see also* Appx30 (Board stating that a skilled artisan would have known that Julia "could be implemented" with the features of Nazarathy or Quigley).

The Board also rejected Promptu's secondary consideration evidence. It first denied Promptu a presumption of a nexus by adjudicating theories the parties never briefed. Appx41-42. In particular, the Board found that AgileTV contained "important, unclaimed features" despite no party squarely making this argument at trial. *Id.*

The Board then summarily disregarded "Mr." [sic] Chaiken's testimony on the functionality of AgileTV. Appx40-41. Confusing Dr. Chaiken as an expert—

not a fact witness—the Board found that he had failed to "disclose the underlying facts" about his "opinion." *Id.* The Board branded his unrebutted testimony as "conclusory" and ignored it. *Id.*; *see also* Appx49 (giving "no weight" to Promptu's evidence of nonobviousness); Appx38 (same).

The Board dispensed with the remainder of Promptu's evidence in an odd sequence of conclusions. First, the Board disregarded Promptu's objective evidence on cable networks because the claims, according to the Board, did not require cable. Appx43-44. The Board tried to support this contention by construing—for the first time—the claim phrase "at least one of cable television delivery and video delivery" to not require cable. *Id.* No party had ever made this argument. *See* Appx43 (citing no briefing). Second, the Board construed claim 1 to find that it did not require speech recognition technology. Appx45-46. In making this judgment, the Board never referenced the "speech content" processed from "speech channels" recited in the claims. Appx159-160 at 50:62-10. The Board also found Comcast's licensing of the '196 patent inconsequential because the license included other patents. Appx47. It then found Promptu's $35 million in funding unpersuasive because Promptu did not introduce market share evidence. Appx46 n.16.

In sum, the Board afforded "no weight" whatsoever to Promptu's secondary consideration evidence. Appx49-50. It thus found claims 1, 2, 4-6, 12, and 13 unpatentable. Appx88. Promptu timely appealed. Appx1692-1696.

## IV. SUMMARY OF THE ARGUMENT

The Court should reverse the Board's obviousness holding as to claims 1, 2, 4-6, 12, and 13 of the '196 patent. First, the Board found the claims obvious using a legally deficient motivation to combine. The only rationale the Board provided for combining the references was that they "could be" or "can be" combined. This Court has ruled such a rationale insufficient to support an obviousness determination. The Board then compounded its error by justifying the combination on the conclusory notion that doing so would be "logical." The law has long rejected such superficial reasons for combining references.

Second, the Board improperly ignored Promptu's secondary consideration evidence. The Board erred in several ways. For one, the Board improperly denied Promptu a presumption of a nexus by raising, addressing, and deciding issues the parties never briefed. It did so for the first time in its final written decision, depriving Promptu notice of the arguments against it and a meaningful chance to respond. The Board erred a second time when it mistook a factual declarant as an expert and summarily ignored his unrebutted testimony.

Third, the Board improperly disregarded Promptu's direct objective indicia evidence using faulty claim constructions. The Board first misconstrued "at least one of cable television delivery *and* video delivery" to exclude cable television content. This construction runs afoul of longstanding precedent from this Circuit.

Next, the Board misconstrued claims involving "processing . . . speech channels" into "speech content" to exclude speech recognition technology. Such a construction vitiates the plain meaning of the claim language, the '196 patent's specification, and all other evidence.

Due to the Board's flawed motivation to combine and improper treatment of secondary consideration evidence, this Court should reverse the Board's decision as to claims 1, 2, 4-6, 12, and 13. In the alternative, the Court should vacate the Board's decision and remand the case for further proceedings.

## V. ARGUMENT

### A. Standard of Review

This Court reviews the Board's legal determinations de novo and its factual findings for substantial evidence. *Chemours Co. v. Daikin Indus.*, 4 F.4th 1370, 1374 (Fed. Cir. 2021). Substantial evidence is more than a "mere scintilla" such that a reasonable mind would accept the evidence as adequate to support the conclusion. *Id.* Substantial evidence requires examining the record as whole, including the evidence detracting from the agency's decision. *TQ Delta, LLC v. Cisco Sys.*, 942 F.3d 1352, 1358 (Fed. Cir. 2019). Neither speculation nor conclusory expert testimony is substantial evidence. *Id.* at 1358-59 (collecting cases); *Intellectual Ventures I LLC v. Motorola Mobility LLC*, 870 F.3d 1320, 1331 (Fed. Cir. 2017).

Obviousness is a question of law with underlying issues of fact. *TQ Delta*, 942 F.3d at 1357. Those factual questions include (1) whether a skilled artisan would have been motivated to combine the references to achieve the claimed invention and (2) secondary considerations of nonobviousness. *See id.*; *Graham v. John Deere Co.*, 383 U.S. 1, 17 (1966).

This Court reviews Board decisions under the Administrative Procedure Act (APA). *E.g.*, *Personal Web*, 848 F.3d at 992. Under this framework, Board decisions cannot be "arbitrary, capricious, an abuse of discretion, otherwise not in accordance with law, or unsupported by substantial evidence." *Id.* (quoting 5 U.S.C. § 706(A), (E)) (alterations omitted). The Board falls short of this standard when it does not articulate the reasons and logic for its conclusions. *Id.* at 992-93.

### B. The Board improperly relied on a legally deficient motivation to combine based on what "could" have been done, not what "would" have been obvious to do

#### 1. The Board's only articulated reason for combining Julia with Nazarathy and Quigley relies on sheer physical possibility

The Board erred by resting its obviousness conclusion on a legally deficient motivation to combine. In finding claims 1, 2, 4-6, 12, and 13 of the '196 patent obvious, the Board found only that Nazarathy, Quigley, and Julia "could be" combined—not that it "would" have been obvious to do so. Appx34. Because such motivations cannot support an obviousness finding, the Board's decision as to these claims should be reversed.

"An obviousness determination requires finding that a [skilled artisan] would have been motivated to combine or modify" the references to arrive at the claimed solution. *E.g.*, *Endo Pharm. Inc. v. Actavis LLC*, 922 F.3d 1365, 1373 (Fed. Cir. 2019) (quoting *Regents of Univ. of Cal. v. Broad Inst., Inc.*, 903 F.3d 1286, 1291 (Fed. Cir. 2018)). In identifying this motivation, it is "not enough" that "a skilled artisan, once presented with [those] references, would have understood that they *could* be combined." *Personal Web*, 848 F.3d at 993-94. This rationale amounts to impermissible hindsight. *InTouch Techs., Inc. v. VGO Commc'ns, Inc.*, 751 F.3d 1327, 1352 (Fed. Cir. 2014) (rejecting as "hindsight bias" the argument that skilled artisans "*could* combine the[] references"). Rather, there must be "a motivation to pick out those two references and combine them to arrive at the claimed solution." *Personal Web*, 848 F.3d at 993-94; *see also WBIP, LLC v. Kohler Co.*, 829 F.3d 1317, 1337 (Fed. Cir. 2016) (asking "whether [a skilled artisan] would select particular references in order to combine their elements").

Here, the Board relied on hindsight to find a motivation to combine Nazarathy and Quigley with Julia. Beyond restating legal tests, the Board never identified an articulable motivation for why a skilled artisan "would have" combined these references. Appx33-34. Instead, the Board found only that they "can be" or "could be" combined. *Id.* As this Court has made clear, that rationale is "not enough" to

support an obviousness finding. *Personal Web*, 848 F.3d at 993-94; *see also InTouch*, 751 F.3d at 1352.

The Board's word choice was no accident—it used the words "can be" or "could be" consistently throughout its analysis. It used them to describe Comcast's obviousness argument. Appx30 (framing Comcast's argument as how Julia "could be implemented" with features from Nazarathy and Quigley); Appx572. It used them when quoting Comcast's expert. Appx34 (stating that Nazarathy and Quigley "can be used" with Julia). The expert himself used these phrases *six times* in a single paragraph to describe his rationale for combining the references. Appx3193-3195 ¶ 443 (justifying the combination with the phrase "can be" six times). And the Board used them again to describe its motivation for arriving at the claimed combination. *See* Appx34 (stating how skilled artisans would have known that multiplexing and demultiplexing "could be used" to partition data).

None of these passages articulates a reason why a skilled artisan "would" have combined the references to arrive at the claimed solution. They do not explain why skilled artisans "would have plucked [these] reference[s] out of the sea of prior art" in the manner claimed. *WBIP*, 829 F.3d at 1337. They merely posit that a skilled artisan, already having the references and using the patent as a roadmap, would have understood that combining them is physically possible. This is not enough. *E.g.*, *Personal Web*, 848 F.3d at 993-94; *InTouch*, 751 F.3d at 1351; *see also Ecolochem,*

*Inc. v. S. Cal. Edison Co.*, 227 F.3d 1361, 1372 (Fed. Cir. 2000) ("Broad conclusory statements regarding the teaching of multiple references, standing alone, are not 'evidence.'").

Indeed, when the Board confronted Comcast's arguments for why a skilled artisan "would" have combined the references, it categorically rejected them. Appx36; Appx572. The Board dismissed Comcast's contention that a skilled artisan would know how Julia's system "*would* reap the benefits" of Nazarathy and Quigley. Appx36 (emphasis added). The Board similarly rejected Comcast's insistence that Nazarathy and Quigley "*would* improve" Julia's user interface. *Id.* (emphasis added). In the Board's view, none of these rationales "*would* have motivated an ordinary artisan to make the proposed invention." *Id.* (emphasis added).

That conclusion should have ended the Board's analysis. Without a proper motivation to combine the references, Comcast's hindsight-driven obviousness case fails. Appx571-572. The Board erred by accepting it. Accordingly, the Board's obviousness decision as to claims 1, 2, 4-6, 12, and 13 should be reversed. *See, e.g.*, *TQ Delta*, 942 F.3d at 1357 (reversing an obviousness determination when a motivation to combine rested on conclusory expert testimony); *In re Rouffet*, 149 F.3d 1350, 1357-58 (Fed. Cir. 1998) (reversing an obviousness finding failing to supply a proper motivation to combine).

### 2. The Board further erred by justifying the combination of references with aspirational platitudes

The Board compounded its error by justifying its combination of references with vague truisms. In both instances where the Board found that the references "could be" combined, it did so simply because Comcast's combination was "logical." Appx34-35.

This Court has long forbade such trite maxims as supporting a motivation to combine. In *In re Van Os*, for example, this Court rejected a combination that the Board found merely "intuitive" or "common sense." 844 F.3d 1359, 1361 (Fed. Cir. 2017). Similarly, in *In re Nuvasive, Inc.*, the Court refused the vague rationale that a combination would have provided "additional information." 842 F.3d 1376, 1382 (Fed. Cir. 2016). And in *In re Lee*, the Court found insufficient a motivation to combine based on "common sense." 277 F.3d 1338, 1344-45 (Fed. Cir. 2002).

Labeling a combination "logical," as the Board did here, succumbs to the same hindsight plaguing those cases. It does not reflect the "thorough and searching" delve into the record required to support motivations to combine. *Nuvasive*, 842 F.3d at 1381-82. Nor does it describe a tenable reason why a skilled artisan would have "pick[ed] out" those references and combined them without *a priori* knowledge of the patent. *Personal Web*, 848 F.3d at 993-94. Rather, it is "no different than merely stating the combination 'would have been obvious, [a] conclusory assertion

with no explanation [that] is insufficient to support a . . . motivation to combine." *Van Os*, 844 F.3d at 1361.

To be sure, the Board also mentioned that it accepted Comcast's combination because it did not find "persuasive evidence to the contrary." Appx34-35. But this remark flips the governing burden on its head. As the Petitioner, it was Comcast's burden to establish the unpatentability of each challenged claim. *In re Magnum Oil Tools Int'l*, 829 F.3d 1364, 1375 (Fed. Cir. 2016) (quoting *Dynamic Drinkware LLC v. Nat'l Graphics, Inc.*, 800 F.3d 1375, 1378 (Fed. Cir. 2015)). This burden "never shifts to the patentee." *Id.* The Board thus cannot immunize a combination of references by marking it "logical" and requiring evidence to refute it.[5] Indeed, the Board rejected Comcast's actual purported motivations as factually unsupported—irrespective of how "logical" they may have been. *See* Appx36.

Nor can the Board defend its "logical" combination by stating that it was consistent with the record. Appx34-35. That was never the question. The obviousness inquiry is not whether Comcast's expert contradicted the record (*id.*)—it is whether the record provides "a motivation to pick out those [] references and

[5] Promptu provided evidence, argument, and case law disputing the combination of Nazarathy, Quigley, and Julia. Appx783-785; Appx5263-5264 ¶¶ 48-52. Promptu focused its attention on Comcast's positions on why a skilled artisan "would" have allegedly combined the references. Appx784. The Board agreed with Promptu and rejected Comcast's proposals. Appx36. Promptu went on to explain, as it has on appeal, that Comcast's remaining arguments amounted only to the irrelevant proposition that "a POSITA *could have* combined" the references. Appx785.

combine them to arrive at the claimed solution." *Personal Web*, 848 F.3d at 993-94; *WBIP*, 829 F.3d at 1337. And for the reasons discussed above, the record does not supply that motivation. *See* Section V.B.1, *supra*.

Finally, it is not enough to note, as the Board did, that multiplexing existed generally. *See id.* (citing Appx136 at 3:44-52). All inventions rest to some degree on known elements. *Personal Web*, 848 F.3d at 991-92 (quoting *KSR Int'l v. Teleflex Inc.*, 550 U.S. 398, 418-19 (2007)). Here, the '196 patent did not purport to invent the concept of multiplexing. Instead, it invented a new way of delivering cable and video content using a remote speech recognition system, a back channel, wireline nodes and partitioned speech channels within the back channel. *See* Appx159-160 at claim 1. None of the asserted references teaches or suggests this solution, and nothing in the record supplies a valid motivation to pick the selected references from a sea of choices to arrive at the claimed invention.[6] *See Personal Web*, 848 F.3d at 993-94; *WBIP*, 829 F.3d at 1337.

That articulable motivation is absent in the Board's decision. Without it, Comcast's obviousness theory cannot prevail. The Board itself acknowledged as much. Appx36 ("[W]e are not persuaded that these benefits would have motivated

[6] In fact, Promptu was the first to make such a combination in an actual product and received significant praise and recognition for doing so. *See* Section V.C, *infra*.

an ordinary artisan to make the proposed combination.”). The Board’s obviousness determination should be reversed.

### C. The Board improperly disregarded Promptu’s secondary consideration evidence

In addition to its flawed motivation to combine, the Board further erred by disregarding Promptu’s secondary consideration evidence. At trial, Promptu adduced significant evidence on objective indicia of nonobviousness. *See* Section III, *supra*. This evidence established that Promptu’s AgileTV product embodied the claimed invention, garnered success and praise, and formed the basis for a license Comcast executed with Promptu to avoid infringing the ’196 patent. *Id.* Despite this overwhelming evidence, however, the Board improperly gave it “no weight” for allegedly having no nexus to the claimed invention. Appx38.

The Board’s error took two forms. First, it inappropriately raised and decided theories the parties never briefed. Second, the Board hinged its analysis on unexpressed and incorrect claim constructions. Either error alone warrants reversal or, at a minimum, vacatur.

#### 1. Promptu established a proper nexus both by presumption and direct evidence

An obviousness analysis must consider the so-called “objective indicia” or “secondary considerations” of nonobviousness when such evidence exists. *E.g.*, *Apple, Inc. v. Samsung Elecs. Co.*, 839 F.3d 1034, 1048 (Fed. Cir. 2016) (en banc).

This evidence serves as a bulwark against hindsight, often serving as "the most probative and cogent evidence in the record." *WBIP*, 829 F.3d at 1328. To bear on the obviousness question, the evidence must have a "nexus" to the claimed invention. *Chemours*, 4 F.4th at 1378. Courts presume a nexus when patentees tie the objective evidence to a product embodying the invention "disclosed and claimed in the patent." *Id.* (quoting *J.T. Eaton & Co. v. Atl. Paste & Glue Co.*, 106 F.3d 1563, 1571 (Fed. Cir. 1997)); *WBIP*, 829 F.3d at 1329 (same). Patentees may also show a nexus directly by linking the evidence to the merits of the claimed invention. *See WBIP*, 829 F.3d 1332-37 (analyzing defined classes of objective indicia).

During trial, Promptu established a nexus under both approaches. It provided evidence relating to the AgileTV product and showed how AgileTV embodies the invention disclosed and claimed in the '196 patent. *See* Section III, *supra*; Appx791-801. This evidence established a long-felt need, industry praise, commercial success, and Comcast's licensing of the '196 patent. Appx795-801. Promptu also explained how the evidence bore directly on the claimed features. Appx793-801. Promptu was thus entitled to a nexus either through presumption, direct evidence, or both. *E.g.*, *WBIP*, 829 F.3d at 1331-37.

### 2. The Board erred in rejecting a presumed nexus by adjudicating unbriefed issues and ignoring undisputed facts

#### a. The Board improperly decided issues never briefed by the parties with conclusory findings

The Board's first error occurred when it denied Promptu a presumption of a nexus by deciding issues the parties never raised. Specifically, the Board found that AgileTV contained "important, unclaimed features" despite no party making this argument during trial. Appx41.

This conclusion suffers from two problems. First, the Board cannot "raise, address, and decide unpatentability theories" on its own accord. *Magnum Oil*, 829 F.3d at 1381. Nor can it "adopt arguments on behalf of petitioners that could have been, but were not, raised by the petitioner during an IPR." *Id.* By doing so, the Board robs parties of the requisite notice under the APA and a meaningful chance to respond. *See id.*; *see also In re IPR Licensing, Inc.*, 942 F.3d 1363, 1369 (Fed. Cir. 2019) (forbidding the Board from resting its decision "on arguments that a patent owner has no ability to rebut or anticipate").

That is precisely what happened here. Comcast never urged that AgileTV contained important, unclaimed features. *See* Appx880-888. Promptu thus had no reason to address the issue. *See* Appx948-956. Promptu even noted the lack of dispute on this point during oral argument. *See* Appx1425-1426 at 81:6-82:2 (explaining how Comcast never argued that AgileTV's success was "due to some

unclaimed feature”). Nevertheless, the Board raised, addressed, and decided the matter entirely on its own, based solely on “our [own] review of the evidence.” Appx41. It did so in surprise fashion after all argument had concluded, depriving Promptu of notice and an opportunity to respond. *Id.* The Board cannot spring a dispositive issue for the first time in a final written decision without adequate notice. *E.g.*, *Magnum Oil*, 829 F.3d at 1381. The Board’s ruling should be overturned. *Id.* (reversing the Board for deciding an issue not raised by the petitioner); *Dell Inc. v. Acceleron, LLC*, 818 F.3d 1293, 1300-01 (Fed. Cir. 2016) (vacating an invalidity finding based on an argument first raised at oral hearing).

Second, the Board did not explain the basis for its conclusion. Appx41-42. This omission is fatal. Under the APA, the Board must “articulate a satisfactory explanation for its action.” *Alacritech, Inc. v. Intel Corp.*, 966 F.3d 1367, 1372-73 (Fed. Cir. 2020) (quoting *Nuvasive*, 842 F.3d at 1382). These explanations are necessary for effective judicial review. *Personal Web*, 848 F.3d at 992-93. The Board fails this mandate when it does not explain the reasons for its conclusions. *Id.* at 993; *see also Alacritech*, 966 F.3d at 1371.

The Board did not explain its reasoning here. In its decision, the Board did not identify the “unclaimed features” AgileTV allegedly practiced. Appx41-42. Nor did the Board explain how it determined these unidentified features were “important.” *Id.* Instead, the Board merely cited authority and scattered portions of

the record without articulating a single "important, unclaimed feature" allegedly present in AgileTV. *Id.*

Such conclusory assertions fall short of the required clarity for Board decisions. *See Alacritech*, 966 F.3d at 1372; *Personal Web*, 848 F.3d at 992-93. Without specifying what "unclaimed features" AgileTV possessed—let alone explaining why those features were important—the Board left Promptu and this Court to simply speculate as to the Board's decision-making process. When the Board's path cannot be reasonably discerned, it has not abided by the APA. *E.g.*, *Alacritech*, 966 F.3d at 1370-71.

This ambiguity is especially pernicious here because the presence of unclaimed features does not automatically defeat a nexus. *E.g.*, *Quanergy Sys. v. Velodyne Lidar USA*, 24 F.4th 1406, 1418 (Fed. Cir. 2022); *Ecolochem*, 227 F.3d at 1377-78. Nor can mere speculation. *E.g.*, *WBIP*, 829 F.3d at 1329; *Demaco Corp. v. F. Von Langsdorff Licensing Ltd.*, 851 F.2d 1387, 1393 (Fed. Cir. 1988); *see also* Appx41-42 (Board speculating that AgileTV may have changed over time in unexplained ways). The Board therefore erred in denying Promptu a presumption of a nexus due to unidentified features of unexplained importance the parties never discussed.

**b. The Board erred by summarily disregarding unrebutted factual testimony**

The Board further erred by denying Promptu a presumed nexus when it summarily ignored unrebutted factual testimony. At trial, Promptu supplied testimony from Dr. Chaiken as to how AgileTV operated. Appx5222-5236. Comcast never contested the substance of this evidence. Appx880-887. The Board nevertheless disregarded it after confusing Dr. Chaiken as an expert (rather than a factual deponent) and branding his unrebutted testimony as "conclusory." Appx40. Neither explanation withstands scrutiny.

First, Dr. Chaiken's testimony was not conclusory. He explained in detail how AgileTV embodied the claimed invention. *E.g.*, Appx5227-5228 ¶¶ 14-16. He went so far as to provide examples:

> By 2003, the AgileTV system architecture partitioned a received back channel to a multiplicity of received identified speech channels, processed those to create a multiplicity of identified speech content, and responded to the multiplicity of identified speech content to create a unique identified speech content response for each identified speech content. For example, users could send different voice commands, such as "Find CNN" and "Find ESPN," upstream to the cable headend to request digital content. The user voice commands were multiplexed on a back channel received by the AgileTV voice processing system, which would partition the different voice commands from the back channel, process those commands to identify the users' respective requested content (e.g., CNN or ESPN), and respond with a unique response for each user with the appropriate requested content.

Appx5227-5228 ¶ 15; *see also* Appx792-794 (citing the same).

The Board oddly criticizes this evidence for mirroring the language of the claims too closely. Appx40. That critique is misguided. Secondary consideration evidence must "have a nexus to the *claimed invention*." *Chemours*, 4 F.4th at 1378 (emphasis added). Patentees may thus establish a nexus by showing how a product "is the invention *disclosed and claimed* in the patent." *Id.* (emphasis added) (quoting *J.T. Eaton*, 106 F.3d at 1571). Dr. Chaiken's testimony unequivocally confirms that AgileTV operated like the claimed invention. Appx5227-5228 ¶¶ 14-16; *see also* Appx159-160 at 50:62-51:10. That correspondence makes his testimony indispensable, not irrelevant, to the issue of secondary considerations.[7]

Indeed, the patent itself advertises the relationship between AgileTV and the claimed invention. The '196 patent was *specifically intended* to cover AgileTV. *See* Appx5227-5228 ¶¶ 14-16. The patent refers to "AgileTV" components and software throughout the specification. *See, e.g.*, Appx140 at 11:62-64 ("AgileTV™ Speech Processor"), 12:45-56 ("AgileTV™ Voice Processing Unit (AVPU)"); Appx143 at 17:58-62 ("AgileTV™ central office"), 18:1-3; Appx155 at 41:47-52; Appx158 at 48:12-13 ("AgileTV™ engines"), 48:46-49; Appx159 at 49:13-22 ("AgileTV™ modulator system"), 49:53-50:18, 50:38-41, 50:51-53; *see also* Appx792-793; Appx5226-5227 ¶ 12 (explaining how the "Agile engine" implemented speech

[7] Had Dr. Chaiken used different language than the claims, the Board might have rejected it as being insufficiently tied to the claimed invention. Since Comcast did not object to Dr. Chaiken's language, the Board should not have either.

recognition functions). It strains credulity for the Board to conclude that AgileTV bore no relation to the ’196 patent with such repeated invocations of the product’s name.

Comcast itself never seriously disputed whether AgileTV embodied the claims of the ’196 patent. *See* Appx956. Comcast did not provide one iota of evidence contradicting Dr. Chaiken’s testimony. Nor did Comcast ask him a single question about AgileTV’s back channel or partitioning functionality at his deposition. *See generally* Appx3443-3560 (no questions on “back channel” or “partition”). All it mustered was a footnote dismissing Dr. Chaiken out of hand. Appx881 n.4. This is no response at all. Had Comcast wanted to dispute Dr. Chaiken’s testimony, it needed to “present evidence”—not proceed “with argument alone.” *WBIP*, 829 F.3d at 1329; *see also Intellectual Ventures*, 870 F.3d at 1331 (explaining how “mere speculation or attorney argument” are not substantial evidence). Comcast chose not to do so.

Second, the Board simply misapprehended the nature of Dr. Chaiken’s testimony. The Board ignored him because he was seemingly an “expert” who did “not disclose the underlying facts or data on which [his] opinion is based.” Appx40-41. But Dr. Chaiken was not an expert. *E.g.*, Appx3559, 116:13-16. He was a fact witness. *E.g.*, Appx956; Appx5222-5235. His unrebutted testimony *is* the “underlying facts” of the case. As a former Vice President and CTO of Promptu,

Dr. Chaiken was personally involved with AgileTV's creation, development, and implementation. Appx5224 ¶ 5. Comcast never meaningfully disputed the substance of this testimony (*see supra*), and the Board did not contest his credibility (*see* Appx40-41). The Board thus had the "responsibility to ensure that unrebutted, legally significant evidence is not arbitrarily ignored." *Zavaleta-Policiano v. Sessions*, 873 F.3d 241, 248 (4th Cir. 2017) (finding it an abuse of discretion for an agency to disregard unrebutted factual testimony); *see also Holmwood v. Sugavanam*, 948 F.2d 1236, 1240 (Fed. Cir. 1991) (reversing the Board when it ignored "reliable, unrebutted evidence" as to how a product operated); *Quanery*, 24 F.4th at 1418 (presuming a nexus based on undisputed testimony). The Board failed this charge.

Accordingly, Promptu was entitled to a presumption of a nexus. The evidence attributable to AgileTV should have been presumed to have a nexus to the claimed invention. *WBIP*, 829 F.3d at 1330. The Board's decision should be reversed.

**3. The Board improperly discounted Promptu's direct secondary consideration evidence by relying on incorrect claim constructions and other legal errors**

The Board's final error occurred when it dispensed with Promptu's direct evidence on secondary considerations under faulty claim constructions and other legal errors. The Board used these errors to exclude certain evidence from the scope of the claims and treat other evidence as irrelevant. Appx42-49. Under the proper

constructions and legal tests, however, the evidence bears squarely on the claimed invention. The Board erred in discarding it.

**a. The Board improperly construed "at least one of cable television delivery and video delivery" disjunctively to exclude cable television content**

Claim 1 of the '196 patent recites "a network supporting at least one of cable television delivery *and* video delivery." Appx159 at 50:62-67 (emphasis added). Despite the presence of the word *and*, the Board construed this phrase disjunctively to cover either cable delivery "or" video delivery. *See* Appx43-44 ("a network supporting video or cable television delivery"). Using this incorrect construction, the Board found that Promptu's objective indicia on cable systems spoke to embodiments "no[t] required by the claims." *Id.*

The Board's construction runs afoul of longstanding Federal Circuit principles. In *SuperGuide Corp. v. DirecTV Enters., Inc.*, this Court held that the phrase "at least one of" connotes a conjunctive list when it joins elements with the word *and*. 358 F.3d 870, 886-87 (Fed. Cir. 2004). This understanding follows simple rules of grammar. *Id.* "When there is a straightforward, parallel construction that involves all nouns or verbs in a series, a prepositive or postpositive modifier normally applies to the entire series." *SIMO Holdings Inc. v. H.K. uCloudlink Network Tech.*, 983 F.3d 1367, 1376-77 (Fed. Cir. 2021) (quoting ANTONIN SCALIA & BRYAN A. GARNER, READING LAW: THE INTERPRETATION OF LEGAL TEXTS § 19,

147 (2012)) (discussing *SuperGuide* and construing "a plurality of" conjunctively when used as a prepositive term). Thus, "at least one of A and B" usually means "at least one of A" and "at least one of B." *See SuperGuide*, 358 F.3d at 886-87. Exceptions may arise when the specification compels it, such as when a claimed series lists "mutually exclusive possibilities." *Ortho-McNeil Pharm., Inc. v. Mylan Labs., Inc.*, 520 F.3d 1358, 1361-62 (Fed. Cir. 2008). But when a series does not recite mutually exclusive options, this Court construes "and" conjunctively. *See Medgraph, Inc. v. Medtronic, Inc.*, 843 F.3d 942, 949-50 (Fed. Cir. 2016).

These cases foreclose the Board's construction of claim 1. As seen, the claim recites "at least one of cable television delivery *and* video delivery." Appx159 at 50:62-67 (emphasis added). The recited elements are joined with the conjunctive word *and*. *Id.* The specification makes plain how these options are not mutually exclusive. *See, e.g.*, Appx97 at Abstract (explaining how the patent supports "cable television and/or video delivery," thereby expressly contemplating both), Title (same); Appx135 at 1:26-29 (same), Appx137 at 5:3-10 (same); Appx139 at 10:44-53 ("video content and/or cable television"). The '196 patent also describes various types of cable and video content, establishing these elements as categories. *See, e.g.*, Appx102 at Fig. 3 (depicting a speech processor working with analog television, digital television, video on demand, interactive guides, etc.); Appx137 at 5:18-22; Appx141 at 13:1-8. The *Ortho-McNeil* exception thus does not apply, and

*SuperGuide* controls. Claim 1 of the '196 patent requires "cable television delivery *and* video delivery." Appx159 at 50:62-67. The Board erred by construing it to exclude cable content. Appx43-44.

The Board's misconstruction frustrated much of its consideration of Promptu's objective indicia evidence. The Board used its faulty construction to presumptively ignore *all* evidence relating to voice recognition in cable systems. Appx42-43. This included all evidence relating to AgileTV, for which a nexus should have been presumed. *See* Section V.C.1, *supra*; *Chemours*, 4 F.4th at 1378; *WBIP*, 829 F.3d at 1329 ("[T]here is a presumption of nexus for objective considerations when the patentee shows that the asserted objective evidence is tied to a specific product and that product is the invention disclosed and claimed in the patent." (internal quotation marks and citation omitted)). The Board similarly disregarded evidence of a long-felt need, as cable television was "no[t] required by the claims." Appx44-45. None of the Board's conclusions are sound under the proper construction.

The Board's approach was doubly unwarranted here because, just as it did with other evidence, the parties never raised this argument during trial. Instead, Comcast argued only that Promptu did not tie its evidence to "novel claim elements." Appx882. Promptu had no reason to anticipate that the Board would surprise the parties with an implicit claim construction excluding cable content in its decision.

The Board may not introduce a construction for the first time in a final written decision when the construed phrase has never been disputed. *See, e.g.*, *SAS Inst., Inc. v. ComplementSoft, LLC*, 825 F.3d 1341, 1351 (Fed. Cir. 2016), *rev'd on other grounds*, *SAS Inst., Inc. v. Iancu*, 138 S. Ct. 1348 (2018); *see also Qualcomm Inc. v. Intel Corp.*, 6 F.4th 1256, 1263 (Fed. Cir. 2021). It erred by doing so here.

**b. The Board improperly construed the claims to exclude speech recognition technology**

The Board's surprise constructions continued with its analysis of other objective indicia. For example, the Board rejected Promptu's evidence of industry praise because the evidence involved speech recognition technology. Appx45-46. In the Board's view, this feature was "not recited in the challenged claims." *Id.*

This conclusion defies explanation. As this Court has explained, the '196 patent relates to "*speech recognition* presented by a back channel from multiple user sites within a network." *Comcast*, 838 F. App'x at 552 (emphasis added) (quoting Appx97 at Abstract). To this end, the method of claim 1 "process[es]" a multiplicity of identified "speech channels" to create a "multiplicity of identified speech content." Appx160 at 51:5-7. The specification explains how generating "speech content" involves speech recognition. *See, e.g.*, Appx143 at 18:31-33 ("The speech recognition engine processes speech packets to create speech content and formulate the response to the speech content."); Appx154 at 40:3-7 (using a "speech processor computer" to create "speech contents"); *see generally* Appx142 at 15:16-

17:34 (describing the process of using speech recognition to create speech content). The claims thus involve speech recognition on their face.

Excluding speech recognition from the scope of claim 1, as the Board did, violates nearly every tenet of claim construction. It is inconsistent with the claim's plain language. *See Phillips v. AWH Corp.*, 415 F.3d 1303, 1312-13 (Fed. Cir. 2005) (en banc); *Baxalta Inc. v. Genentech, Inc.*, 972 F.3d 1341, 1346 (Fed. Cir. 2020). It is inconsistent with the specification. *See Phillips*, 415 F.3d at 1315. It is also inconsistent with the extrinsic evidence. *See id.* at 1317-18. Even Comcast's expert understood that the '196 patent "describes distributed *speech recognition* over a *cable television* system." Appx2981 ¶ 32 (emphases added). He made similar statements throughout his report. *See* Appx2991-2993 ¶¶ 47, 49-53; Appx3016-3017 ¶ 85 (construing the claimed "partitioning" step as involving "speech recognition at a wireline node"); Appx3130 ¶ 308 (reading "processing" voice data as "performing speech recognition on it"); Appx3137-3138 ¶ 324 (citing Julia's speech recognition step as teaching creating speech content). Promptu's expert did too. *See, e.g.*, Appx5248 ¶ 19 ("The '196 patent discloses novel and nonobvious methods and systems for speech recognition in a network."). Indeed, Comcast never disputed whether the claims involved speech recognition at trial, leaving Promptu no occasion to address it.

The Board therefore erred when it ruled—without explanation or notice—that speech recognition fell outside the challenged claims. Appx45-46. The Court should construe "processing said multiplicity of said received identified speech channels to create a multiplicity of identified speech content" to include speech recognition. The Board should therefore have considered Promptu's evidence of industry praise as part of its secondary consideration analysis. *Id.*

**c. The Board's remaining analysis is rife with legal errors**

Aside from its claim construction errors, the Board's remaining analysis on secondary considerations is rife with legal missteps. The Court should therefore reverse the Board's obviousness holding or, in the alternative, remand for the Board to consider the objective indicia under a proper legal framework.

**i. The Board improperly required nexus evidence to pertain to a novel feature rather than the invention as a whole**

In one example, the Board ignored evidence on AgileTV's speech recognition functions because this "general concept" was "disclosed in the prior art." Appx43-44; *see also* Appx44-45 (explaining how the evidence did not relate to a "novel" feature). Recent decisions from this Court reject this approach. In *Chemours*, the Court reversed the Board for requiring objective indicia to bear on a specific feature rather than the claimed combination of elements. *Chemours*, 4 F.4th at 1378 ("Concluding otherwise would mean that a nexus could never exist where the

claimed invention is a unique combination of known elements from the prior art.”). And in *WBIP*, this Court rejected the notion that objective indicia must be tied to a “supposedly ‘new’ feature” in the claims. *WBIP*, 829 F.3d at 1330. Instead, the evidence can be linked to the “inventive combination” of elements. *Id.* at 1332.

The Board tried to minimize these cases with a brief footnote. Appx44 n.14. There, the Board concluded without explanation that Promptu’s evidence did not show a nexus to the claimed combination as a whole. *Id.* But of course it did. Among other things, the evidence confirmed how the claimed solution reduced latency problems common in legacy systems:

> Promptu is in essence a voice-activated EPG. By speaking specific command and tag words into a mic built into the remote, *users can look up specific programs or channels far more quickly than the more conventional interface* that often involves hitting several keys on the remote. Promptu works by converting the voice commands into meta tags that are directed via a separate infrared eye (that would eventually be integrated into all boxes) to a server stored at the head-end. This is similar to the way VOD commands are currently serviced, although *the latency on the Promptu service was noticabl[y] lower than on the VOD service*. What we found really interesting about the Promptu demo was *the ease with which it could conduct searches* (e.g. for all programs starring Julia Roberts).

Appx4991 (emphases added). Promptu even won an award due in part to AgileTV’s ability “to scale from thousands to hundreds of thousands of voice-enabled customers.” Appx4957. These bandwidth problems were one of the very issues the ’196 claims intended to tackle. *E.g.*, Appx137 at 5:26-31; *see* Appx135-136 at 2:60-3:3, Appx142 at 15:1-15. This is why the claims recite processing speech channels

partitioned from multiple user sites and responding to the speech content with unique commands. Appx159-160 at claim 1. It is no coincidence that the claims of the '196 patent accomplished what the inventors sought to achieve.

The Board's only response to this evidence was to write it off as being directed to unclaimed speech recognition technology. Appx45. But for the reasons explained above, that interpretation is wrong. *See supra*.

It is also inconsistent with the Board's own words. In a parallel proceeding for a related patent (now on appeal), the Board found that Promptu's evidence established a long-felt need for "providing voice recognition processing *for multiple users*." *See Comcast Cable Commc'ns, LLC v. Promptu Sys. Corp.*, IPR2018-00343, Paper No. 56, at 49-50 (P.T.A.B. July 18, 2019) (emphasis added). While the Board ignored the evidence in that case because those claims did not involve multiple users (*id.*), that is not the case here. Claim 1 of the '196 patent expressly recites "a multiplicity of user sites" and "partitioning [a] received back channel into a multiplicity of received identified speech channels." Appx159-160 at 50:62-51:4. It was arbitrary and capricious for the Board to reject nexus evidence in one case because claims involving speech recognition do not recite multiple users, only to reject similar evidence in another case because claims involving multiple users do not involve speech recognition. *See Vicor Corp. v. SynQor, Inc.*, 869 F.3d 1309, 1321 (Fed. Cir. 2017) (admonishing the Board for "reach[ing] inconsistent

conclusions as to the evidentiary weight to be given to the secondary considerations evidence presented in [two cases], without any explanation to justify such inconsistency."). That the claims at issue here do involve speech recognition just confirms the pretextual nature of the Board's analysis.

**ii. The Board improperly required evidence of market share to establish commercial success**

The Board erred again when—in yet another footnote—it rejected Promptu's evidence of commercial success due to the lack of market share evidence. Appx46 n.16. Evidence of market share is unnecessary to establish a nexus. *See Chemours*, 4 F.4th at 1378 ("[M]arket share data, though potentially useful, is not required to show commercial success.").

Here, Promptu obtained over $35 million in funding to develop AgileTV. *E.g.*, Appx5232 ¶ 26; Appx4843 at 34; Appx5003-5004. Comcast licensed this technology, fell in "love" with it, and successfully deployed it in a pilot program. *See* Section III, *supra*; *see also, e.g.*, Appx5083 (licensing "AGLE0001," the application maturing into the '196 patent); Appx4965 (Comcast Vice President admitting that he "could fall in love with this" and a manager describing how "[e]verybody loves this toy"); Appx5229 ¶ 19; Appx5232-5233 ¶¶ 26-27. That collaboration generated interest in the product. *E.g.*, Appx5003-5004 (touting how Agile TV developed "with significant input from cable operators and their customers"). While Comcast ultimately decided to infringe the '196 patent rather

than deploy AgileTV, that does not make AgileTV's success less salient. The Board should have considered Promptu's considerable funding in its secondary consideration analysis.

**iii. The Board improperly discounted Comcast's licensing of the '196 patent and AgileTV because the license included other patents**

The Board next erred when it downplayed Comcast's license to the '196 patent merely because the license included other patents. Appx47-48. Licensing is always relevant to the nexus analysis. *E.g.*, *Metabolite Labs., Inc. v. Lab. Corp.*, 370 F.3d 1354, 1368 (Fed. Cir. 2004). "The accused infringer's recognition of the importance of [an] advance is relevant to a determination of obviousness." *Mintz v. Dietz & Watson, Inc.*, 679 F.3d 1372, 1379 (Fed. Cir. 2012) (quoting *Gambro Lundia AB v. Baxter Healthcare Corp.*, 110 F.3d 1573, 1579 (Fed. Cir. 1997)).

Here, Comcast licensed the application maturing into the '196 patent (among others). *See* Section III, *supra*; Appx5233-5235 ¶¶ 27-32; Appx5006; Appx5084. Comcast took the license to deploy AgileTV in its cable television network and "to avoid infringement claims based on Comcast's [use] of AgileTV."[8] Appx887. At

---

[8] Comcast tried to diminish the license with attorney argument, urging that it took the license as a matter of "pruden[ce]." Appx887. This assertion lacks evidentiary support and credulity. "[T]he litigation argument that an innovation is really quite ordinary carries diminished weight when offered by those who . . . promptly adopted

the time of the license, the Patent Office had already found the claims of the '196 application allowable and sought only a clerical amendment to the specification prior to issuance. *See* Appx2313-2318; Appx5083. The claims issued without change thereafter. Appx2431-2436. Despite this evidence, the Board found the '196 patent "incidental" to the license. Appx47.

The Board's analysis hinged on two findings, neither supporting its conclusion. First, the Board emphasized how "[t]he purpose of the [license] was to evaluate the AgileTV system for possible deployment." *Id.* This statement is true. It also supports Promptu's position. Comcast executed a license to safely deploy AgileTV, as doing so otherwise would give rise to "infringement claims." Appx887. That makes the '196 patent central, not "incidental," to the parties' license.

Second, the Board improperly trivialized the license because it included rights to other patents and applications, analogizing the case to *Shoes by Firebug LLC v. Stride Ride Children's Grp.*, 962 F.3d 1362 (Fed. Cir. 2020). *Firebug* is inapposite. There, the licenses (and a declarant discussing them) comprised the only secondary consideration evidence of record. *Id.* at 1372. The accused infringer was not a party to the licenses, and the licenses did not cover products protected under the licensed

---

the solution that they are now denigrating." *Heidelberger Druckmaschinen AG v. Hantscho Commercial Prods.*, 21 F.3d 1068, 1072 (Fed. Cir. 1994). Tellingly, Comcast did not support its attorney argument with a declarant. Appx887. Promptu did. Appx5222-5235; Appx5417-5421.

patents. *Id.* Here, Promptu's license (1) involves the accused infringer, (2) covers a specific commercial product protected by the licensed patents, and (3) accompanies swaths of other evidence. *See* Section III.D.3, *supra*.

Accordingly, the Board erred by finding the '196 patent "incidental" to the license between Promptu and Comcast. Appx47.

## VI. CONCLUSION

For the foregoing reasons, the Court should reverse the judgment of the Board finding claims 1, 2, 4-6, 12, and 13 of the '196 patent unpatentable. Alternatively, the Court should vacate and remand the Board's judgment for further proceedings.

March 17, 2022

Respectfully submitted,

/s/ Jacob A. Schroeder
Jacob A. Schroeder
FINNEGAN, HENDERSON, FARABOW,
GARRETT & DUNNER, LLP
3300 Hillview Avenue
Palo Alto, CA 94304
(650) 849-6600

Joshua L. Goldberg
FINNEGAN, HENDERSON, FARABOW,
GARRETT & DUNNER, LLP
901 New York Ave., N.W.
Washington, D.C. 20001
(202) 408-4000

Joseph M. Schaffner
FINNEGAN, HENDERSON, FARABOW,
GARRETT & DUNNER, LLP
1875 Explorer Street
Reston, VA 20190
(571) 203-2700

*Counsel for Appellant*

# ADDENDUM

NON-PUBLIC VERSION – PROTECTIVE ORDER MATERIAL

Trials@uspto.gov
Tel: 571-272-7822

Paper 68
Date: August 25, 2021

UNITED STATES PATENT AND TRADEMARK OFFICE

---

BEFORE THE PATENT TRIAL AND APPEAL BOARD

---

COMCAST CABLE COMMUNICATIONS, LLC,
Petitioner,

v.

PROMPTU SYSTEMS CORPORATION,
Patent Owner.

---

IPR2018-00344
Patent 7,047,196 B2

---

Before JAMESON LEE, ROBERT L. KINDER, and
JULIET MITCHELL DIRBA, *Administrative Patent Judges*.

DIRBA, *Administrative Patent Judge.*

JUDGMENT
Final Written Decision on Remand
Determining Some Challenged Claims Unpatentable
Granting-in-Part Petitioner's Motion to Exclude
Denying Patent Owner's Motion to Exclude
*35 U.S.C. §§ 144, 318*

NON-PUBLIC VERSION – PROTECTIVE ORDER MATERIAL

## I. INTRODUCTION

### *A. Procedural History*

On December 19, 2017, Comcast Cable Communications, LLC ("Petitioner")[1] filed a Petition seeking institution of an *inter partes* review of claims 1, 2, 4–6, 12, 13, 27, 28, 30–32, and 38–42 (the "challenged claims") of U.S. Patent No. 7,047,196 B2 (Ex. 1001, the "'196 patent"). Paper 1 ("Pet."). Pursuant to 35 U.S.C. § 314, we instituted *inter partes* review of the challenged claims on all grounds set forth in the Petition. Paper 10 ("Institution Decision" or "Inst. Dec.").

After institution, Promptu Systems Corporation ("Patent Owner") filed a Response (Paper 20, "PO Resp."), Petitioner filed a Reply (Paper 29, "Pet. Reply"), and Patent Owner filed a Sur-Reply (Paper 38, "PO Sur-Reply"). Petitioner and Patent Owner filed motions to exclude (Papers 37, 40), which were opposed (Papers 45, 46) and the subject of corresponding replies (Papers 49, 51). An oral hearing was held on January 28, 2019, and a transcript of the hearing is included in the record. Paper 56 ("Tr.").

On June 28, 2019, we issued a Final Written Decision determining that Petitioner had not shown any challenged claim to be unpatentable. Paper 59 ("Final Dec."). That decision was premised on a determination that Petitioner failed to show that the prior art taught or suggested a claim limitation required by all challenged claims—"receiving said back channel to create a received back channel"—and was based on our construction of that claim phrase. *Id.* at 21–26, 29–30, 32–34. In particular, we concluded

---

[1] Comcast Corporation is also a real party in interest. Pet. x.

that this phrase requires receipt of a "back channel" and creation of a different "received back channel." *See id.* at 21–26. In addition, the Final Written Decision dismissed as moot both parties' motions to exclude because we did not rely on any of the evidence subject to the parties' challenges. *Id.* at 31–32. Petitioner appealed. Paper 60.

On appeal, the U.S. Court of Appeals for the Federal Circuit concluded that our dispositive claim construction was in error and, consequently, vacated and remanded the Final Written Decision. *Comcast Cable Comm'ns, LLC v. Promptu Sys. Corp.*, 838 Fed. Appx. 551, 554 (Fed. Cir. 2021) ("CAFC Decision"). In particular, the Federal Circuit held that "the broadest reasonable interpretation of 'received back channel' is a 'back channel that has been received.'" *Id*. "Under such a reading, the phrase 'to create a received back channel' describes the result of 'receiving' the 'back channel." *Id.* The Federal Circuit instructed "the Board to consider the parties' arguments under the correct construction." *Id.*

On remand, we authorized additional briefing to address the impacts of the Federal Circuit's decision and other subsequent authority regarding issues in this proceeding. Paper 63 (Order), 5. In addition, we clarified that we considered the CAFC Decision to have vacated our rulings on the parties' motions to exclude. *Id.* at 4. The parties thereafter simultaneously filed Opening Briefs After Remand (Paper 65 ("Pet. Remand Open."); Paper 64 ("PO Remand Open.")) and then simultaneously filed Response Briefs After Remand (Paper 66 ("Pet. Remand Resp."); Paper 67 ("PO Remand Resp.")).

We have jurisdiction under 35 U.S.C. §§ 6(b) and 144(b). This Decision is a final written decision under 35 U.S.C. § 318(a) as to the patentability of the challenged claims.

For the reasons discussed in this Decision, Petitioner has shown by a preponderance of the evidence that claims 1, 2, 4–6, 12, and 13 of the ’196 patent are unpatentable, and Petitioner has not shown that claims 27, 28, 30–32, and 38–42 of the ’196 patent are unpatentable. Also, as explained below, Petitioner’s Motion to Exclude (Paper 37) is *granted-in-part*, *denied-in-part*, and *dismissed-in-part*, and Patent Owner’s Motion to Exclude (Paper 40) is *denied*.

### *B. Related Matters*

The parties identify a civil action involving the ’196 patent: *Promptu Systems Corporation v. Comcast Corporation*, Case No. 2:16-cv-06516 (E.D. Pa.). Pet. x; Paper 5 (PO Mandatory Notices), 2.

In addition, this proceeding is related to IPR2018-00345 (“the 345 IPR”), in which Petitioner challenged different claims of the ’196 patent. *Compare* Pet. (challenging claims 1, 2, 4–6, 12, 13, 27, 28, 30–32, and 38–42), *with Comcast Cable Comm’ns, LLC v. Promptu Sys. Corp.*, IPR2018-00345, Paper 1 (Petition) (PTAB Dec. 19, 2017) (challenging claims 14, 15, 17–19, 25, 26, 53–55, 61, 62, and 64–66). In that proceeding, we determined that Petitioner had not shown any of the challenged claims to be unpatentable. *Comcast Cable Comm’ns, LLC v. Promptu Sys. Corp.*, IPR2018-00345, Paper 59, 2, 34 (PTAB June 28, 2019) (the “345 Final Decision”). In particular, in that decision, we determined that Petitioner

failed to show that the prior art taught or suggested a claim limitation required by all claims challenged in that proceeding: "a speech recognition system coupled to a wireline node in a network." *Id.* at 21–26, 30.

Petitioner appealed the 345 Final Decision, and the Federal Circuit affirmed. *Comcast Cable*, 838 Fed. Appx. at 553–554; *see id.* at 552–553 (addressing both this proceeding and the 345 IPR in the same CAFC Decision). In particular, the Federal Circuit affirmed the Board's construction of the claim language and found no error in the Board's refusal to consider Petitioner's new mapping in its reply brief in that proceeding. *Id.* at 553–554. However, the Federal Circuit did not reach the parties' arguments regarding whether Murdock qualifies as prior art. *Id.* at 553 n.1.

### *C. The Petition's Asserted Grounds*

In this proceeding, Petitioner asserts the following grounds of unpatentability (Pet. 3):

| Claims Challenged | 35 U.S.C. § | References/Basis |
|---|---|---|
| 1, 2, 4–6, 12, 13, 27, 28, 30–32, 38–42 | 103(a)[2] | Murdock[3] |
| 1, 2, 4–6, 12, 13, 27, 28, 30–32, 38–42 | 103(a) | Murdock, Nazarathy[4] |

[2] The Leahy-Smith America Invents Act ("AIA"), Pub. L. No. 112-29, 125 Stat. 284, 285–88 (2011), revised 35 U.S.C. § 103 effective March 16, 2013. Because the challenged patent was filed before March 16, 2013, we refer to the pre-AIA version of § 103.

[3] US 7,013,283 B1, filed Nov. 16, 2000, issued March 14, 2006 (Ex. 1010).

[4] US 6,490,727 B1, filed Oct. 7, 1999, issued Dec. 3, 2002 (Ex. 1013).

| Claims Challenged | 35 U.S.C. § | References/Basis |
|---|---|---|
| 1, 2, 4–6, 12, 13, 27, 28, 30–32, 38–42 | 103(a) | Murdock, Quigley[5] |
| 5, 6, 31, 32 | 103(a) | Murdock, Nazarathy, Banker[6] |
| 5, 6, 31, 32 | 103(a) | Murdock, Nazarathy, Gordon[7] |
| 5, 6, 31, 32 | 103(a) | Murdock, Quigley, Banker |
| 5, 6, 31, 32 | 103(a) | Murdock, Quigley, Gordon |
| 1, 2, 4–6, 12, 13, 27, 28, 30–32, 38–42 | 103(a) | Julia,[8] Nazarathy |
| 1, 2, 4–6, 12, 13, 27, 28, 30–32, 38–42 | 103(a) | Julia, Quigley |
| 5, 6, 31, 32 | 103(a) | Julia, Nazarathy, Banker |
| 5, 6, 31, 32 | 103(a) | Julia, Nazarathy, Gordon |
| 5, 6, 31, 32 | 103(a) | Julia, Quigley, Banker |
| 5, 6, 31, 32 | 103(a) | Julia, Quigley, Gordon |

Petitioner also relies on the testimony of Christopher Schmandt to support its contentions. *See* Ex. 1019; Ex. 1029 (Reply declaration).

Patent Owner relies on the testimony of John Tinsman to dispute these contentions. *See* Ex. 2033. Patent Owner also relies on the testimony of

---

[5] US 6,650,624 B1, filed May 19, 2000, issued Nov. 18, 2003 (Ex. 1014).

[6] US 5,477,262, issued Dec. 19, 1995 (Ex. 1015).

[7] US 6,314,573 B1, filed May 29, 1998, issued Nov. 6, 2001 (Ex. 1016).

[8] US 6,513,063 B1, filed March 14, 2000, issued Jan. 28, 2003 (Ex. 1012).

Dr. David Chaiken regarding alleged objective indicia of nonobviousness. *See* Ex. 2032.

### *D. Summary of the '196 patent*

The '196 patent is titled "System and Method of Voice Recognition Near a Wireline Node of a Network Supporting Cable Television and/or Video Delivery." Ex. 1001, code (54). The application that led to the '196 patent was filed on February 16, 2001, and claimed the benefit of a U.S. provisional application filed June 8, 2000. *Id.* at codes (22), (60).

The '196 patent generally relates to a "method and system of speech recognition presented by a back channel from multiple user sites within a network." Ex. 1001, Abstract. According to the Specification, "a centralized wireline node refers to a network node providing video or cable television delivery to multiple users using a wireline physical transport between those users at the node." *Id.* at 1:66–2:2. The Specification states that "the problems of speech recognition at a centralized wireline node in a network supporting video delivery or cable television delivery have not been addressed by [the] prior art." *Id.* at 1:63–66. The Specification describes a "preferred embodiment [of the claimed invention that uses] a back channel containing a multiplicity of identified speech channels from a multiplicity of user sites presented to a speech processing system at a wireline node in a network that supports at least one of cable television delivery and video delivery." *Id.* at Abstract.

Figure 3 of the '196 patent is reproduced below.

IPR2018-00344
Patent 7,047,196 B2




FIG. 3

As shown above, Figure 3 illustrates:

> a remote control unit 1000 coupled 1002 to set-top apparatus 1100, communicating via a two-stage wireline communications system containing a wireline physical transport 1200 through a distributor node 1300, and through a high speed physical transport 1400, possessing various delivery points 1510 and entry points 1512–1518 to a tightly coupled server farm 3000, with one or more gateways 3100, and one or more tightly coupled server arrays 3200[.]

Ex. 1001, 7:17–25. Server farm 3000 includes a central "speech recognition processor system 3200" for processing speech signals from user sites, such as from subscribers' set-top boxes. *Id.* at Fig. 3. The Specification further

notes that "[t]he back channel is from a multiplicity of user sites and is presented to a speech processing system at the wireline node in the network." *Id*. at 22:12–14. Specifically, "[t]he speech signal transmitted from a subscriber's set-top box, or set-top appliance, 1100[,] is received [at the] 1510 [entry points] by the five to 40 MHz data receiving equipment." *Id*. at 12:21–23, 12:57–58.

Figure 10 of the '196 patent is reproduced below.




As shown above, Figure 10 "depicts a flowchart of a method using a back channel from a multiplicity of user sites containing a multiplicity of identified speech channels presented to a speech processing system at a wireline node in a network supporting cable television delivery in accordance with the invention." Ex. 1001, 7:42–46.

### *E. Challenged Claims*

The Petition challenges claims 1, 2, 4–6, 12, 13, 27, 28, 30–32, and 38–42 of the ’196 patent. Of these, claims 1 and 27 are independent. The independent claims recite:

> 1. A method of using a back channel containing a multiplicity of identified speech channels from a multiplicity of user sites presented to a speech processing system at a wireline node in a network supporting at least one of cable television delivery and video delivery, comprising the steps of:
>
> receiving said back channel to create a received back channel;
>
> partitioning said received back channel into a multiplicity of received identified speech channels;
>
> processing said multiplicity of said received identified speech channels to create a multiplicity of identified speech content; and
>
> responding to said identified speech content to create an identified speech content response that is unique, for each of said multiplicity of identified speech contents.

Ex. 1001, 50:62–51:10.

> 27. A system supporting speech recognition in a network, said system comprising:
>
> *a speech recognition system coupled to a wireline node* in said network for receiving a back channel from a multiplicity of user sites coupled to said network, further comprising
>
> a back channel receiver, for receiving said back channel to create a received back channel;
>
> a speech channel partitioner, for partitioning said received back channel into a multiplicity of received identified speech channels; and

> a processor network executing a program system comprised of program steps residing in memory accessibly coupled to at least one computer in said processor network;
>
> wherein said program system is comprised of the program steps of:
>
> processing said multiplicity of said received identified speech channels to create a multiplicity of identified speech content;
>
> responding to said identified speech content to create an identified speech content response, for each of said multiplicity of said identified speech contents; and
>
> wherein said network supports at least one of the collection comprising: cable television delivery to said multiplicity of user sites; and video delivery to said multiplicity of user sites.

Ex. 1001, 55:9–36 (emphasis added to dispositive limitation).

## II. ANALYSIS

### *A. Principles of Law*

In an *inter partes* review, the petitioner has the burden of proving unpatentability by a preponderance of the evidence. 35 U.S.C. § 316(e). That burden never shifts to the patentee. *Dynamic Drinkware, LLC v. Nat'l Graphics, Inc.*, 800 F.3d 1375, 1378 (Fed. Cir. 2015).

A patent claim is unpatentable under 35 U.S.C. § 103(a) if the differences between the claimed subject matter and the prior art are "such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains." *KSR Int'l Co. v. Teleflex Inc.*, 550 U.S. 398, 406 (2007). The legal question of obviousness is resolved on the basis of

underlying factual determinations including (1) the scope and content of the prior art; (2) any differences between the claimed subject matter and the prior art; (3) the level of ordinary skill in the art; and (4) when in evidence, objective evidence of obviousness or nonobviousness. *Graham v. John Deere Co. of Kansas City*, 383 U.S. 1, 17–18 (1966). One seeking to establish obviousness based on more than one reference also must articulate sufficient reasoning with rational underpinnings to combine teachings. *See KSR*, 550 U.S. at 418.

### *B. The Level of Ordinary Skill in the Art*

Petitioner asserts that a person of ordinary skill in the art would have:

> (i) an undergraduate degree (or equivalent) in electrical engineering, computer science, or a comparable subject and at least three years of professional work experience in the field of multi-media systems including in particular speech recognition and control technologies; or (ii) an advanced degree (or equivalent) in electrical engineering, computer science, or a comparable subject and at least one year of post-graduate research or work experience in the field of multi-media systems including in particular speech recognition and control technologies.

Pet. 6 (citing Ex. 1019 ¶¶ 75–77). Patent Owner does not dispute Petitioner's assertions regarding a person of ordinary skill in the art. *See generally* PO Resp.

Petitioner's proposal is supported by the testimony of Mr. Schmandt and is consistent with the '196 patent specification and the asserted prior art. *See Ruiz v. A.B. Chance Co.*, 234 F.3d 654, 666–67 (Fed. Cir. 2000) (identifying factors); *see also Okajima v. Bourdeau*, 261 F.3d 1350, 1355 (Fed. Cir. 2001) (The "level of skill in the art is a prism or lens through

which a judge, jury, or the Board views the prior art and the claimed invention.”). Accordingly, we adopt the level of ordinary skill as articulated by Petitioner, except that we remove the qualifier “at least” because it broadens ordinary skill to include expert-level knowledge and skill. *Accord* Final Dec. 17–18 (adopting same position).

### *C. Claim Construction*

In this *inter partes* review, claim terms are given their “broadest reasonable interpretation in light of the specification.” *Comcast Cable*, 838 Fed. Appx. at 553 (quoting 37 C.F.R. § 42.100(b) (2017)).[9]

Below, we address the proper construction of two phrases recited in the challenged claims. Given the parties’ disputes, we need not construe any other claim terms or phrases in this proceeding. *See, e.g.*, *Nidec Motor Corp. v. Zhongshan Broad Ocean Motor Co.*, 868 F.3d 1013, 1017 (Fed. Cir. 2017) (“[W]e need only construe terms ‘that are in controversy, and only to the extent necessary to resolve the controversy.’” (quoting *Vivid Techs., Inc. v. Am. Sci. & Eng’g, Inc.*, 200 F.3d 795, 803 (Fed. Cir. 1999))).

---

[9] On October 11, 2018, the USPTO revised its rules to harmonize the Board’s claim construction standard with that used in federal district court. Changes to the Claim Construction Standard for Interpreting Claims in Trial Proceedings Before the Patent Trial and Appeal Board, 83 Fed. Reg. 51,340 (Oct. 11, 2018). We apply the old version of the rule to this Petition. *See id.* (new rule applies to petitions filed on or after November 13, 2018); Paper 3 (Petition accorded a filing date of December 19, 2017).

1. *"receiving said back channel to create a received back channel"*

Independent claim 1 recites "receiving said back channel to create a received back channel." Ex. 1001, 51:1–2. On appeal, the Federal Circuit held that "the broadest reasonable interpretation of 'received back channel' is a 'back channel that has been received.'" *Comcast Cable*, 838 Fed. Appx. at 554. The Court stated that "the 'received back channel' is merely a relabeled 'back channel'" and explained that the claim does not require an additional element of "creat[ing]" a received back channel. *Id.*

In this Decision, we apply the Federal Circuit's construction of this claim phrase.

2. *"a speech recognition system coupled to a wireline node in said network"*

Independent claim 27 recites "a speech recognition system coupled to a wireline node in said network." Ex. 1001, 55:11–12. Patent Owner argues that this language requires the "speech recognition system" and the "wireline node" to be different components (PO Resp. 20–21), and Petitioner disagrees (Pet. Reply 12–13). We agree with Patent Owner that the claimed "speech recognition system" and the claimed "wireline node" must be different components.

First, "[b]ecause claim terms are normally used consistently throughout the patent, the usage of a term in one claim can often illuminate the meaning of the same term in other claims." *See Phillips v. AWH Corp.*, 415 F.3d 1303, 1314 (Fed. Cir. 2005). Here, the Federal Circuit has construed substantially similar language in other independent claims of the

’196 patent. Specifically, independent claims 14 and 53 of the ’196 patent (which are not challenged in this proceeding, but were challenged in the related 345 IPR) recite “a speech recognition system coupled to a wireline node in a network.” Ex. 1001, 52:65–66, 58:12–13. We concluded that “‘a speech recognition system’ and ‘wireline node’ should be interpreted to be different components.” 345 Final Decision at 26; *see id.* at 24–26 (providing analysis). On appeal, the Federal Circuit agreed. *Comcast Cable*, 838 Fed. Appx. at 553. After analyzing the claim language and the Specification, the Federal Circuit stated that “[t]he broadest reasonable interpretation of ‘coupled to’ [in claims 14 and 53] requires that the ‘speech recognition system’ and ‘wireline node’ are distinct components.” *Id.* This conclusion indicates that “coupled to,” as recited in claim 27, similarly requires the claimed “speech recognition system” and “wireline node” to be distinct components.

Second, for substantially the same reasons articulated by the Board and the Federal Circuit in the 345 IPR (when analyzing the similar phrase in claims 14 and 53), we conclude that the “speech recognition system” and “wireline node” must be distinct components (in claim 27). Specifically, the claim identifies a “speech recognition system” and a separate “wireline node,” which indicates that these are distinct components. *See Becton, Dickinson & Co. v. Tyco Healthcare Grp., LP*, 616 F.3d 1249, 1254 (Fed. Cir. 2010) (“Where a claim lists elements separately, the clear implication of the claim language is that those elements are distinct components of the patented invention.” (cleaned up)). Moreover, the claim specifies that the speech recognition system is “coupled to” the wireline node, and it makes

little sense to require a component to be "coupled to" itself. Further, the Specification repeatedly refers to different components that are "coupled to" each other, and Petitioner identifies (and we perceive) no passage where the Specification refers to something as being "coupled to" itself. *See, e.g.*, Ex. 1001, 4:18–21, 9:1–8, 9:52–62; *see also* Pet. Reply 12 (citing Ex. 1001, 10:34–35, 21:21–22, 22:56–57, 26:50–51, 40:42–46).

Finally, although Petitioner appears to rely on an embodiment where the speech recognition system is arguably *in* the wireline node (*see* Pet. Reply 12–13 (citing Ex. 1001, 40:55–67)), the Specification also describes an embodiment with a speech recognition system "near" a wireline node (Ex. 1001, 5:11–15). Accordingly, the Specification "does not show a 'clear intent' to depart from the claim's plain language." *Comcast Cable*, 838 Fed. Appx. at 553 (quoting *Hill-Rom Servs., Inc. v. Stryker Corp.*, 755 F.3d 1367, 1373 (Fed. Cir. 2014)).

For these reasons, we conclude that the "speech recognition system" and the "wireline node" recited in independent claim 27 must be different components.

### *D. Summary of Asserted References*

#### *1. Murdock (Ex. 1010)*

Murdock describes a "system and a concomitant method for providing programming content in response to an audio signal." Ex. 1010, Abstract. Figure 1 of Murdock is reproduced below.




***FIG. 1***

As shown above, Figure 1 "depicts a high-level block diagram of a voice control system." Ex. 1010, 1:64–65. The program control device 110 can be "a portable or hand-held controller." *Id.* at 2:35–36. It can "capture[] the input verbal command signal from the user of the voice activated control system 100." *Id.* at 2:22–24. "Once the input command signal is received, the program control device 110 performs a transmission, *e.g.*, a wireless transmission, of the command signal to the local processing unit 120," which "may include a set top terminal, a cable box, and the like." *Id.* at 2:31–34, 45–47. The input command signal is then transmitted to remote server computer 130 via back channel 134. *Id.* at 3:1–12. Remote server computer 130 "performs speech recognition on the received signal, . . . retrieves the requested program content from a program database, and transmits the retrieved program content via the forward channel 132 to the local processing unit 120." *Id.* at 3:15–36. "Upon receipt of the requested programming content, the local processing unit 120 transmits the received

content to the video player 122 or the television recorder 124." *Id.* at 2:61–66.

### 2. *Julia (Ex. 1012)*

Julia describes a "navigation of electronic data by means of spoken natural language requests." Ex. 1012, 1:16–18. Figure 1a of Julia is reproduced below.




**Fig. 1a**

As shown above, Figure 1a "illustrates a system providing a spoken natural language interface for network-based information navigation . . . with server-side processing of requests." *Id.* at 3:6–9. "[A] user's voice input data is captured by a voice input device 102, such as a microphone." *Id.* at 3:39–41. "[T]he voice data is transmitted from device 102 preferably via infrared (or other wireless) link to [a receiver in] communications box 104," which may be a set-top box. *Id.* at 3:48–50. "The voice data is then

transmitted across network 106 to a remote server or servers 108." *Id*. at 3:54–55. The voice data "is processed by request processing logic 300 in order to understand the user's request and construct an appropriate query or request for navigation of remote data." *Id*. at 3:61–64. "Once the desired information has been retrieved from data source 110, it is electronically transmitted via network 106 to the user for viewing on client display device 112." *Id*. at 4:18–20.

### 3. *Nazarathy (Ex. 1013)*

Nazarathy describes "hybrid fiber coaxial cable networks such as [those] used in cable television where two-way digital communications are desired." Ex. 1013, Abstract. Figure 9 of Nazarathy is reproduced below.




FIG. 9

As shown above, Figure 9 of Nazarathy illustrates a Wavelength Division Multiplexing ("WDM") and Time Division Multiplexing ("TDM") network

showing how data from multiple home terminals (HT 18-1, . . . 18-n), for example, cable modem or set-top box, is transmitted to the cable headend (HE 202). *Id.* at Fig. 9, 1:21–27, 14:6–8. Nazarathy discloses that "[a]ny operations of TDM and/or WDM multiplexing are undone at the HE [202] by corresponding WDM and TDM demultiplexers." *Id.* at 14:62–64, 15:40–46.

*4. Quigley (Ex. 1014)*

Quigley describes "[a] number of features for enhancing the performance of a cable transmission system in which data is transmitted between a cable modem termination system at a headend and a plurality of cable modems located [at] different distances from the headend." Ex. 1014, Abstract, 1:32–35. Figure 1 of Quigley is reproduced below.

FIG. 1




Figure 1 of Quigley "is a schematic diagram of a hybrid fiber coaxial (HFC) network showing typical pathways for data transmission between the

headend (which contains the cable modem termination system) and a plurality of homes (each of which contain a cable modem)." *Id.* at 3:56–60. In Quigley, "[t]he hybrid fiber coaxial network of a cable modem system utilizes a point-to-multipoint topology to facilitate communication between the cable modem termination system and the plurality of cable modems." *Id.* at 9:1–4. "Frequency domain multiple access (FDMA)/time domain multiple access (TDMA) is used to facilitate communication from each cable modem to the cable modem termination system, i.e., in the upstream direction." *Id*. at 9:8–12, 48–52. "The upstream channel 491, is divided into a plurality of time intervals 110." *Id*. at 46:31–34. "The upstream channel 491 is thus partitioned so as to facilitate the definition of time slots, such that each of a plurality of cable modems 12 may transmit data packets to the cable modem termination system 10 without interfering with one another." *Id*. at 46:34–40.

*5. Banker (Ex. 1015)*

Banker describes an apparatus "for providing a user friendly interface to a subscription television terminal." Ex. 1015, Abstract. Banker describes a number of user interface features such as "messaging, establishing a favorite channel list, pay-per-view, program timing, and terminal control." *Id.*; *see also id.* at 4:1–5, 16–18. Figure 6F of Banker is reproduced below.




FIG.6F

As shown above, Figure 6F illustrates a sequence of screens a user would navigate through in order to purchase a pay-per-view event. *Id.* at 16:54–17:3. Banker also discusses how customers can be billed for using the subscription television terminal. *See id.* at 7:58–8:3, 12:1–15.

### 6. *Gordon (Ex. 1016)*

Gordon describes "[a] method and apparatus for providing subscription-on-demand (SOD) services for a[n] interactive information distribution system, where a consumer may subscribe to packages of on-demand programs for a single price." Ex. 1016, Abstract. Figure 8 of Gordon is reproduced below.




FIG. 8

As shown above, Figure 8 of Gordon shows "a menu that allows a consumer to subscribe to a selected subscription-on-demand service." *Id.* at 3:40–41. According to Gordon, "through manipulation of the menus, the consumer selects a programming package, becomes a subscriber to that package and is billed accordingly." *Id.* at 2:61–63.

*E. Obviousness Grounds Based on Julia*

Petitioner contends that claims 1, 2, 4–6, 12, 13, 27, 28, 30–32, and 38–42 are unpatentable under 35 U.S.C. § 103(a) over Julia in view of either Nazarathy or Quigley, and claims 5, 6, 31, and 32 are unpatentable under 35 U.S.C. § 103(a) over Julia in view of either Nazarathy or Quigley and in further view of either Banker or Gordon (collectively "the Julia grounds"). Pet. 12–14, 42–68; *see supra* § I.C (table delineating grounds).

Patent Owner contends that Petitioner fails to prove several limitations of independent claims 1 and 27 and that Petitioner's stated motivations to combine Julia with Nazarathy or Quigley are insufficient. PO Resp. 8–23. Patent Owner alleges further deficiencies in Petitioner's

showings for dependent claims 5, 6, 13, 31, 32, and 39. *Id.* at 24–27. Finally, Patent Owner contends that objective indicia further demonstrate nonobviousness. *Id.* at 28–41.

We have considered the parties' arguments and evidence. We begin our discussion by addressing independent claim 1, and then turn to each of its dependent claims (i.e., claims 2, 4–6, 12, and 13). Last, we address independent claim 27 and its dependent claims 28, 30–32, and 38–42.

#### 1. *Independent Claim 1*

##### a. *Julia discloses the preamble.*

The preamble of claim 1 recites: "A method of using a back channel containing a multiplicity of identified speech channels from a multiplicity of user sites presented to a speech processing system at a wireline node in a network supporting at least one of cable television delivery and video delivery . . . ." Ex. 1001, 50:62–67.

Petitioner contends that Julia discloses the preamble. Pet. 43–44 (citing Ex. 1019 ¶¶ 307–309). According to Petitioner, "Julia discloses a voice control system that can be implemented in an interactive cable television network," and with this system, "[m]ultiple users can issue voice commands requesting television and other video content from a remote server computer (e.g., 'a wireline node')." *Id.* at 43 (citing Ex. 1012, 1:29–34, 4:31–35, 6:12–26). Petitioner submits that the "remote server performs speech recognition processing to identify the spoken request and then sends the requested content to the particular user." *Id*. at 43–44 (citing Ex. 1012, 3:61–4:20).

Patent Owner does not contest Petitioner's showing for the preamble. *See generally* PO Resp.

We are persuaded that Julia discloses the preamble.[10] In particular, Julia's remote server 108 receives voice data from a user site (including device 102 and communications box 104) via network 106. *E.g.*, Ex. 1012, 3:61–4:20. Julia teaches that its invention may be implemented in a network supporting cable television delivery (*id.* at 1:29–43, 2:20–25, 4:31–35),[11] and the remote server may receive requests from multiple user sites simultaneously (*id.* at 6:12–26).

*b. Julia discloses the receiving limitation.*

Claim 1 next recites "receiving said back channel to create a received back channel." Ex. 1001, 51:1–2.

---

[10] Because Petitioner has shown that the recitations in the preamble are satisfied by Julia, we need not determine whether the preamble is limiting. *See Vivid Techs.*, 200 F.3d at 803.

[11] When addressing another claim limitation, Patent Owner asserts in passing that Julia discloses that network 106 "can be implemented *over cable lines*" but not "*in* an interactive cable television network." PO Resp. 11 (emphasis added) (citing Pet. 43; Ex. 1012, 4:31–39; Ex. 2033 ¶ 35). We disagree. Julia's background explains that high-bandwidth networks like "cable" "ultimately require[] interactive navigation of content databases in a manner that is too complex for user-friendly selection by means of a traditional remote-control clicker," so Julia proposes a "voice-driven" solution compatible with "proprietary high-bandwidth content delivery network[s]." Ex. 1012, 1:29–43, 2:20–25. In light of this background, we understand Julia to disclose implementation in a cable television network. *See id.* at 4:31–35.

Petitioner contends that Julia discloses this limitation. Pet. 44–45. Petitioner submits that a voice command is transmitted from voice input device 102 to communications box 104 and then to remote server 108 via network 106. *Id.* at 44 (citing Ex. 1012, 3:39–55). Petitioner notes that network 106 may be a cable television network and that multiple users may simultaneously transmit their voice commands. *Id*. (citing Ex. 1012, 4:31–35, 6:12–26). Petitioner contends that "[a] person of ordinary skill in the art would have known that upstream data transmissions in the cable television network disclosed Julia are transmitted on the 'back channel.'" *Id*. (citing Ex. 1019 ¶¶ 307, 311; Pet. 7–8 (explaining that "back channel" refers to the "upstream communication channel delivering signals from multiple user sites to a central wireline node")). From this, Petitioner asserts that "a person of ordinary skill in the art would recognize that remote server 108 receives the 'back channel to create a received back channel,' as recited in claim 1." *Id.* at 45 (citing Ex. 1019 ¶¶ 311–312). To illustrate its mapping, Petitioner includes an annotated version of Julia's Figure 1a, which is reproduced below:




**Julia Fig. 1a (annotated)**

Petitioner's annotated version of Julia's Figure 1a, shown above, highlights the connection between communications box 104, network 106, and remote server 108 and labels this connection as "received back channel." Pet. 45.

In the Response, Patent Owner argues that Petitioner fails to address how any reference "creates a received back channel," as the claim requires. PO Resp. 10–14. However, as Petitioner explains in its remand briefing, this argument is premised on a claim construction that was rejected by the Federal Circuit. *See* Pet. Remand Open. 2–3 (contending that the CAFC Decision negates Patent Owner's arguments regarding this limitation); *see generally* PO Remand Resp. (not disputing Petitioner's assessment). The Federal Circuit explained that "the phrase 'to create a received back channel' describes the result of 'receiving' the 'back channel,'" and the claim language does not require an additional element of "creat[ing]" a received

back channel. *Comcast Cable*, 838 Fed. Appx. at 554. Accordingly, Patent Owner's argument is misplaced.

In the Response, Patent Owner also contends that Petitioner and Mr. Schmandt inconsistently mapped claim limitations. PO Resp. 13 (alleging inconsistencies in the references to "channel" and "data"); *see also id.* at 14–18 (also arguing inconsistencies between "data" and "signals"). We disagree. Petitioner and Mr. Schmandt consistently map Julia's upstream communications channel to the claimed "back channel." The discussion of "data" refers to information sent via that channel, and "signals" are the way that data is transmitted. *See* Pet. Reply 10 (citing Ex. 1029 ¶ 9), 11–12 (citing Ex 1029 ¶ 14); Ex. 1029 ¶¶ 9, 14 (discussing relationship between a channel, signals, and data).

Having reviewed the parties' arguments and the evidence of record, and applying the Federal Circuit's claim construction, we are persuaded that Julia discloses this limitation. In particular, we are persuaded that a person of ordinary skill in the art would understand that Julia's remote server 108 "receiv[es] said back channel to create a received back channel"—Julia's remote server 108 receives the voice command data from user sites via an upstream communication channel. Ex. 1019 ¶¶ 307, 311; *e.g.*, Ex. 1012, 3:37–60.

*c. The Julia-Nazarathy and Julia-Quigley combinations each disclose the partitioning limitation.*

Claim 1 further recites "partitioning said received back channel into a multiplicity of received identified speech channels." Ex. 1001, 51:3–4.

For this limitation, Petitioner relies on a combination of Julia and either Nazarathy or Quigley.[12] Pet. 45–47. With respect to Julia, Petitioner points to Julia's disclosure that multiple users may simultaneously issue requests and that existing systems "support access requests from simultaneous multiple network users, as known by practitioners of ordinary skill in the art." *Id.* at 45–46 (quoting Ex. 1012, 6:13–21). Petitioner then turns to Nazarathy and Quigley, asserting that each discloses a "prior art cable network[] in which multiple users could issue requests 'simultaneously . . .' to a central information source." *Id.* at 46 (citing Ex. 1019 ¶¶ 316–320). Petitioner contends that each of these references "disclose[s] techniques for 'partitioning' an upstream data channel carrying multiple user signals at a central cable headend." *Id.* at 46 (citing Ex. 1013, Abst., 13:64–14:46, 14:62–64; Ex. 1014, 9:56–10:3, 46:32–40; Ex. 1019 ¶¶ 316–317, 319; Pet. 8–9); *see id.* at 8–9 (explaining that "partitioning" includes "any approach or technique to divide a communication channel into identifiable portions," including, for example, demultiplexing, which was well-known in the art (citing Ex. 1019 ¶¶ 87–89)).

Petitioner further contends that a person of ordinary skill in the art would have been motivated to combine Julia with Nazarathy to yield this

---

[12] In its remand briefing, Petitioner also contends that it "showed that Julia alone . . . discloses" this limitation. Pet. Remand Open. 3 (citing Pet. 45–47, 54; Pet. Reply 10–11). However, this is belied by the cited portions of the Petition and the Reply, which exclusively rely on a combination of Julia and either Nazarathy or Quigley. *See* Pet. 45–47; Pet. Reply 10–11; *see also* PO Remand Resp. 2 (identifying error); Tr. 11:19–24, 22:9–14, 24:6–9. To the degree Petitioner seeks to present a new argument, we do not consider it.

claim limitation and to combine Julia with Quigley to yield this claim limitation. Pet. 60–61; *see also id.* at 45–47 (citing Ex. 1019 ¶¶ 316–320). In particular, Petitioner contends that an ordinary artisan would have considered Nazarathy and Quigley in connection with Julia because "[a] skilled artisan would have known that Julia's voice control system could be implemented using those techniques and networks." *Id.* at 60–61 (citing Ex. 1019 ¶ 443; Ex. 1012, 6:47–59; Ex. 1013, 13:64–14:46; Ex. 1014, 9:65–10:3); *see id.* at 61 (contending that Julia's disclosure suggests the combination). Petitioner further contends that "a person of ordinary skill in the art would have recognized the benefits of combining Julia with the teachings of Nazarathy and Quigley, as discussed above," and the combinations "would have been no more than combining prior art elements according to known methods to yield predicable results for a person of ordinary skill in the art." *Id.* at 61 (citing Ex. 1019 ¶ 444).

Patent Owner argues that the Petitioner fails to account for the difference between the claimed "back channel" and the claimed "received back channel" (PO Resp. 14–16), but this argument is premised on a claim construction rejected by the Federal Circuit, as explained above (*see supra* § II.E.1.b). *See also* Pet. Remand Open. 2–4 (contending that the CAFC Decision negates these arguments); *see generally* PO Remand Resp. (not disputing this assessment). In addition, Patent Owner restates its inconsistency arguments (*see* PO Resp. 14–15), but we perceive no such inconsistency (*see supra* § II.E.1.b). Thus, these arguments are misplaced.

In the Response, Patent Owner also argues that the Petition fails to address "a multiplicity of received identified speed channels" and that

neither Nazarathy nor Quigley discuss partitions "identified with speech commands." PO Resp. 16–17 (citing Ex. 2033 ¶ 42; Pet. 8–9, 46).

Patent Owner further argues that the Petition fails to articulate a sufficient motivation to combine Julia with Nazarathy or Quigley. PO Resp. 21–23. Patent Owner critiques Petitioner's analysis as "fall[ing] within [a] mere three paragraphs" and failing to sufficiently explain *why* a person of ordinary skill in the art would have been motivated to make the combination. *Id.* (citing Pet. 60–61). According to Patent Owner, Petitioner's allegations "identif[y] generalized purported benefits without linking them to the features of the challenged claims" and without providing "any factual basis." *Id.* at 22 (citing Ex. 2033 ¶ 50). Further, Patent Owner argues that Petitioner fails to sufficiently explain *how* an ordinary artisan would make the proposed combination with a reasonable expectation of success. *Id.* at 23.

We have reviewed the parties' arguments and cited evidence. On this record, for the reasons explained below, we are persuaded that the Julia-Nazarathy combination and the Julia-Quigley combination each disclose the partitioning limitation. Moreover, as we will explain, we are persuaded that a person of ordinary skill in the art would have had a motivation to combine Julia's system with partitioning (as disclosed in Quigley and Nazarathy) to allow Julia's remote server to receive and process requests from multiple users simultaneously, as it discloses. We are further persuaded that either combination would have been predicable to an ordinary artisan and within his skill.

Julia's remote server 108 receives voice data from a user site (including voice input device 102 and communications box 104), and this teaches "receiving said back channel to create a received back channel," as required by claim 1. *See supra* § II.E.1.b. Julia also teaches that "multiple users, each having their own client input device, may issue requests[] simultaneously." Ex. 1012, 6:12–16. Julia's remote server 108 processes the voice data sent by the user(s) to determine each user's command, and this teaches "processing said multiplicity of said received identified speech channels to create a multiplicity of identified speech content," as required by claim 1. *See infra* § II.E.1.d. Moreover, Julia discloses that its techniques may be implemented in a network supporting cable television delivery. *Id.* at 1:29–43, 2:20–25, 4:31–35.

But Julia does not describe all implementation details. Of relevance in this proceeding, Julia does not address how multiple requests would be transmitted to remote server 108 in a cable network (other than to indicate that they would be sent via network 106). Julia does, however, indicate that a person of ordinary skill in the art would know how to accommodate requests from multiple users. *See* Ex. 1012, 6:16–26.

Nazarathy and Quigley each disclose that multiple user requests are sent from different cable modems (located at subscribers' homes) to a central cable headend by including these requests on a common upstream channel and then, at the headend, dividing them into the separate requests (or, in the parlance of the claim, "partitioning" them). *See* Pet. 46. Specifically, Nazarathy describes a cable television network where a headend receives "reverse (upstream) transmissions" from home terminals

(e.g., "digital cable modems") and processes those transmissions. *E.g.*, Ex. 1013, Abst., 1:6–31. Nazarathy states that data from the home terminals may be multiplexed on the upstream channel (e.g., using time division multiplexing (TDM)) and demultiplexed by the headend. *E.g.*, *id.* at 13:64–14:46, 14:62–64; *see id.* at 2:32–35 (noting that "[e]ach upstream channel frequency may be shared by many home terminals"); Ex. 1019 ¶ 316. Similarly, Quigley states that its upstream channel is "partitioned" to allow "each of a plurality of cable modems 12 [to] transmit data packets to the cable modem termination system 10 [in the headend] without interfering with one another." Ex. 1014, 46:32–40; *see also id.* at 8:42–60 (headend includes cable modem termination system), 9:48–55 (noting that "[c]ontemporary cable modem systems . . . utilize time division multiple access (TDMA) in order to facilitate communication between a plurality of cable modems and a single cable modem termination system on each upstream channel"); Ex. 1019 ¶ 319.

We are persuaded that a person of ordinary skill in the art would have been motivated to combine Julia and Nazarathy to yield the partitioning limitation, and we are also persuaded that a person of ordinary skill in the art would have been motivated to combine Julia and Quigley to yield the partitioning limitation. As noted above, Julia discloses that its technique can be used in a cable television network and that its remote server 108 can receive and process multiple user requests simultaneously; however, Julia does not describe how this would be accomplished. Nazarathy and Quigley each describe a cable television network where a central headend partitions

an upstream channel to identify each subscriber's data. As Mr. Schmandt further explains:

> Nazarathy and Quigley also provide additional details for implementing bi-directional communication systems for cable networks that fit directly into, but are not expressly described, by Julia. For example, Julia states that persons of ordinary skill in the art would appreciate how to implement its system to support receiving and processing multiple simultaneous user requests, but does not provide details regarding how such implementation should occur. . . . Nazarathy and Quigley both describe multiplexing methods that can be used for supporting simultaneous requests, as Julia suggests. . . . A person of ordinary skill in the art, looking for further details regarding how to implement Julia to support simultaneous requests, would thus naturally consider the teachings of Nazarathy and Quigley because they disclose methods for bi-directional communication that fit directly into the communication needs of Julia.

Ex. 1019 ¶ 443 (citations omitted). We credit this testimony because it is logical and supported by the cited references and because there is no persuasive evidence to the contrary.

We are further persuaded that a person of ordinary skill in the art would have known that multiplexing and then demultiplexing could be used to combine and then separate (or "partition") data associated with different users. *See* Ex. 1019 ¶¶ 87–88. Mr. Schmandt testifies "one well-known technique for 'partitioning' a communication channel" involved "multiplexing (i.e., combining) several independent communication signals together for transmission to the central network node and then de-multiplexing (i.e., decomposing) that signal into portions identified with each sending user location." *Id.* ¶ 88 (citing Ex. 1001, 3:44–52 (challenged

patent describing multiplexing in the background of the invention)). We credit this testimony because it is logical and consistent with the cited evidence and because there is no contradictory evidence.

As demonstrated by our analysis above, we do not agree with Patent Owner's argument that the Petition fails to sufficiently address "a multiplicity of received identified speech channels," as required by claim 1. *See* PO Resp. 16–17. Moreover, Patent Owner's argument that neither Nazarathy nor Quigley discuss partitioning "speech commands originating from system users" is inapposite. *Id.* (quoting Pet. 8–9; citing Ex. 2033 ¶ 42). Petitioner does assert that Nazarathy or Quigley disclose speech commands; rather, Petitioner relies on Julia for this disclosure. *See* Pet. 45–47. We have considered the testimony of Patent Owner's declarant, but it suffers from the same misunderstanding. *See* Ex. 2033 ¶ 42 (parroting language of the Response).

We also disagree with Patent Owner's argument that the Petition's analysis of the rationale to combine is insufficient to show a motivation to combine. *See* PO Resp. 21–23; *accord* Inst. Dec. 30–33 (determining that Petitioner's rationale to combine was sufficient). Patent Owner cites to Mr. Tinsman's testimony; however, Mr. Tinsman simply repeats the Response's contention that the Petition is insufficient. *Compare* Ex. 2033 ¶ 50, *with* PO Resp. 22. Moreover, Mr. Tinsman's testimony summarizes Petitioner's arguments and concludes, without additional explanation, that Petitioner's "purported benefits likewise lack any factual basis" and fail to support its proposed modification. Ex. 2033 ¶ 50. We do not credit this testimony because Mr. Tinsman provides legal arguments, not technical expertise.

However, we agree with Patent Owner that two of the Petition's sentences fail to support Petitioner's rationale to combine. *See* PO Resp. 22 (citing Pet. 61). Specifically, the Petition states:

> The Julia network would reap the benefits of Nazarathy (e.g., increased bandwidth) or Quigley (e.g., avoiding collisions between multiple upstream signals). Implementing Julia's voice control system on the networks of Nazarathy or Quigley would improve the user interface for those systems.

Pet. 61 (citing Ex. 1019 ¶ 444). But Petitioner fails to adequately explain the relationship between the alleged benefits (i.e., Nazarathy's increased bandwidth and Quigley's avoiding collisions) and its proposed combination. As a result, we are not persuaded that these benefits would have motivated an ordinary artisan to make the proposed combination. The second sentence appears to propose a different combination in which Julia's voice recognition is added into Nazarathy's or Quigley's system; however, Petitioner does not sufficiently explain such a combination, and we are not persuaded by it. Nevertheless, we are persuaded based on the totality of the record that a person of ordinary skill in the art would have been motivated to combine Julia with Nazarathy or Quigley for the reasons articulated above.

*d. Julia discloses the processing and responding limitations.*

Finally, claim 1 recites "processing said multiplicity of said received identified speech channels to create a multiplicity of identified speech content" and "responding to said identified speech content to create an identified speech content response that is unique, for each of said multiplicity of identified speech contents." Ex. 1001, 51:5–10.

Petitioner contends that Julia discloses these limitations. Pet. 47–48. In particular, Petitioner contends that Julia's remote server 108 processes the voice data "to understand the user's request and construct an appropriate query or request for navigation of remote data source." *Id.* (quoting Ex. 1012, 3:61–65; citing *id.* at 7:5–7). According to Petitioner, "[a]fter identifying the information requested by a particular viewer, '[t]he retrieved information is transmitted across the network and presented to the user on a suitable client display device.'" *Id.* (second alteration in original) (quoting Ex. 1012, 2:65-67; citing *id.* at 4:18–20, 11:60–67).

Patent Owner again argues that the Petition's mapping is inconsistent (*see* PO Resp. 17–18), but we disagree, as explained above (*see supra* § II.E.1.b). Patent Owner does not otherwise dispute Petitioner's showing for these claim limitations. *See generally* PO Resp.

We are persuaded that Julia discloses the processing and responding limitations. In particular, Julia's remote server 108 processes the data received from multiple users to identify the words spoken by each user (and the corresponding requests) and responds with information responsive to each request. *E.g.*, Ex. 1012, 3:61–4:20, 7:1–11, 6:12–26, 11:60–67, Fig. 4.

*e. Patent Owner fails to show a nexus between its evidence of objective indicia and the claimed invention.*

Patent Owner contends that there are objective indicia of nonobviousness "based on the success and acclaim of an AgileTV system embodying the invention of the '196 patent." PO Resp. 29; *see id.* at 28–41

(addressing objective indicia and supporting evidence).[13] Petitioner disagrees. Pet. Reply 18–26.

Having considered the parties' arguments and evidence, we determine that Patent Owner fails to show a nexus between its alleged objective indicia and the merits of the claimed invention. *See Fox Factory, Inc. v. SRAM, LLC*, 944 F.3d 1366, 1373 (Fed. Cir. 2019) ("The patentee bears the burden of showing that a nexus exists." (quoting *WMS Gaming Inc. v. Int'l Game Tech.*, 184 F.3d 1339, 1359 (Fed. Cir. 1999))). Specifically, as explained below, we disagree with Patent Owner's contentions that (1) it is entitled to a presumption of nexus and (2) the evidence shows a direct nexus between the objective indicia and the claimed invention. *See* PO Resp. 29–30.

Because Patent Owner fails to establish nexus, we accord no weight to Patent Owner's alleged objective indicia of nonobviousness. *See Bosch Auto. Serv. Solns., LLC v. Matal*, 878 F.3d 1027, 1036 (Fed. Cir. 2017), *as amended on reh'g in part* (Mar. 15, 2018) ("Evidence of [objective indicia] is only relevant to the obviousness inquiry 'if there is a nexus between the claimed invention and the [objective indicia].'" (alterations in original) (quoting *In re Affinity Labs of Tex., LLC*, 856 F.3d 883, 901 (Fed. Cir. 2017))).

*i. Presumption of nexus*

Patent Owner first contends that it is entitled to a presumption of nexus because the "AgileTV system embodied the invention disclosed and

[13] The AgileTV system was developed by Patent Owner (then known as AgileTV) in the early 2000s. *See* Ex. 2023 ¶¶ 3, 15.

claimed in the '196 patent." PO Resp. 30. In support, Patent Owner argues that "[t]he '196 patent describes embodiments of the AgileTV system," as demonstrated by Mr. Chaiken's testimony, the Specification, and the provisional application to which the '196 patent claims priority. *Id.* at 30–31 (citing Ex. 2032 ¶¶ 8–12, 13–16; Ex. 1001, 11:62–65, 12:50–56; Fig. 3; Ex. 2006, 11, 14, 29).

Patent Owner's arguments are misplaced because Patent Owner focuses on the contents of the *disclosure* of the '196 patent (*see* PO Resp. 30–31; PO Sur-Reply 18) rather than whether a *claim* of the '196 patent covers, and is coextensive with, the AgileTV system. *See Fox Factory*, 944 F.3d at 1373 ("[P]resuming nexus is appropriate when the patentee shows that the asserted objective evidence is tied to a specific product and that product embodies the claimed features, and is coextensive with them." (quotations omitted)); *see also WBIP, LLC v. Kohler Co.*, 829 F.3d 1317, 1329 & n.3 (Fed. Cir. 2016) (explaining that a presumption of nexus is appropriate when a specific product "is the invention disclosed and claimed in the patent," not when "the patented invention is only a component of the product" (quotations omitted)).

Applying the correct standard, we find that Patent Owner has not persuasively shown that it is entitled to a presumption of nexus. First, Patent Owner fails to show that the AgileTV system embodies the claimed features. On this point, Patent Owner provides no explanatory argument or evidence—in fact, Patent Owner does not identify *which claim* is allegedly embodied in the AgileTV system.

This missing analysis is not found elsewhere in Patent Owner's Response. In a different subsection of the Response, Patent Owner includes a sentence having elements that are somewhat similar to the limitations of claim 1. *Compare* PO Resp. 32–33, *with* Ex. 1001, 50:62–51:10. Patent Owner does not appear to rely on this sentence to show that the AgileTV embodied the claims (and does not reference claim 1). But, even if it had, we would still find this lone sentence to be insufficient. Specifically, that sentence states:

> By 2003, AgileTV implemented the above-described architecture [i.e., "Server-Centric Voice Recognition"] to partition a received back channel to a multiplicity of received identified speech channels, process those to create a multiplicity of identified speech content, and responding to the multiplicity of identified speech content to create a unique identified speech content response for each identified speech content.

PO Resp. 32–33 (citing Ex. 2032 ¶¶ 9–10, 15; Ex. 2003, 9; Ex. 2007, 8; Ex. 2008, 1, 3). However, Patent Owner fails to provide analysis or evidence to support the statements that arguably correspond to the limitations of claim 1 (e.g., that the AgileTV "architecture . . . partition[ed] a received back channel"). Patent Owner cites the testimony of Mr. Chaiken, but he describes the AgileTV architecture generally and simply reiterates the quoted statement. Ex. 2023 ¶¶ 9–10, 15. Patent Owner also cites documents, but they merely show that AgileTV provided voice recognition processing at a cable headend. Ex. 2007, 8; Ex. 2008, 1, 3. Because there is insufficient documentary evidence or explanation, we afford little weight to the conclusory sentence quoted above and to Mr. Chaiken's conclusory testimony on that point. *See* 37 C.F.R. § 42.65 ("Expert testimony that does

not disclose the underlying facts or data on which the opinion is based is entitled to little or no weight."); *see also* Pet. Reply 18–19 ("Patent Owner cites no evidence describing its actual commercial product. It merely argues in a circle that the product embodied the patent because the patent allegedly describes the product."). Accordingly, we determine that Patent Owner does not show that the AgileTV system embodies the claimed features.

Second, Patent Owner has not persuasively shown that it is entitled to a presumption of nexus because Patent Owner also fails to show that the AgileTV system is coextensive with claim 1. Patent Owner fails to address the degree of correspondence between its product and the patent claim, and the omission of this analysis is independently fatal to Patent Owner's contention that nexus should be presumed. *See Fox Factory*, 944 F.3d at 1374 ("Although we do not require the patentee to prove perfect correspondence to meet the coextensiveness requirement, what we do require is that the patentee demonstrate that the product is essentially the claimed invention.").

In fact, as to the coextensiveness requirement, our review of the evidence indicates that the AgileTV system included important, unclaimed features that materially impacted its functionality, relating to the accuracy and ease-of-use of its voice recognition technology. *See, e.g.*, Ex. 2002, 3; Ex. 2009, 2; Ex. 2010, 4; Ex. 2019; Ex. 2020, 7; *see also* Ex. 2032 ¶¶ 14 (acknowledging that the AgileTV system changed over time, but without addressing the substance or timing of those changes). This evidence further supports our finding that a presumption of nexus is inappropriate. *See Fox Factory*, 944 F.3d at 1375 ("A patent claim is not coextensive with a product

that includes a 'critical' unclaimed feature that is claimed by a different patent and that materially impacts the product's functionality."); *Demaco Corp. v. F. Von Langsdorff Licensing Ltd.*, 851 F.2d 1387, 1392 (Fed. Cir. 1988) ("When the thing that is commercially successful is not coextensive with the patented invention—for example, if the patented invention is only a component of a commercially successful machine or process—the patentee must show prima facie a legally sufficient relationship between that which is patented and that which is sold.").

*ii. Direct evidence of nexus*

We next evaluate whether Patent Owner has proven "nexus by showing that the evidence of secondary considerations is the 'direct result of the unique characteristics of the claimed invention.'" *Fox Factory*, 944 F.3d at 1373–74 (quoting *In re Huang*, 100 F.3d 135, 140 (Fed. Cir. 1996)). Patent Owner asserts that "[t]he success and industry praise of the AgileTV system was the direct result of AgileTV having successfully implemented the claimed invention to provide voice recognition processing for multiple users in a cable television network." PO Resp. 33; *see also id.* at 31–33 (alleging direct evidence of nexus), 33–40 (addressing objective indicia and evidence). We disagree.

Initially, we note that Patent Owner's analysis is undermined by two erroneous assumptions. First, Patent Owner appears to assume that its evidence of objective indicia should show nonobviousness as long as: (a) AgileTV embodied the claim and (b) the objective indicia relate to AgileTV. But this skips the nexus requirement entirely—it does not

consider whether there is any connection between the evidence and the claimed invention. *See, e.g.*, *Henny Penny Corp. v. Frymaster LLC*, 938 F.3d 1324, 1332 (Fed. Cir. 2019) ("[T]o be accorded substantial weight in the obviousness analysis, the evidence of secondary considerations must have a 'nexus' to the claims, i.e., there must be 'a legally and factually sufficient connection' between the evidence and the patented invention." (quoting *Demaco*, 851 F.2d at 1392)).

Second, Patent Owner appears to assume that the claimed invention is, generally, the concept of voice recognition processing for multiple users in a cable television network. This is not appropriate. The challenged claims do not require voice recognition *in cable systems*: they encompass speech recognition in any *video delivery* network. *See* Ex. 1001, 50:64–66 (independent claim 1 reciting a method "in a network supporting at least one of cable television delivery and video delivery"), 55:33–36 (independent claim 27 reciting commensurate limitation). Thus, it is not sufficient to show a nexus between the evidence and voice recognition in cable systems specifically. *See Therasense, Inc. v. Becton, Dickinson & Co.*, 593 F.3d 1325, 1336 (Fed. Cir. 2010) ("Because the claims are broad enough to cover devices that either do or do not solve the 'short fill' problem, [patent owner's] objective evidence of non-obviousness fails because it is not 'commensurate in scope with the claims which the evidence is offered to support.'" (quoting *In re Grasselli*, 713 F.2d 731, 743 (Fed. Cir. 1983)).

That assumption is also inappropriate here because, as we have found, the general concept of voice recognition processing for multiple users in a network supporting video or cable television delivery was expressly

disclosed in the prior art (*e.g.*, Ex. 1012, 1:30–43, 2:13–25, 3:61–4:35, 6:12–26), and the law requires "a nexus to some aspect of the claim not already in the prior art." *In re Kao*, 639 F.3d 1057, 1069 (Fed. Cir. 2011); *see also id.* at 1068 ("Where the offered secondary consideration actually results from something other than what is both claimed and *novel* in the claim, there is no nexus to the merits of the claimed invention.").[14]

We have reviewed the specific arguments and evidence presented regarding alleged objective indicia (*see* PO Resp. 33–40), and we find that Patent Owner fails to show a direct nexus between the evidence and the claimed invention. We address each of Patent Owner's alleged objective indicia in turn.

Patent Owner first argues that certain evidence demonstrates "a long-felt but unmet need for using voice recognition in cable systems." PO Resp. 33–34 (emphasis omitted) (citing Ex. 2001; Ex. 2002, 3; Ex. 2032 ¶¶ 6–12; Ex. 2040). At most, Patent Owner demonstrates a connection between its evidence and the general concept of voice recognition in cable systems, but, as explained above, this general concept is neither novel nor required by the claims. Moreover, although Patent Owner touts its "comprehensive" solution, which included the microphone, transport, and server-side voice recognition engine (*see* PO Resp. 34), it fails to identify any correlation between these features and the invention recited in the

[14] We agree with Patent Owner's statement that a nexus could be shown between the objective evidence and "the claimed combination as a whole" (PO Sur-Reply 12), but Patent Owner fails to provide any argument or evidence to demonstrate a nexus between the evidence and the claimed combination as a whole (*see* PO Resp. 31–40; PO Sur-Reply 12–13).

challenged claims. Accordingly, we find no nexus between Patent Owner's evidence of long-felt need and the challenged claims.[15]

Patent Owner also argues that AgileTV received industry praise (and praise from Petitioner), but similarly fails to show any connection between the alleged praise of the AgileTV system and the claimed invention. *See* PO Resp. 35–37 (citing Ex. 2009, 3; Ex. 2010, 4, 6; Exs. 2011–2019; Ex. 2020, 4, 6–7; Ex. 2032 ¶¶ 17–25); Pet. Reply 21–23 (arguing that Patent Owner fails to tie its evidence to any novel feature of the challenged claims). For example, Patent Owner fails to show that the 2005 award by Speech Technology Magazine was related to any features recited in the challenged claims. *See* Ex. 2009, 2–3 (stating that the award is given for solutions "that have impacted organizations in innovative and unique ways"). Similarly, we find Patent Owner's other evidence lacks any apparent connection to the claimed invention. *See* Ex. 2023 ¶¶ 17–25; Ex. 2010, 4, 6; Exs. 2012–2019; Ex. 2020, 4, 6–7. In fact, the evidence indicates that AgileTV received attention for a feature that is not recited in the challenged claims—namely, voice recognition technology. *See, e.g.*, Ex. 2009, 2 (touting the product's

[15] Furthermore, Patent Owner fails to show that any alleged need was long-felt. *See* PO Resp. 33–34; Pet. Reply 20–21. On this point, Patent Owner relies on Mr. Chaiken, who testifies that, "[a]s early as 2000, AgileTV recognized" a need to facilitate navigation of digital content available to cable subscribers. Ex. 2032 ¶¶ 6–7; *see also* Ex. 2001 (AgileTV business plan in April 2000). However, the '196 patent was filed shortly thereafter, in February 2001, claiming priority to applications filed on or after June 8, 2000. Ex. 1001, codes (22), (60), (63). We are not persuaded that a need allegedly recognized by one company for no more than a few months qualifies as a long-felt need.

ability to accurately recognize spoken words using "extensive, dynamically managed database of more than 100,000 phrases"); Ex. 2010, 4 (identifying "[e]ase of use and convenience of voice navigation" as one of the most compelling features); Ex. 2019 (discussion on the Kudlow & Cramer indicates that ease of use and accuracy of voice recognition were key features); Ex. 2016, 1 (Comcast executive pointing to voice recognition feature with intuitive commands); Ex. 2020, 7 (Buckingham Research Group found "interesting . . . the ease with which [the AgileTV system] could conduct searches (e.g., for all programs starring Julia Roberts)"); *cf.* Ex. 1012, 14:9–28 (prior art disclosed voice recognition with intuitive commands such as "show me movies starring John Wayne"). Accordingly, we find no nexus between Patent Owner's evidence purporting to show industry praise and the claimed invention.

Patent Owner next contends that the AgileTV system was commercially successful because "millions of dollars" were invested. PO Resp. 37–38 (citing Ex. 2002, 3; Ex. 2003, 34; Ex. 2021, 1–2; Ex. 2032 ¶ 26). Again, Patent Owner again fails to tie any of this evidence to the challenged claims, and thus, fails to show nexus.[16]

---

[16] Furthermore, we are not persuaded that the cited evidence shows commercial success. Patent Owner shows that its company had investors (*see, e.g.*, Ex. 2032 ¶ 26 (summarizing other exhibits); Ex. 2003, 34 (identifying other products)), but fails to show that the AgileTV system itself was commercially successful. For example, Patent Owner introduces no evidence regarding the market share of the AgileTV system, and the evidence does not show any significant revenue for that product. *See* PO Resp. 37–38; *see also* Pet. Reply 24 (identifying deficiencies in Patent Owner's evidence).

Finally, Patent Owner contends that Petitioner previously licensed the patent and copied the claimed invention. PO Resp. 38–40 (citing Exs. 2022–2029; Ex. 2032 ¶¶ 27–32). These allegations fare no better.

As to the former, we find no sufficient connection between the ’196 patent and the cited License and Development Agreement (“LDA”; Exhibit 2022). *See* PO Resp. 38–39; Pet. Reply 24–25 (arguing that the license to the ’196 patent in the LDA was limited, provided for no consideration, and simply “prudent” given the business efforts). The purpose of the LDA was to evaluate the AgileTV system for possible deployment in Petitioner’s products, and it included a patent license tailored to that goal. *See* PO Resp. 38–39 (identifying “the limited purposes” of the license and citing Ex. 2022, 8); Ex. 2022, 1, 8; Ex. 1024 (testimony of Mr. Paul Cook), 160:20–107:9. The license also included all patents owned or licensable by Patent Owner at the time; an exhibit to the LDA listed twenty-one patents and applications, as well as the application that would later issue as the ’196 patent. Ex. 2022, 77–78; *see id.* at 4 (license includes “AgileTV Patents”), 42–43 (“AgileTV Patents” includes all patents owned by AgileTV during the coverage period). Based on these facts, we find that the license to the yet-to-be-issued ’196 patent was incidental to the LDA, and the parties entered into that agreement for reasons unrelated to the ’196 patent. Accordingly, we determine that the LDA alone does not establish a legally or factually sufficient nexus with the ’196 patent. *See Shoes by Firebug LLC v. Stride Rite Children’s Grp.*, LLC, 962 F.3d 1362, 1372 (Fed. Cir. 2020) (“Because the licenses include numerous intellectual property rights in addition to the [challenged] patents, the agreements on

their face do not establish a nexus between the commercial interest in Firebug's products and the claims of the [challenged] patents.").

As for the allegations of copying, we find the evidence insufficient to support Patent Owner's contention. *See* PO Resp. 39–40. Patent Owner asserts that Petitioner's X1 System "is practically identical to the AgileTV solution installed in [Petitioner's] cable network in the mid-2000" and that the "X1 System practices the invention claimed in the '196 patent." *Id.* However, Patent Owner fails to provide sufficient evidence or analysis to support either contention. Patent Owner cites to its preliminary infringement contentions at district court (Ex. 1017, 38–81) and an instructional video for "Promptu Voice Controlled Television" for Comcast Cable (Ex. 2026), but provides no explanation of the contents or significance of these exhibits. We reject Patent Owner's apparent attempt to incorporate by reference contents of these documents into the Response (*see* 37 C.F.R. § 42.6(a)(3)), and the information wholly contained within the Exhibits will not be considered to be part of the Response. *Cf. infra* § II.F.2.b (similarly refusing to allow attempted incorporation by reference of extensive declaration testimony regarding whether Murdock is entitled to the filing date of its provisional application). Patent Owner also points to Mr. Chaiken's declaration, where he testifies that "acquaintances of mine who were aware of the scope of my work at AgileTV told me they confused Comcast's functionality with the AgileTV solution." Ex. 2032 ¶ 34. As explained in § III.A.6, we exclude statements by Mr. Chaiken's unidentified acquaintances as hearsay; they have occurred outside of this proceeding (because they are not offered in declarations from the persons uttering them), and Patent Owner presents the

statements in an attempt to establish the truth of the matter implicitly asserted (that Petitioner copied the AgileTV system). No other evidence supports Mr. Chaiken's assertion of copying (*see, e.g.*, *id.* ¶ 35), and we note that Mr. Chaiken does not testify to the accuracy or import of the preliminary infringement contentions (Ex. 1017) or instructional video (Ex. 2026) cited by Patent Owner. Thus, on this record, Patent Owner fails to show that Petitioner's X1 System meets the limitations of any challenged claim. Consequently, Patent Owner fails to show any copying of the claimed invention.

*f. Conclusion for claim 1*

We have considered the evidence presented by both parties related to the objective indicia of nonobviousness. As explained above, we find that Patent Owner fails to show a nexus between the evidence of objective indicia and the claimed invention. Consequently, we accord no weight to the evidence of nonobviousness.

On the other hand, we find the evidence of obviousness to be strong. Julia teaches the preamble language as well as the receiving, processing, and responding limitations of claim 1. *See supra* § II.E.1.a–b, d. The Julia-Nazarathy combination and the Julia-Quigley combination each disclose the partitioning limitation of claim 1, and a person of ordinary skill in the art would have been motivated to make these combinations to yield the partitioning limitation. *See supra* § II.E.1.c. In particular, Julia discloses that its technique can be used in a cable television network and that its remote server can receive and process multiple user requests simultaneously,

but fails to describe specifically how this would be accomplished. An ordinary artisan would have been motivated to look to other references that describe cable television networks (including Nazarathy and Quigley), and given the references' disclosures, an ordinary artisan would have found it obvious to implement Julia's processing of multiple user requests in a cable network by combining those requests on the back channel and partitioning those requests at the headend (e.g., by multiplexing and demultiplexing the information).

Considering the entirety of the evidence before us, we determine that the evidence of obviousness outweighs that of nonobviousness. Accordingly, we find that Petitioner has established by a preponderance of the evidence that claim 1 is unpatentable as obvious over the Julia-Nazarathy combination and over the Julia-Quigley combination.

*2. Dependent Claims 2, 4, and 12*

Petitioner contends that the subject matter of dependent claims 2, 4, and 12 would have been obvious over Julia in view of either Nazarathy or Quigley. Pet. 48–52. Patent Owner does not address Petitioner's showing for these claims. *See generally* PO Resp.

Claim 2 depends from claim 1 and further recites:

> wherein at least one of said identified speech channels has an associated user site; and
>
> wherein the step partitioning said received back channel is further comprised of the step of:
>
>> partitioning said received back channel into a multiplicity of said received identified speech channels from said associated user site;

> wherein the step processing said multiplicity of said received identified speech channels is further comprised the step of:
>
> > processing said multiplicity of said received identified speech channels from said associated user site to create a multiplicity of said identified speech contents; and
>
> wherein the step responding to said identified speech content is further comprised the step of:
>
> > responding to said identified speech content from said associated user site to create said identified speech content response for said associated user site.

Ex. 1001, 51:12–30. Petitioner contends that Julia discloses the limitations additionally recited by this claim, except for the partitioning limitation, for which Petitioner points to Julia in combination with Nazarathy or Quigley. Pet. 48–51. In support, Petitioner relies on its discussion of claim 1 and further states that Julia discloses processing each voice command and transmitting the requested information back to the associated user via its communications box 104. *Id.* (citing Ex. 1012, 2:65–67, 3:37–55, 3:61–66, 4:18–20, 11:60–67, Fig. 1a; Pet. 45–48; Ex. 1019 ¶¶ 332, 334–337, 339, 341).

Claim 4 depends from claim 2 and further recites:

> wherein the step responding to said identified speech contents from said associated user site is comprised of the steps of:
>
> > processing said identified speech content response to create said identified user site response; and
> >
> > sending said identified user site response to said identified user site.

Ex. 1001, 51:46–54. Petitioner contends that Julia discloses the limitations additionally recited by this claim. Pet. 51–52. Specifically, Petitioner contends that Julia discloses processing voice data to understand the user's

request, retrieving the requested information, and transmitting it to communications box 104 for display. *Id.* (citing Ex. 1012, 3:61–66, 4:18–20; Ex. 1019 ¶ 343).

Claim 12 also depends from claim 2, and it further recites:

> wherein the step responding to said identified speech content from said associated user site is further comprised of the step of:
>
> > responding to said speech content identified as to said user site based upon natural language to create a speech content response of said speech content identified with said user site.

Ex. 1001, 52:48–55. Petitioner contends that Julia discloses the limitations additionally recited by this claim. Pet. 52. In support, Petitioner relies on its discussion of claims 1 and 2, and Petitioner also quotes Julia's express statement that it "relates generally to the navigation of electronic data by means of spoken *natural language* requests." *Id.* (quoting Ex. 1012, 1:16–20; citing Ex. 1012, 3:37–39, 7:1–8:32; Pet. 47–51; Ex. 1019 ¶¶ 363–366).

Patent Owner does not address Petitioner's showing for these claims and has therefore waived any opposition. *See generally* PO Resp.; *see also* Paper 11 (Scheduling Order), 3 ("The patent owner is cautioned that any arguments for patentability not raised in the response will be deemed waived.").

Petitioner's assertions as to claims 2, 4, and 12 are supported by the cited evidence and are persuasive. Moreover, as noted above in the context of independent claim 1, we have determined that the objective evidence of nonobviousness is entitled to no weight because Patent Owner fails to show a nexus with the merits of the claimed invention, and the same is true for

these dependent claims. Furthermore, Patent Owner has not submitted objective evidence of nonobviousness evidence specifically directed to the features of these dependent claims.

Considering the entirety of the evidence before us, we determine that Petitioner has established by a preponderance of the evidence that claims 2, 4, and 12 are unpatentable as obvious over Julia in view of Nazarathy and over Julia in view of Quigley.

### *3. Dependent Claims 5 and 6*

Petitioner contends that the subject matter of dependent claims 5 and 6 would have been obvious over Julia in view of either Nazarathy or Quigley and also in further view of either Banker or Gordon. Pet. 61–65. Patent Owner disputes Petitioner's showing for claim 5 (PO Resp. 24–26) and contends that Petitioner's assertions for claim 6 are similarly defective (*id.* at 26).

Claims 5 and 6 both depend from dependent claim 2 and specify that "the step responding to said identified speech contents from said associated user site is comprised of" additionally recited steps. Ex. 1001, 51:56–58, 5:65–67. Claim 5 further recites:

> assessing said speech content response identified as to said user site to *create a financial consequence identified as to said user site*; and
>
> *billing said user site based upon said financial consequence*.

*Id.* at 51:59–63 (emphasis added). Claim 6 similarly recites:

> assessing said speech response to create a financial consequence identified with said user site;

> displaying said financial consequence to create a displayed financial consequence at said user site;
>
> confirming said displayed financial consequence from said user site to create a financial commitment; and
>
> billing said user site based upon said financial commitment.

*Id.* at 52:1–8.

We focus our discussion on claim 5 because it is representative of the parties' dispute.

*a. Julia alone does not disclose the assessing and billing limitations*

Petitioner contends that Julia discloses the assessing and billing limitations of claim 5. Pet. 62–63. In particular, Petitioner submits that Julia's system can be implemented in the "Diva Systems video-on-demand system," and Petitioner contends that a person of ordinary skill in the art would know "the Diva System provided pay-per-view functionality." *Id.* at 62 (citing Ex. 1012, 1:30–43, 3:61–4:17, 6:47–59; Ex. 1019 ¶ 345). Petitioner further contends that an ordinary artisan would understand that such functionality "would require a purchase, resulting in a bill" and, thus, contends that the limitations are satisfied. *Id.* at 62–63 (also citing Ex. 1019 ¶ 347).

We are not persuaded, and we agree with Patent Owner's argument that Petitioner fails to show that Julia discloses "creat[ing] a financial consequence identified as to said user site," as required by claim 5. *See* PO Resp. 24–26. Julia states that its system may be implemented in "the Diva Systems video-on-demand system" (Ex. 1012, 6:47–59), but Petitioner fails to show that this discloses the assessing and billing limitations of claim 5.

First, we are not persuaded that Julia's disclosure of "video-on-demand" satisfies the assessing and billing limitations. In particular, contrary to Petitioner's argument, we do not agree that any debt or payment qualifies as the claimed "financial consequence" (*see* Pet. Reply 15–16; *see also* Pet. 62–63)—claim 5 specifies assessing *the speech content response* (recited in independent claim 1) *to create* the financial consequence. Thus, even if an ordinary artisan would have understood video-on-demand to require a paid subscription (as Petitioner contends), we are not persuaded that such a subscription-based service would create a financial consequence based on an assessment of a response to a user's voice command (e.g., by charging a fee for providing a particular video requested by a user). Although we agree that "pay-per-view" would satisfy these claim limitations, Petitioner has not established that "video-on-demand" means or requires "pay-per-view." For example, the fact that a given a video rental system could qualify as both "video-on-demand" and "pay-per-view" fails to show that these terms are synonymous. *See* Pet. Reply 16 (citing 1029 ¶ 22).

Second, we are not persuaded that Julia's reference to "the Diva System[]" discloses the assessing and billing limitations because Petitioner also has not established that "the Diva Systems video-on-demand system" specifically means or requires pay-per-view. Ex. 1012, 6:58–59. Mr. Schmandt testifies that "[a] person of ordinary skill in the art would have known that the Diva System provided pay-per-view functionality" (Ex. 1019 ¶ 345), but we accord little weight to this testimony because it does not disclose the underlying facts or data upon which his opinion is

based (*see* 37 C.F.R. § 42.65(a)). Moreover, even if "pay-per-view" was a functionality provided by a Diva System, that does not mean the "pay-per-view" functionality was required or used in all applications of the system. (For example, Mr. Schmandt has not testified that "the Diva Systems video-on-demand system" provides only "pay-per-view" video service.) Thus, even if we were to agree that the Diva System provided pay-per-view, Julia's contemplated implementation on a Diva System *may*, *or may not*, mean that it would be implemented in the Diva System's pay-per-view feature.[17] Thus, Julia's reference to the Diva system does not disclose pay-per-view, or the assessing and billing limitations of claim 5.

*b. Julia-Banker discloses the assessing and billing limitations*

As Petitioner points out (Pet. Reply 14), the Petition also contends that the assessing and billing limitations are disclosed by the combination of Julia and Banker. Pet. 63 (citing *id.* at 35–38; Ex. 1019 ¶¶ 348–349). In particular, Petitioner contends that Banker discloses a pay-per-view system in which a user purchases a particular movie and is billed for the purchase. *Id.* at 36–37 (citing Ex. 1015, 7:60–63, 16:43–50, 16:62–17:3, Fig. 6F; Ex. 1019 ¶ 184). Petitioner further contends that an ordinary artisan would have been motivated to combine Julia with Banker. *Id.* at 66–67 (citing

[17] We evaluate only the contentions advanced in the Petition, so we do not consider whether it would have been obvious to use Julia's voice recognition with the pay-per-view features allegedly provided by the Diva System. *See* Pet. 62–63 (contending that Julia "discloses" the limitations, but not that the limitations are suggested by or would have been obvious in light of Julia).

Ex. 1012, 1:30–38, 3:36–60, 6:47–59, Fig. 1a; Ex. 1015, Abst., 16:43–55, 16:62–17:3, Fig. 6F; Ex. 1019 ¶¶ 446–447).

Patent Owner submits that "Petitioner appears to premise any combination of Banker or Gordon with Julia on Julia already disclosing" the claimed creation of a financial consequence (in the assessing limitation). PO Resp. 24 (citing Pet. 63, 67). Patent Owner does not otherwise address Petitioner's contention that the Julia-Banker combination discloses the limitations of claim 5. *See generally* PO Resp. 24–26; *see also* Sur-Reply 9 (arguing that the discussion of Banker's disclosure of the assessing limitation in the Reply is "unambiguously not responsive" to the Response).

Having considered the parties' arguments and the evidence presented, we are persuaded that the combination of Julia and Banker discloses the assessing and billing limitations of claim 5. *See* Pet. 36–37, 63. Julia discloses the use of voice commands to navigate video-on-demand systems, and Julia returns the requested content to the user. Ex. 1012, 1:30–42, 6:47–59; *see, e.g.*, *id.* at 14:9–28 (describing request and corresponding response for John Wayne movies). Banker discloses a user interface that allows pay-per-view purchases from a remote, and Banker bills the user based on its pay-per-view purchases. Ex. 1015, 1:14–17, 7:60–63, 16:43–50, 16:62–17:3. We are also persuaded that a person of ordinary skill in the art would have been motivated to combine Julia's voice navigation with Banker's pay-per-view purchase and accounting to yield the limitations recited in dependent claim 5. *See* Pet. 66–67. Mr. Schmandt testifies that "[i]t would also have been within the capability of a person of ordinary skill in the art to combine Julia and . . . Banker . . . to permit a user to order pay-per-view

movies using the sequence described by Banker . . . but using voice commands as in Julia." Ex. 1019 ¶ 447. We credit this testimony because it is logical and consistent with the cited references, and because there is no evidence to the contrary. We also agree with Petitioner's contention that the proposed Julia-Banker combination would have been no more than a predictable combination of prior art elements (Julia's voice interface with Banker's pay-per-view system) from analogous references according to known methods. *See* Pet. 66–67; Ex. 1019 ¶¶ 446–447.

On this record, we do not agree with Patent Owner's assessment that Petitioner relied exclusively on Julia to disclose "creat[ing] a financial consequence." *See* PO Resp. 24. Although that was our understanding in the Institution Decision (*see* Inst. Dec. 44–45), we are now persuaded the Petition also relies on Banker to disclose this limitation (*see* Pet. 63). Indeed, Petitioner elucidates its prior contention with a targeted quote from the Petition and a clear explanation. *See* Pet. Reply 14 (citing Pet. 63). The portion of the Petition cited by Petitioner does map Banker's purchase of a pay-per-view movie to the assessing limitation (which requires "creat[ing] a financial consequence"). Pet. 36–37 (cited by *id.* at 63). Moreover, we observe that, for dependent claim 6, the Petition clearly contends that Banker discloses a substantially similar limitation. *See* Pet. 64. Accordingly, we are persuaded that the Petition contends that Banker discloses the assessing and billing limitations of claim 5, so we disagree that Petitioner relied exclusively on Julia to disclose creating a financial consequence.

Further, for substantially the same reasons as those explained for dependent claim 5, Petitioner has persuasively shown that the Julia-Banker

combination discloses the limitations of dependent claim 6, and a person of ordinary skill in the art would have been motivated to combine these references to yield the limitations of the claim. *See* Pet. 64–65 (citing *id.* at 38–41 (citing Ex. 1015, 16:62–17:3, Fig. 6F)). In particular, Banker displays the financial consequence by providing a notification to the user, and Banker confirms the financial consequence by receiving the user's confirmation. Ex. 1015, 16:62–17:3. As noted above, Patent Owner contends that Petitioner's contentions for claim 6 suffer the same deficiencies as those for claim 5, but Patent Owner does not otherwise dispute Petitioner's showing for claim 6. *See* PO Resp. 26.

*c. Conclusion*

As discussed above, Julia does not disclose the assessing and billing limitations of claim 5. For the same reasons, we conclude that Julia does not disclose the commensurate limitations of claim 6. Accordingly, we determine that Petitioner has not established by a preponderance of the evidence that claims 5 or 6 are unpatentable as obvious over the Julia-Nazarathy combination or the Julia-Quigley combination.

As noted above in the context of independent claim 1, we have determined that the objective evidence of nonobviousness is entitled to no weight because Patent Owner fails to show a nexus with the merits of the claimed invention. The same is true for dependent claims 5 and 6. Furthermore, Patent Owner has not submitted objective evidence of nonobviousness specifically directed to the features of these dependent claims. On the other hand, we find the evidence of obviousness for these

claims to be strong with respect to the Julia-Nazarathy-Banker combination and with respect to the Julia-Quigley-Banker combination.

Considering the entirety of the evidence before us, we determine that Petitioner has established by a preponderance of the evidence that claims 5 and 6 are unpatentable as obvious over the Julia-Nazarathy-Banker combination and the Julia-Quigley-Banker combination.

Given this determination, we elect not to reach Petitioner's contentions based on the Julia-Nazarathy-Gordon combination and the Julia-Quigley-Gordon combination (where Gordon replaces Banker). *See* Pet. 63 (citing *id.* at 35–38; Ex. 1019 ¶¶ 348–349); *see id.* at 37–38 (citing Ex. 1016, 2:60–63, 9:64–10:9, 10:16–27, 10:43–46, Figs. 3B, 8; Ex. 1019 ¶ 185).

*4. Dependent Claim 13*

Petitioner contends that the subject matter of dependent claim 13 would have been obvious over Julia in view of either Nazarathy or Quigley. Pet. 52–53. Patent Owner disagrees. PO Resp. 26–27.

Claim 13 depends from dependent claim 2 and specifies that the claimed step of processing the multiplicity of received speech channels for at least one user site is further comprised of:

> processing said received speech channels from said user site based upon natural language for said user site to create said speech content identified as to said user site.

Ex. 1001, 52:56–64. Petitioner contends that Julia discloses these additionally recited limitations. Pet. 52–53. In support, Petitioner relies on its discussion of claims 1 and 2, and Petitioner submits that Julia expressly states that its system is "driven by spoken natural language input." *Id.* at 53

(quoting Ex. 1012, 3:37–39; citing Ex. 1012, 1:16–20, 7:1–8:32; Pet. 47–51; Ex. 1019 ¶¶ 368–369).

Patent Owner contends that Petitioner fails to show that Julia discloses processing received speech channels "based upon natural language *for said user site* to create said speech content identified as to said user site." PO Resp. 26–27 (emphasis omitted and added). Patent Owner further contends that this claim language requires the recited natural language to be "specific to a user site." *Id.* at 27; *see* PO Sur-Reply 4 (clarifying that the claims further require the processing to occur "based upon" this natural language). Also, according to Patent Owner, for this claim, the Petition merely copies the analysis for claim 12, even though that claim does not include this requirement. PO Resp. 27 (citing Pet. 52–53).

Having reviewed the parties' arguments and cited evidence, we are persuaded that Julia discloses the limitations additionally recited by dependent claim 13. Julia is directed to navigating content using spoken natural language requests. Ex. 1012, 3:37–39. The user's voice data is transmitted to a remote server that processes this data "in order to understand the user's request." *Id.* at 3:45–66; *see id.* at 7:1–8:32 (describing method for processing data). Julia expressly teaches that "speech recognition [is used] to extract words from the voice data" and "natural language parsing of those words [is used] in order to generate a structured linguistic representation of the user's request." *Id.* at 7:7–11; *see also id.* at 7:12–15 (stating that "practitioners will know" of commercially available speech recognition engines); *id.* at 7:25–28 (indicating that existing speech recognition engines have "a vocabulary lexicon of likely words or

phrases" for "a given application"); 7:28–43 (adapting recognition engine based on user's interaction with system), 7:47–8:9 (natural language parsers uses grammar to correctly interpret requests), 8:25–32 (explaining that recognition engine can learn "from the past usage patterns of a particular user or of groups of users").

We disagree with Patent Owner's argument that the Petition is deficient. *See* PO Resp. 26–27. The Petition's contentions for claims 12 and 13 are understandably similar because the subject matter recited by those claims is similar. Moreover, as shown by the Petition, Julia discloses processing "based upon natural language for said user site," as required by the claim. Pet. 52–53 (citing, *inter alia*, Ex. 1012, 7:1–8:32). Julia teaches that a user's spoken request is processed using a speech recognition engine and a natural language parser, which identify the user's spoken words by comparing the voice data with possible words. Ex. 1012, 7:1–8:32.

We also disagree with Patent Owner's implication that the claimed "natural language" must be *unique* to a particular user site. *See* PO Resp. 27. Patent Owner provides no argument or evidence to support such a narrow interpretation of the claim language, and we perceive no support in the Specification. *See* Ex. 1001, 25:54–64 (describing processing "based upon a natural language for the user site" generally). And, to the extent Patent Owner contends Julia is otherwise defective, Patent Owner fails to adequately explain what Julia is allegedly missing.

Moreover, as noted above in the context of independent claim 1, we have determined that the objective evidence of nonobviousness is entitled to no weight because Patent Owner fails to show a nexus with the merits of the

claimed invention, and the same is true for dependent claim 13. Furthermore, Patent Owner has not submitted objective evidence of nonobviousness evidence specifically directed to the features of this claim. On the other hand, we find the evidence of obviousness to be strong.

Considering the entirety of the evidence before us, we determine that Petitioner has established by a preponderance of the evidence that claim 13 is unpatentable as obvious over the Julia-Nazarathy combination and over the Julia-Quigley combination.

#### 5. *Independent Claim 27 and Dependent Claims 28, 30–32, and 38–42*

Independent claim 27 recites a system comprising "a speech recognition system coupled to a wireline node in [a] network." Ex. 1001, 55:9–12. As explained above, this claim language requires the recited speech recognition system and the wireline node to be different components. *See supra* § II.C.2 (construing claim limitation).

In the Petition, Petitioner contends that this limitation is disclosed by Julia. Pet. 53. It provides the following explanation:

> In Julia, speech recognition processing is performed by remote server 108, which constitutes "a wireline node" in the network.

*Id.* (citing Ex. 1019 ¶¶ 373–375).

Patent Owner responds that the Petition fails to identify the claimed "speech recognition system" that is "coupled to" the claimed wireline node. PO Resp. 20–21. Patent Owner argues that Julia's remote server 108 cannot be both the claimed "speech recognition system" as well as the claimed "wireline node" given the proper construction of the claim phrase. *Id.* at 21.

We agree with Patent Owner that the Petition fails to establish that Julia teaches a "speech recognition system coupled to a wireline node in [a] network," as required by independent claim 27. The Petition points to Julia's remote server 108 as teaching both the claimed "speech recognition system" and the "wireline node" (Pet. 53), but the claim requires two different components.

In its Reply, Petitioner asserts that "Julia's remote server 108 constitutes a wireline node and within it (i.e., coupled to it) is processing logic 300 (a speech recognition system)." Pet. Reply 12 (citing Pet. 53; Ex. 1019 ¶¶ 371, 373). Patent Owner responds that this is an untimely "new argument that the speech recognition system in claim 27 is the 'processing logic 300.'" PO Sur-Reply 3. Patent Owner also argues that this new mapping is inconsistent with the Petition, which contends that remote server 108 teaches components of the claimed speech recognition system, including the recited "back channel receiver," "speech channel partitioner," and "processor network." *Id.* at 3–4.

We agree with Patent Owner that the Reply's mapping of Julia's processing logic 300 to the claimed speech recognition system is an untimely new argument. As prior support for this mapping, Petitioner points to page 53 of its Petition and paragraphs 371 and 373 of Mr. Schmandt's declaration. *See* Pet. Reply 12. However, the cited portion of the Petition maps both claim elements to Julia's remote server 108, and it does not even refer to Julia's processing logic 300. *See* Pet. 53. Petitioner's reliance on Mr. Schmandt's declaration fares no better, as he unequivocally states:

> As discussed above, *the "speech recognition system" is the remote server 108*, which includes processing logic 300. The remote server 108 is also a "wireline node" as that term is used in the '196 Patent" . . . .

Ex. 1019 ¶ 373 (emphasis added); *accord id.* ¶ 371 (explaining that remote server 108 teaches the claimed "speech recognition system" because it processes a user's spoken input request using request processing logic 300).

Other portions of the Petition also demonstrate that Petitioner previously mapped Julia's remote server 108 to the claimed speech recognition system. Specifically, claim 27 requires the speech recognition system to further comprise "a back channel receiver," "a speech channel partitioner," and "a processor network" (Ex. 1001, 55:11–21), and Petitioner maps each of these components to Julia's remote server 108, not processing logic 300 (*see* Pet. 54–55). Indeed, as Patent Owner observes (*see* PO Sur-Reply 3–4), Petitioner fails to explain how these elements would be taught under the Reply's new mapping of Julia's processing logic 300 to the claimed speech recognition system.

Accordingly, we determine that Petitioner's mapping to Julia's processing logic 300 in the Reply is an improper new argument, and we do not address this argument further. *See* 37 C.F.R. 42.23(b); *Intelligent Bio-Systems*, 821 F.3d at 1369 ("Unlike district court litigation—where parties have greater freedom to revise and develop their arguments over time and in response to newly discovered material—the expedited nature of IPRs bring with it an obligation for petitioners to make their case in their petition to

institute."); *see also* PTAB Consolidated Trial Practice Guide (CTPG) 73–74 (Nov. 2019).[18]

Accordingly, Petitioner has not established, by a preponderance of the evidence, that Julia teaches "a speech recognition system coupled to a wireline node in said network," as required by claim 27.[19] For all of the Julia grounds, Petitioner relies on Julia alone to teach this limitation. Thus, Petitioner has not shown, by a preponderance of the evidence, that independent claim 27 as well as its dependent claims (i.e., claims 28, 30–32, and 38–42) are unpatentable based on any of the obviousness grounds relying on Julia.

### *F. Obviousness Grounds Based on Murdock*

Petitioner contends that claims 1, 2, 4–6, 12, 13, 27, 28, 30–32, 38–42 are unpatentable under 35 U.S.C. § 103(a) over Murdock alone and over Murdock in view of Nazarathy, Quigley, Banker, and/or Gordon. Pet. 9–12, 14–42; *see supra* § I.C (table delineating grounds). Patent Owner argues that the Petition fails to establish that Murdock is prior art. PO Resp. 6–8.

We have considered the parties' arguments and evidence. Below, we address all grounds that rely on Murdock ("the Murdock grounds").

---

[18] *Available at* https://www.uspto.gov/TrialPracticeGuideConsolidated.

[19] In light of this determination, we need not (and do not) reach the parties' arguments regarding issue preclusion. *See* PO Remand Open. 8–10; Pet. Remand Resp. 1–5, 8–9.

*1. Parties' Contentions*

In the Petition, Petitioner asserts that Murdock is prior art to the '196 patent under 35 U.S.C. § 102(e) because Murdock is entitled to the benefit of the provisional application to which Murdock claims priority.[20] Pet. 1, 9–10. In relevant part, the Petition states:

> Murdock . . . was filed on November 16, 2000, and claims priority to a provisional application filed on November 17, 1999. The Board has held that under the Federal Circuit decision in *Dynamic Drinkware, LLC v. National Graphics, Inc.*, 800 F.3d 1375 (Fed. Cir. 2015), a patent is entitled to the benefit of a "provisional application's filing date if the provisional application provides sufficient support for *at least one claim* in the child [patent]." Petitioner's expert Christopher Schmandt shows in his supporting declaration that at least claim 1 of Murdock is supported by the disclosure in the provisional application. In addition, the Board has required that "the provisional application must *also* provide support for the subject matter relied upon" to establish that the challenged patent is unpatentable. Petitioner's expert witness confirms that the Murdock provisional application meets this requirement, too. *Thus, Murdock is entitled to the benefit of the provisional application's filing date (i.e., November 17, 1999) and is therefore prior art to the '196 patent under at least 35 U.S.C. § 102(e).*

[20] The application that led to Murdock was filed on November 16, 2000 ("the Murdock application"), claiming the benefit of a provisional filed on November 17, 1999 ("the Murdock provisional"). Ex. 1010, codes (22), (60). The application that led to the '196 patent was filed on February 16, 2001 ("the '196 application"), claiming the benefit of a provisional filed on June 8, 2000 ("the '196 provisional"). Ex. 1001, codes (22), (60). Thus, the sequence of filing was as follows: the Murdock provisional, the '196 provisional, the Murdock application, and then the '196 application.

*Id.* at 9–10 (last emphasis added) (citing, *inter alia*, Ex. 1019 ¶¶ 99–113, 135–293); *see also id.* at 1 (contending that "the claimed invention of the '196 Patent was not new or inventive as of its earliest effective filing date in June 2000" and identifying Murdock "which is based on a provisional application filed in 1999"), 4 (identifying effective filing date of the '196 patent).

Patent Owner contends that Petitioner's "barebones analysis" fails to sufficiently support its contention. PO Resp. 6–8. Patent Owner argues that Petitioner improperly incorporates by reference "more than 150 paragraphs of essential analysis from the declaration into the [P]etition." *Id*. at 7. Patent Owner contends that the statements in the Petition fail to satisfy the particularity and specificity required by law and regulation. *Id.* (citing 35 U.S.C. § 312(a)(3); 37 C.F.R. §§ 42.22(a)(2), 42.104(b)(4)–(5)). Patent Owner further contends that "the incorporation violates the Board's rules prohibiting arguments made in a supporting document from being incorporated by reference into a petition" and, consequently, that the material improperly incorporated should be disregarded. *Id*. at 7–8 (citing 37 C.F.R. § 42.6(a)(3); Inst. Dec. 26). Finally, Patent Owner contends that "it would be improper for the Board to consider any new arguments or evidence from Petitioner at this late date in the proceedings." *Id.* at 8 (citing 5 U.S.C.A. § 554(b)(3)).

Petitioner replies that it satisfied its initial burden of production under *Dynamic Drinkware* "by explaining that Murdock, which has an earlier filing date than the '196 Patent, is invalid[at]ing," thereby shifting the burden of production to Patent Owner. Pet. Reply 2 (citing *Dynamic*

*Drinkware, LLC v. Nat'l Graphics, Inc.*, 800 F.3d 1375, 1379–80 (Fed. Cir. 2015)). Petitioner also argues that, in another proceeding, the Board addressed the "same situation" and concluded that the burden had shifted to Patent Owner. *Id.* (citing *Sonos, Inc. v. D&M Holdings Inc.*, IPR2017-01045, Paper 17 (PTAB Jan. 31, 2018) (denying request for rehearing of institution decision)). According to Petitioner, because Patent Owner did not meet its burden, "the '196 Patent should be held to its filing date." *Id.* at 2–3. In addition, in the Reply, Petitioner provides argument and cites evidence to support its contention that Murdock is entitled to the filing date of its provisional. *Id.* at 3–8.

Patent Owner argues that Petitioner's Reply includes improper new arguments. PO Sur-Reply 4–8. In particular, Patent Owner contends that Petitioner's Reply attempts to include "the necessary and improperly incorporated argument" regarding Murdock's alleged entitlement to its provisional filing date. *Id.* at 6 (citing Pet. Reply 3–8). Patent Owner further contends that "the Reply asserts for the first time that Murdock is prior art even if not entitled to its provisional date." *Id.* at 7 (citing Pet. Reply 2–3). According to Patent Owner, it "was not on notice that the priority claim of the '196 patent was being challenged or even pertinent," and Patent Owner observes that "Petitioner still does not even assert that the '196 patent is not entitled to priority of the provisional application." *Id.*

*2. Analysis*

This case involves dueling priority dates evaluated under pre-AIA 35 U.S.C. § 102(e). The parties' arguments implicate two ways in which

Petitioner could have shown that Murdock qualifies as prior art: (a) the Murdock application was filed before the ’196 application, and (b) the Murdock provisional was filed before the ’196 provisional. For the latter, Petitioner would also need to have shown that Murdock is entitled to the filing date of its provisional.

For the reasons explained below, we determine that, in the Petition, Petitioner did not argue the former and did not prove the latter. While the Reply seeks to cure those deficiencies, Petitioner’s belated arguments and evidence are untimely. Thus, we determine that Petitioner fails to prove that Murdock is prior art.

We address each path to prior art status in turn.

*a. Petitioner fails to show that Murdock qualifies as prior art based on the applications’ filing dates.*

Petitioner contends that, under *Dynamic Drinkware*, “Petitioner had the initial burden of production and met it by explaining that Murdock, which has an earlier filing date than the ’196 Patent, is invalid[at]ing.” Pet. Reply 2 (citing Pet. 9–10). Petitioner contends that this shifted the burden of production to Patent Owner “to argue or produce evidence . . . that Murdock is not prior art because the asserted claims are entitled to the benefit of a filing date before Murdock’s filing date.” *Id.* (citations omitted). According to Petitioner, because “Patent Owner failed to antedate Murdock,” the ’196 patent “should be held to its filing date.” *Id.* at 3.

We do not agree. Petitioner’s position is untenable because it is inconsistent with the contentions actually advanced in the Petition.

Despite Petitioner's implication, the Petition does not contend that Murdock qualifies as prior art *because the Murdock application was filed before the '196 application*. Rather, the Petition expressly (and only) contends that Murdock qualifies as prior art because it is entitled to the filing date of *the Murdock provisional*, which is earlier than the filing date of *the '196 provisional*.[21] The Petition specifies the filing dates of Murdock and its provisional, identifies requirements for showing that a patent is entitled to its provisional filing date, states that Murdock and its provisional meet these requirements, and concludes:

> Thus, Murdock is entitled to the benefit of the provisional application's filing date (i.e., November 17, 1999) *and is therefore prior art* to the '196 Patent under at least 35 U.S.C. § 102(e).

Pet. 9–10 (emphasis added); *see also id.* at 1 (comparing Murdock provisional filing date to the challenged patent's effective filing date). The Petition's only mention of the filing date of the Murdock application, on the other hand, is a passing biographical reference. *See id.* at 9. And the Petition does not indicate, in any way, that this date is relevant to its challenges. *See* Sur-Reply 7.

Moreover, this contention would have been in tension with the Petition's statements regarding the effective filing date of the '196 patent. Specifically, the Petition contends that the effective filing date of the '196 patent is June 2000 (i.e., the filing date of the '196 provisional):

> [T]he claimed invention of the '196 Patent was not new or inventive as of *its earliest effective filing date in June 2000*.

[21] We address this contention in the next subsection. *See infra* § II.F.2.b.

Pet. 1 (emphasis added). The Petition includes one other passage regarding the effective filing date:

> A. Effective Filing Date of the '196 Patent
>
> The '196 Patent issued from U.S. Application No. 09/785,375, which was filed on February 16, 2001 and claims priority to a provisional application filed on June 8, 2000. The effective filing date of all claims in the '196 Patent is therefore no earlier than June 8, 2000. Patent Owner does not assert any earlier priority date.

*Id.* at 4 (citations and emphasis omitted). Importantly, the Petition does not question whether '196 patent is entitled this effective filing date. Given the Petition's assumed effective filing date (June 2000), Murdock could qualify as prior art based on the filing of the Murdock provisional (November 1999), but not the Murdock application (November 2000).

Accordingly, given these facts, we determine the Petition fails to contend that Murdock qualifies as prior art because the Murdock application was filed before the '196 application. It would be inappropriate to interpret this Petition otherwise because: the Petition fails to include the contention expressly or by implication; the contention would conflict with the Petition's assumption regarding the challenged patent's effective filing date; and it is Petitioner's obligation to clearly identify its contentions in the Petition. *See* 37 C.F.R. §§ 42.22(a)(2), 42.104(b). As the Federal Circuit explained, "the expedited nature of IPRs bring with it an obligation for petitioners to make their case in their petition to institute," and "[i]t is of the utmost importance that petitioners in the IPR proceedings adhere to the requirement that the initial petition identify 'with particularity' the 'evidence that supports the grounds for the challenge to each claim.'" *Intelligent Bio-Sys., Inc. v.*

*Illumina Cambridge Ltd.*, 821 F.3d 1359, 1369 (Fed. Cir. 2016) (quoting 35 U.S.C. § 312(a)(3)).

As a result, contrary to Petitioner's argument (*see* Pet. Reply 2), the Petition did not shift the burden of production to Patent Owner to show that the asserted claims are entitled to a filing date before the filing date of Murdock's application. *See Dynamic Drinkware*, 800 F.3d at 1379 (explaining that a petitioner has the initial burden of going forward with evidence on a contention). In other words, because the Petition did not include this contention, the burden did not shift to Patent Owner to present contrary evidence.

The Petition's failure to include the relevant contention readily distinguishes the Board decision cited by Petitioner. *See* Pet. Reply 2 (citing *Sonos*, IPR2017-01045, Paper 17). In *Sonos*, the petition *expressly* stated that petitioner disagreed that the challenged patent was entitled to the effective filing date of its provisional. IPR2017-01045, Paper 1 at 13 (March 7, 2017) (Petition). Moreover, that petition expressly contended *both* that the reference was prior art because it was filed before the challenged patent *and* that the reference was entitled to the filing date of its provisional. *Id.* The omission of these contentions in the Petition is a crucial distinction.

Furthermore, because the Petition assumed that the asserted claims were, in fact, entitled to the benefit of the filing date of the '196 provisional, we cannot fault Patent Owner for failing to prove its entitlement to this date in its Response. *See In re Magnum Oil Tools Int'l, Ltd.*, 829 F.3d 1364, 1376 (Fed. Cir. 2016) (explaining that "shifting of the burden of production

is warranted [when a patentee seeks to establish an earlier priority date] because the patentee affirmatively seeks to establish a proposition not relied on by the patent challenger and not a necessary predicate for the unpatentability claim asserted"); *see also* Inst. Dec. 24 (assuming, based on the Petition's contentions, that the '196 patent is entitled to the filing date of the '196 provisional).

On that point, we further analogize Petitioner's assertion (that the '196 patent's priority date is June 8, 2000) to assertions made by litigants in their pleadings. Specifically, the doctrine of judicial admissions recognizes that allegations made by litigants in their pleadings are binding in the case and on appeal. *See, e.g.*, *Purgess v. Sharrock*, 33 F.3d 134, 144 (2d Cir. 1994) ("A court can appropriately treat statements in briefs as binding judicial admissions of fact.") (citations omitted); *see also* Kenneth S. Broun et al., McCormick on Evidence § 254 (6th ed. 2009). Further, "'[a] patent owner . . . is undoubtedly entitled to notice of and a fair opportunity to meet the grounds of rejection,' based on due-process and APA guarantees." *In re NuVasive, Inc.*, 841 F.3d 966, 971 (Fed. Cir. 2016) (quoting *Belden Inc. v. Berk-Tek LLC*, 805 F.3d 1064, 1080 (Fed. Cir. 2015)). Accordingly, and pursuant to both the doctrine of judicial admissions and the APA's requirement for notice of and a fair opportunity to meet the grounds of rejection, Petitioner's adoption of an effective filing date in its Petition acts as notice to Patent Owner of the scope of the proceeding and as a binding admission unless otherwise withdrawn. Petitioner's Reply does not expressly contend that the '196 patent is not entitled to the filing date of the

’196 provisional (*see* PO Sur-Reply 7; *see generally* Pet. Reply 2–8), so Petitioner has not withdrawn its earlier admission.

Finally, to the extent Petitioner seeks to add this contention to this proceeding via its Reply, that argument is untimely. *See* Pet. Reply 2. A petitioner’s “reply may only respond to arguments raised in the . . . patent owner response[] or decision on institution.” 37 C.F.R. § 42.23(b) (2020). “‘Respond,’ in the context of [this regulation], does not mean proceed in a new direction with a new approach as compared to the positions taken in a prior filing.” CTPG 74; *see id.* 73 (“Petitioner may not submit new evidence or argument in reply that it could have presented earlier, e.g. to make out a prima facie case of unpatentability.”); *accord* Office Trial Practice Guide, 77 Fed. Reg. 48,756, 48,767 (Aug. 14, 2012) (including substantially similar instructions in original TPG). To the degree the Reply argues that Murdock is prior art because the Murdock application was filed before the ’196 application, this argument advances a new contention that could have been presented earlier and is not fairly responsive to the critiques in Patent Owner’s Response. *Cf. Ariosa Diagnostics v. Verinata Health, Inc.*, 805 F.3d 1359, 1367–68 (Fed. Cir. 2015) (finding no reversible error in Board’s refusal to consider an argument in a petitioner’s Reply that relied on a new embodiment in the asserted prior art reference not addressed in the petition)

Accordingly, we determine that Petitioner fails to show that Murdock qualifies as prior art based on a comparison of the filing dates of the Murdock application and the ’196 application.

*b. Petitioner fails to show that Murdock qualifies as prior art based on the provisionals' filing dates.*

As noted above, the Petition contends that Murdock qualifies as prior art because Murdock is entitled to its provisional filing date, which is before the '196 provisional. *See* Pet. 9–10.

Murdock is not presumed to be entitled to the filing date of the Murdock provisional; rather, Petitioner must prove entitlement to that date by a preponderance of the evidence. *See Dynamic Drinkware*, 800 F.3d. at 1380. To that end, the Petition observes that the Board has held that a patent is entitled to its provisional filing date if the provisional provides support for: at least one claim of the patent, and the subject matter relied upon. Pet. 9–10 (citing *Ex Parte Mann*, 2016 WL 7487271, at *5–6 (PTAB Dec. 21, 2016)). Then, addressing Murdock, the Petition states:

> Petitioner's expert Christopher Schmandt shows in his supporting declaration that at least claim 1 of Murdock is supported by the disclosure in the provisional application. . . . Petitioner's expert witness confirms that the Murdock provisional application [also] meets [the] requirement [of providing support for the subject matter relied upon.]

Pet. 10 (citing Ex. 1019 ¶¶ 99–113, 135–293). The Petition includes no other argument or evidence to show that Murdock is entitled to the filing date of its provisional.

We begin by rejecting Petitioner's attempt to incorporate by reference extensive analysis from Mr. Schmandt's declaration into the Petition. *See* Pet. 9–10. This is improper, and Mr. Schmandt's analysis will not be considered as part of the Petition. As the Institution Decision explained, "there is no requirement to rewrite every word or example from an expert

declaration into a petition," but the Petition includes two conclusory sentences that are supported by a cite to over 170 paragraphs, spanning more than 80 pages in the Schmandt Declaration. Inst. Dec. 26. We stated that "[n]o reasonable application of 37 C.F.R. § 42.6(a)(3) to the circumstance of this case results in a conclusion that Petitioner complied with the rule." *Id.*; *see* 37 C.F.R. § 42.6(a)(3) ("Arguments must not be incorporated by reference from one document into another document."). At trial, Patent Owner maintains its argument that the attempted incorporation by reference is improper, and Petitioner fails to respond on this issue. *See* PO Resp. 7–8; *see generally* Pet. Reply 2–8. Accordingly, we maintain our initial determination and disregard all the material improperly incorporated by reference, which is paragraphs 99 to 113 and 135 to 293 of the Schmandt Declaration.

Consequently, the Petition is left with only two conclusory sentences, and these sentences fail to show that Murdock is entitled to the filing date of the Murdock provisional. *See Dynamic Drinkware*, 800 F.3d. at 1381–82 (finding that petitioner failed to prove entitlement to reference's provisional filing date "because [petitioner] failed to compare *the claims* of the [asserted reference] to the disclosure in the [reference's] provisional application").

Petitioner attempts to include the required analysis in the Reply, but these arguments are untimely. *See* Pet. Reply 3–8; PO Resp. 6 (arguing the argument is improper). A petitioner's "reply may only respond to arguments raised in the . . . patent owner response[] or decision on institution." 37 C.F.R. § 42.23(b) (2020). Patent Owner argued that the Petition lacks the requisite particularity and improperly incorporates by reference

Mr. Schmandt's testimony. PO Resp. 6–8. The Reply does not fairly respond to these critiques; rather, it attempts to provide the analysis and evidence that was missing. *See* CTPG 73 ("Petitioner may not submit new evidence or argument in reply that it could have presented earlier, e.g. to make out a prima facie case of unpatentability."). This is improper, and we decline to consider Petitioner's untimely arguments.

As a result, Petitioner fails to meet its burden to show that Murdock is entitled to the filing date of its provisional. Accordingly, Petitioner fails to show that Murdock qualifies as prior art because Murdock is entitled to its provisional filing date, which is before the '196 provisional.

*3. Sufficiency of Petition for Claims 27, 28, 30–32, and 38–42*

Even if Petitioner had shown Murdock to be prior art to the '196 patent, we would still determine that Petitioner fails to show that the subject matter of claims 27, 28, 30–32, and 38–42 would have been obvious over Murdock or Murdock in combination with the other asserted references.

As noted above, independent claim 27 requires a "speech recognition system coupled to a wireline node," and this claim language requires the recited speech recognition system and the wireline node to be different components. *See supra* §§ II.C.2 (construing this claim limitation), II.E.5 (explaining that Petitioner fails to show that any of the Julia grounds disclose this limitation). As with the Julia grounds, Petitioner's contentions on the Murdock grounds point to the same component as teaching both the claimed speech recognition system and the wireline node. *See* Pet. 26.

Consequently, Petitioner fails to show that the asserted references teach or suggest this claim limitation.

In particular, Petitioner contends that, "[i]n Murdock, speech recognition processing is performed by remote server computer 130, which constitutes 'a wireline node' in the network." Pet. 26 (citing Ex. 1019 ¶ 216); *see also id.* at 26–28 (mapping Murdock's remote server computer 130 to the speech recognition system's components). Mr. Schmandt similarly testifies:

> Murdock discloses this element. As discussed above, the "speech recognition system" is the remote server computer 130, which includes speech recognition module 410. The remote server computer 130 is also a "wireline node" as that term is used in the '196 Patent . . . .

Ex. 1019 ¶ 216. Thus, Petitioner points to the same component for the claimed "speech recognition system" and the claimed "wireline node"; however, the claim requires two different components.

Accordingly, Petitioner has not established, by a preponderance of the evidence, that Murdock teaches "a speech recognition system coupled to a wireline node in said network," as claim 27 requires. For each of the Murdock grounds, Petitioner relies on Murdock to teach this limitation. Thus, Petitioner has not shown, by a preponderance of the evidence, that independent claim 27 as well as its dependent claims (i.e., claims 28, 30–32, and 38–42) are unpatentable based on the obviousness grounds relying on Murdock.

*4. Conclusion*

Petitioner has not shown by a preponderance of the evidence that Murdock is prior art to the '196 patent. Each of the Murdock grounds relies on Murdock in whole or in part. Consequently, we determine that Petitioner has not proven by a preponderance of the evidence that claims 1, 2, 4–6, 12, 13, 27, 28, 30–32, 38–42 are unpatentable based on any of the Murdock grounds.

Moreover, even if Petitioner had shown Murdock to be prior art to the '196 patent, we would still determine that Petitioner has not proven by a preponderance of the evidence that claims 27, 28, 30–32, and 38–42 are unpatentable based on any of the Murdock grounds.

## III. MOTIONS TO EXCLUDE

*A. Petitioner's Motion to Exclude*

Petitioner moves to exclude some of the evidence related to alleged objective indicia of nonobviousness, namely Exhibits 2001, 2002, 2003, 2009, 2010, 2011, 2015, 2021, and 2024 as well as paragraph 34 of Exhibit 2032. Paper 37. According to Petitioner, these exhibits are or contain inadmissible hearsay. *Id.* Patent Owner opposes the motion (Paper 45), and Petitioner replies in support (Paper 51).

For the reasons below, Petitioner's Motion to Exclude is *granted* with respect to Exhibit 2011 and paragraph 34 of Exhibit 2032, *denied* with respect to Exhibits 2001, 2002, 2003, 2009, 2010, and 2015, and *dismissed as moot* with respect to Exhibits 2021 and 2024.

*1. Exhibits 2001, 2002, and 2003 — Business Plans and Presentations*

Exhibits 2001, 2002, and 2003 relate to a business plan (Ex. 2001), corporate summary (Ex. 2002), and a presentation (Ex. 2003). Petitioner argues these exhibits should be excluded as hearsay. Paper 37 at 2–3.

We deny Petitioner's request to exclude these exhibits. Patent Owner contends, and we agree, that each of these exhibits meets the hearsay exception for business records. Paper 45 at 4 (citing FRE 803(6)).

*2. Exhibits 2009 and 2021 — Press Releases*

Exhibits 2009 and 2021 are purported press releases. Petitioner argues these exhibits should be excluded as hearsay. Paper 37 at 3–4.

We deny Petitioner's motion to exclude Exhibit 2009. Patent Owner relies upon this document to show that it received industry praise (specifically, an award from Speech Technology Magazine). PO Resp. 35. Patent Owner contends, and we agree, that this exhibit meets the hearsay exception for business records. Paper 45 at 5 (citing FRE 803(6)). However, this exhibit is only marginally probative of industry praise because it contains Patent Owner's characterization of the award, rather than the actual award itself, and because Patent Owner fails to provide additional, contextual information regarding the award (such as the criteria for the award).

Exhibit 2021 is a news article containing a press release related to AgileTV obtaining investor funding. *See* PO Resp. 37–38 (citing exhibit to show "AgileTV's ability to raise millions of dollars of investment"). The fact that AgileTV obtained investor funding is not disputed, and we do not

rely on Exhibit 2021 in our final decision. As a result, we dismiss Petitioner's motion to exclude Exhibit 2021 as moot.

*3. Exhibit 2010 — Market Research Reports*

Exhibit 2010 is an internal AgileTV email attaching documents "summarizing various aspects of usability and market research" regarding its television product. Petitioner contends that the email and attachments are hearsay. Paper 37 at 4.

We deny Petitioner's request to exclude Exhibit 2010. We are persuaded this exhibit meets the hearsay exception for business records. *See* Paper 45 at 6–8.

*4. Exhibits 2011 and 2015 — Internal AgileTV Emails Regarding Comcast*

Exhibit 2011 is an email from AgileTV's then-CEO Paul Cook to "All Employees." Mr. Cook's email forwards an email from Mr. Chaiken purporting to recount statements made by certain Comcast employees. Ex. 2011, 1. Exhibit 2011 is proffered by Patent Owner to show Comcast's interest in the AgileTV product. *See* PO Resp. 36. The only relevant purpose of this exhibit is for the content of the third party statements. Moreover, we do not believe an email summarizing alleged statements by numerous Comcast employees falls within the business records exception to the hearsay rule. Accordingly, we agree with Petitioner that Exhibit 2011 should be excluded for the hearsay contained therein.

Exhibit 2015 is an email from Mr. Cook to "All Employees" with a "Weekly Update" that purports to recount conversations with certain

Comcast employees. Patent Owner cites this exhibit to support its contention that "Comcast expressed an intent to invest in AgileTV and deploy the AgileTV solution for Comcast's 21 million subscribers." PO Resp. 37. This email appears to be a regular weekly email update made in the normal course of business as conveyed by Mr. Cook. Accordingly, we determine Exhibit 2015 falls within the exception to the hearsay rule for normally recorded business documents.

*5. Exhibit 2024 — Article Regarding Comcast*

Exhibit 2024 is an online article entitled "A Voice in the Navigation Wilderness." Patent Owner cites the article to support its assertion that "the AgileTV solution was successfully deployed and tested in the Comcast system." PO Resp. 39. Patent Owner argues that this shows that the claimed invention was commercially valuable. *Id.* at 38–39.

Consideration of Exhibit 2024 does not lead to a different result. The parties do not dispute that Petitioner conducted a trial of the AgileTV system (*see* Pet. Reply 23–24), but Patent Owner fails to show a nexus between that trial and the claimed invention. Accordingly, we dismiss Petitioner's motion to exclude as to this exhibit as moot.

*6. Exhibit 2032 — Portions of the Chaiken Declaration*

Exhibit 2032 is the declaration of Patent Owner's former CTO David Chaiken. Ex. 2032 ¶ 3. Mr. Chaiken testifies that "acquaintances . . . told me they confused Comcast's functionality with the AgileTV solution." *Id.* ¶ 34. The acquaintances' alleged statements are being used to prove copying by Petitioner. PO Resp. 39–40. We perceive no relevance to the

mere fact that these statements were allegedly made, and this is not the type of information an expert witness would normally rely upon (uncited sources conveying speculative information) in forming an opinion. We agree this is impermissible hearsay, offered to prove the truth of the matter asserted, and we grant Petitioner's motion to exclude it.

*B. Patent Owner's Motion to Exclude*

Patent Owner moves to exclude certain portions of Exhibit 1024. Paper 40. Petitioner opposes the motion (Paper 46), and Patent Owner replies in support of the motion (Paper 49).

Exhibit 1024 includes excerpts from the deposition transcript of Mr. Paul M. Cook, which are cited by Petitioner in its Reply. Paper 40 at 1–3 (citing Pet. Reply 1, 15, 21, 23 n.5, 23–24). Patent Owner contends that "Mr. Cook's PTAB testimony is limited to only the final 10 pages of the transcript" and the cited portions of the transcript are instead "Mr. Cook's district court testimony." Paper 40, 1–2 (citing Ex. 2045). According to Patent Owner, this "district court testimony" should be excluded as hearsay. *Id.* Patent Owner further contends that the cited testimony exceeds the scope of cross-examination because it "go[es] far afield of Mr. Cook's direct testimony" in this proceeding. *Id.* at 3 (citing 37 C.F.R. §§ 42.53(d)(5)(ii), 42.62(a); Fed. R. Evid. 611(b); Ex. 2042 (Cook declaration)).

Initially, we do not agree that Mr. Cook's testimony is hearsay—it was made while testifying in this proceeding. *See* Paper 40, 1 (characterizing deposition as "Mr. Cook's combined deposition for the related district court litigation and several PTAB proceedings"); Ex. 1024,

1–2 (caption lists this proceeding); *see also* Ex. 2042 (Cook provided direct testimony in this proceeding); Ex. 2045 (deposition excerpt does not indicate otherwise).

As for Patent Owner's complaint that Petitioner submitted and relied upon cross-examination testimony that exceeded its proper scope, such an argument is not properly raised in a Motion to Exclude. As our Scheduling Order makes clear:

> A Motion to Exclude shall only raise admissibility issues under the Federal Rules of Evidence, and not be used as additional briefing on any other topic, subject, or issue, for example, any assertion that a certain brief or evidentiary submission exceeds the proper scope for such brief or submission. *In case of an issue based on exceeding the proper scope of a submission, the parties must raise the matter by initiating a conference call with the Board.*

Paper 11 (Scheduling Order), 8 (emphasis added). Thus, Patent Owner should have raised this matter by initiating a conference call with the Board, rather than raising this issue in a Motion to Exclude.[22]

Accordingly, Patent Owner's Motion to Exclude is denied.

---

[22] Further, we note that our Decision would not change even if we granted Patent Owner's motion and excluded the identified portions of Exhibit 1024. We cite this exhibit only once, in further support of a subsidiary finding of fact, and we would have made the same finding even in the absence of this exhibit. *See supra* § II.E.1.e.ii

## IV. CONCLUSION[23]

Based on the evidence presented with the Petition, the evidence introduced during the trial, and the parties' respective arguments, Petitioner has shown by a preponderance of the evidence that some of the challenged claims are unpatentable, as specified in the following table:

| Claims | 35 U.S.C. § | References/ Basis | Claims Shown Unpatentable | Claims Not Shown Unpatentable |
|---|---|---|---|---|
| 1, 2, 4–6, 12, 13, 27, 28, 30–32, 38–42 | 103(a) | Murdock | | 1, 2, 4–6, 12, 13, 27, 28, 30–32, 38–42 |
| 1, 2, 4–6, 12, 13, 27, 28, 30–32, 38–42 | 103(a) | Murdock, Nazarathy | | 1, 2, 4–6, 12, 13, 27, 28, 30–32, 38–42 |
| 1, 2, 4–6, 12, 13, 27, 28, 30–32, 38–42 | 103(a) | Murdock, Quigley | | 1, 2, 4–6, 12, 13, 27, 28, 30–32, 38–42 |
| 5, 6, 31, 32 | 103(a) | Murdock, Nazarathy, Banker | | 5, 6, 31, 32 |

[23] Should Patent Owner wish to pursue amendment of the challenged claims in a reissue or reexamination proceeding subsequent to the issuance of this decision, we draw Patent Owner's attention to the April 2019 *Notice Regarding Options for Amendments by Patent Owner Through Reissue or Reexamination During a Pending AIA Trial Proceeding*, 84 Fed. Reg. 16,654 (Apr. 22, 2019). If Patent Owner chooses to file a reissue application or a request for reexamination of the challenged patent, we remind Patent Owner of its continuing obligation to notify the Board of any such related matters in updated mandatory notices. *See* 37 C.F.R. § 42.8(a)(3), (b)(2).

| Claims | 35 U.S.C. § | References/ Basis | Claims Shown Unpatentable | Claims Not Shown Unpatentable |
|---|---|---|---|---|
| 5, 6, 31, 32 | 103(a) | Murdock, Nazarathy, Gordon | | 5, 6, 31, 32 |
| 5, 6, 31, 32 | 103(a) | Murdock, Quigley, Banker | | 5, 6, 31, 32 |
| 5, 6, 31, 32 | 103(a) | Murdock, Quigley, Gordon | | 5, 6, 31, 32 |
| 1, 2, 4–6, 12, 13, 27, 28, 30–32, 38–42 | 103(a) | Julia, Nazarathy | 1, 2, 4, 12, 13 | 5, 6, 27, 28, 30–32, 38–42 |
| 1, 2, 4–6, 12, 13, 27, 28, 30–32, 38–42 | 103(a) | Julia, Quigley | 1, 2, 4, 12, 13 | 5, 6, 27, 28, 30–32, 38–42 |
| 5, 6, 31, 32 | 103(a) | Julia, Nazarathy, Banker | 5, 6 | 31, 32 |
| 5, 6, 31, 32 | 103(a) | Julia, Nazarathy, Gordon[24] | | 31, 32 |

[24] As explained above, because we determine that challenged claims 5 and 6 are unpatentable based on the Julia-Nazarathy-Banker combination, we decline to address claims 5 and 6 on the ground of Julia, Nazarathy, and Gordon.

| Claims | 35 U.S.C. § | References/ Basis | Claims Shown Unpatentable | Claims Not Shown Unpatentable |
|---|---|---|---|---|
| 5, 6, 31, 32 | 103(a) | Julia, Quigley, Banker | 5, 6 | 31, 32 |
| 5, 6, 31, 32 | 103(a) | Julia, Quigley, Gordon[25] | | 31, 32 |
| **Overall Outcome** | | | 1, 2, 4–6, 12, 13 | 27, 28, 30–32, 38–42 |

[25] As explained above, because we determine that challenged claims 5 and 6 are unpatentable based on the Julia-Quigley-Banker combination, we decline to address claims 5 and 6 on the ground of Julia, Quigley, and Gordon.

## V. ORDER

It is hereby:

ORDERED that claims 1, 2, 4–6, 12, and 13 of the ’196 patent are determined to be unpatentable;

FURTHER ORDERED that claims 27, 28, 30–32, and 38–42 of the ’196 patent are not determined to be unpatentable;

FURTHER ORDERED that Petitioner’s Motion to Exclude (Paper 37) is *granted-in-part*, *denied-in-part*, and *dismissed-in-part*;

FURTHER ORDERED that Patent Owner’s Motion to Exclude (Paper 40) is *denied*;

FURTHER ORDERED that the parties shall, no later than 14 days from the entry of this Decision, jointly email a proposed redacted version of this Decision, which identifies proposed redactions with red highlighting, to Trials@uspto.gov; and

FURTHER ORDERED that because this is a Final Written Decision, parties to the proceeding seeking judicial review of the decision must comply with the notice and service requirements of 37 C.F.R. § 90.2.

NON-PUBLIC VERSION – PROTECTIVE ORDER MATERIAL



For PETITIONER:

James Day
Daniel Callaway
FARELLA BRAUN + MARTEL LLP
jday@fbm.com
dcallaway@fbm.com

Leo Lam
KEKER, VAN NEST & PETERS LLP
llam@keker.com

For PATENT OWNER:

Joshua Goldberg
Jacob Schroeder
Cory Bell
Daniel Klodowski
FINNEGAN, HENDERSON, FARABOW, GARRETT & DUNNER, LLP
joshua.goldberg@finnegan.com
jacob.schroeder@finnegan.com
cory.bell@finnegan.com
daniel.klodowski@finnegan.com



NON-PUBLIC VERSION – PROTECTIVE ORDER MATERIAL

US007047196B2

(12) **United States Patent**
**Calderone et al.**

(10) **Patent No.: US 7,047,196 B2**
(45) **Date of Patent: May 16, 2006**

(54) **SYSTEM AND METHOD OF VOICE RECOGNITION NEAR A WIRELINE NODE OF A NETWORK SUPPORTING CABLE TELEVISION AND/OR VIDEO DELIVERY**

(75) Inventors: **Theodore Calderone**, San Carlos, CA (US); **Paul M. Cook**, Woodside, CA (US); **Mark J. Foster**, Palo Alto, CA (US)

(73) Assignee: **AgileTV Corporation**, Menlo Park, CA (US)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 1138 days.

(21) Appl. No.: **09/785,375**

(22) Filed: **Feb. 16, 2001**

(65) **Prior Publication Data**

US 2001/0056350 A1 Dec. 27, 2001

**Related U.S. Application Data**

(63) Continuation-in-part of application No. 09/708,315, filed on Nov. 7, 2000, now Pat. No. 6,480,703, and a continuation-in-part of application No. 09/679,115, filed on Oct. 4, 2000, and a continuation-in-part of application No. 09/664,874, filed on Sep. 19, 2000, now abandoned, and a continuation-in-part of application No. 09/661,486, filed on Sep. 14, 2000.

(60) Provisional application No. 60/210,440, filed on Jun. 8, 2000.

(51) **Int. Cl.**
***G10L 21/00*** (2006.01)

(52) **U.S. Cl.** .................. **704/270.1**; 704/201; 704/231; 715/719; 715/512; 715/726; 709/217

(58) **Field of Classification Search** ........ 704/270–278, 704/231, 251, 246, 201; 715/719, 512, 513, 715/716, 721, 723, 726, 733; 709/217
See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

4,506,387 A 3/1985 Walter ........................ 455/612

FOREIGN PATENT DOCUMENTS

EP 0 782 337 7/1997 .................... 7/173

(Continued)

OTHER PUBLICATIONS

*ACTV Awarded Three Key Digital Television Patents: Coverage Extended to ACTV's Core Technology for Eliminating Video Switching Delay*; May 8, 2001; PRNewswire.

(Continued)

*Primary Examiner*—Vijay Chawan
(74) *Attorney, Agent, or Firm*—Michael A. Glenn; Glenn Patent Group

(57) **ABSTRACT**

A method and system of speech recognition presented by a back channel from multiple user sites within a network supporting cable television and/or video delivery is disclosed. The preferred embodiment of the invention comprises ans system and method of using a back channel containing a multiplicity of identified speech channels from a multiplicity of user sites presented to a speech processing system at a wireline node in a network that supports at least one of cable television delivery and video delivery. One embodiment of the invention comprises a method having the steps of receiving the back channel to create a received back channel; partitioning the received back channel into a multiplicity of received identified speech channels; processing the multiplicity of received identified speech channels to create a multiplicity of identified speech content; and responding to the identified speech content to create an identified speech content response that is unique, for each of the multiplicity of identified speech contents.

**66 Claims, 35 Drawing Sheets**



U.S. PATENT DOCUMENTS

| | | | | |
|---|---|---|---|---|
| RE32,012 E | 10/1985 | Pirz et al. | 381/43 |
| 4,633,499 A | 12/1986 | Nishioka et al. | 381/43 |
| 4,653,045 A | 3/1987 | Stanley et al. | 370/62 |
| 4,757,541 A | 7/1988 | Beadles | 381/43 |
| 4,780,906 A | 10/1988 | Rajasekaran et al. | 381/43 |
| 4,783,809 A | 11/1988 | Glinski | 381/43 |
| 4,797,910 A | 1/1989 | Daudelin | 379/67 |
| 4,821,027 A | 4/1989 | Mallory et al. | 340/521 |
| 4,827,520 A | 5/1989 | Zeinstra | 381/43 |
| 4,837,830 A * | 6/1989 | Wrench et al. | 704/238 |
| 4,847,885 A | 7/1989 | Vittorelli | 379/6 |
| 4,907,079 A | 3/1990 | Turner et al. | 358/84 |
| 4,931,950 A | 6/1990 | Isle et al. | 364/513 |
| 4,959,855 A | 9/1990 | Daudelin | 379/213 |
| 4,972,485 A | 11/1990 | Dautrich et al. | 381/43 |
| 4,991,217 A | 2/1991 | Garrett et al. | 381/43 |
| 5,006,987 A | 4/1991 | Harless | 364/419 |
| 5,125,024 A | 6/1992 | Gokcen et al. | 379/88 |
| 5,127,003 A | 6/1992 | Doll, Jr. et al. | 370/110.1 |
| 5,155,760 A | 10/1992 | Johnson et al. | 379/67 |
| 5,163,083 A | 11/1992 | Dowden et al. | 379/88 |
| 5,165,095 A | 11/1992 | Borcherding | 379/88 |
| 5,181,237 A | 1/1993 | Dowden et al. | 379/88 |
| 5,197,005 A | 3/1993 | Shwartz et al. | 364/419 |
| 5,199,062 A | 3/1993 | Von Meister et al. | 379/67 |
| 5,208,848 A | 5/1993 | Pula | 379/67 |
| 5,220,657 A * | 6/1993 | Bly et al. | 711/152 |
| 5,231,670 A | 7/1993 | Goldhor et al. | 381/43 |
| 5,247,347 A | 9/1993 | Litteral et al. | 358/85 |
| 5,255,305 A | 10/1993 | Sattar | 379/34 |
| 5,271,088 A | 12/1993 | Bahler | 395/2 |
| 5,274,560 A | 12/1993 | LaRue | 364/444 |
| 5,325,421 A | 6/1994 | Hou et al. | 379/67 |
| 5,329,608 A | 7/1994 | Bocchieri et al. | 395/2.52 |
| 5,333,237 A | 7/1994 | Stefanopoulos et al. | 395/12 |
| 5,335,276 A | 8/1994 | Thompson et al. | 380/21 |
| 5,345,538 A | 9/1994 | Narayannan et al. | 395/2.84 |
| 5,349,678 A | 9/1994 | Morris et al. | 395/800 |
| 5,353,336 A | 10/1994 | Hou et al. | 379/67 |
| 5,369,575 A | 11/1994 | Lamberti et al. | 364/419.08 |
| 5,386,556 A | 1/1995 | Hedin et al. | 395/600 |
| 5,434,777 A | 7/1995 | Luciw | 364/419.13 |
| 5,442,749 A | 8/1995 | Northcutt et al. | 395/200.09 |
| 5,446,489 A | 8/1995 | Egendorf | 348/3 |
| 5,475,792 A | 12/1995 | Stanford et al. | 395/2.42 |
| 5,500,920 A | 3/1996 | Kupiec | 395/2.79 |
| 5,513,298 A | 4/1996 | Stanford et al. | 395/2.52 |
| 5,519,608 A | 5/1996 | Kupiec | 364/419.08 |
| 5,526,034 A | 6/1996 | Hoarty et al. | 348/7 |
| 5,550,578 A | 8/1996 | Hoarty et al. | 348/7 |
| 5,553,119 A | 9/1996 | McAllister et al. | 379/67 |
| 5,564,001 A | 10/1996 | Lewis | 395/154 |
| 5,566,271 A | 10/1996 | Tomitsuka et al. | 395/2.84 |
| 5,585,858 A | 12/1996 | Harper et al. | 348/485 |
| 5,602,963 A | 2/1997 | Bissonnette et al. | 395/2.84 |
| 5,608,448 A | 3/1997 | Smoral et al. | 348/7 |
| 5,608,624 A | 3/1997 | Luciw | 395/794 |
| 5,615,296 A | 3/1997 | Stanford et al. | 395/2.1 |
| 5,625,814 A | 4/1997 | Luciw | 395/605 |
| 5,634,086 A | 5/1997 | Rtischev et al. | 395/2.79 |
| 5,642,519 A | 6/1997 | Martin | 395/759 |
| 5,664,061 A | 9/1997 | Andreshak et al. | 704/275 |
| 5,666,400 A | 9/1997 | McAllister et al. | 379/67 |
| 5,668,929 A | 9/1997 | Foster, Jr. | 704/273 |
| 5,671,225 A | 9/1997 | Hooper et al. | 370/468 |
| 5,671,328 A | 9/1997 | Fitzpatrick et al. | 395/2.55 |
| 5,719,921 A | 2/1998 | Vysotsky et al. | 379/88 |
| 5,721,827 A | 2/1998 | Logan et al. | 395/200.47 |
| 5,721,902 A | 2/1998 | Schultz | 395/604 |
| 5,721,938 A | 2/1998 | Stuckey | 395/754 |
| 5,726,984 A | 3/1998 | Kubler et al. | 370/349 |
| 5,729,659 A | 3/1998 | Potter | 395/2.79 |
| 5,732,216 A | 3/1998 | Logan et al. | 395/200.33 |
| 5,737,495 A | 4/1998 | Adams et al. | 395/615 |
| 5,748,841 A | 5/1998 | Morin et al. | 395/2.66 |
| 5,748,974 A | 5/1998 | Johnson | 395/759 |
| 5,752,232 A | 5/1998 | Basore et al. | 704/275 |
| 5,752,246 A | 5/1998 | Rogers et al. | 707/10 |
| 5,774,525 A | 6/1998 | Kanevsky et al. | 379/88 |
| 5,774,841 A | 6/1998 | Salazar et al. | 704/225 |
| 5,774,859 A | 6/1998 | Houser et al. | 704/275 |
| 5,774,860 A | 6/1998 | Bayya et al. | 704/275 |
| 5,777,571 A | 7/1998 | Chuang | 341/176 |
| 5,794,050 A | 8/1998 | Dahlgren et al. | 395/708 |
| 5,794,205 A | 8/1998 | Walters et al. | 704/275 |
| 5,802,526 A | 9/1998 | Fawcett et al. | 707/104 |
| 5,805,775 A | 9/1998 | Eberman et al. | 395/12 |
| 5,809,471 A | 9/1998 | Brodsky | 704/275 |
| 5,812,977 A | 9/1998 | Douglas | 704/275 |
| 5,819,220 A | 10/1998 | Sarukkai et al. | 704/243 |
| 5,819,225 A | 10/1998 | Eastwood et al. | 704/275 |
| 5,821,508 A | 10/1998 | Willard | 235/51 |
| 5,822,727 A | 10/1998 | Garberg et al. | 701/243 |
| 5,826,267 A | 10/1998 | McMillan | 707/9 |
| 5,832,063 A | 11/1998 | Vysotsky et al. | 379/88 |
| 5,832,439 A | 11/1998 | Cox, Jr. et al. | 704/275 |
| 5,855,002 A | 12/1998 | Armstrong | 704/270 |
| 5,860,059 A | 1/1999 | Aust et al. | 704/231 |
| 5,864,815 A | 1/1999 | Rozak et al. | 704/275 |
| 5,864,819 A | 1/1999 | De Armas et al. | 704/275 |
| 5,867,817 A | 2/1999 | Catallo et al. | 704/255 |
| 5,874,939 A | 2/1999 | Galvin | 345/156 |
| 5,884,265 A | 3/1999 | Squitteri et al. | 704/275 |
| 5,885,083 A | 3/1999 | Ferrell | 434/156 |
| 5,890,122 A | 3/1999 | Van Kleeck et al. | 704/275 |
| 5,890,123 A | 3/1999 | Brown et al. | 704/275 |
| 5,892,813 A | 4/1999 | Morin et al. | 379/88.01 |
| 5,893,063 A | 4/1999 | Loats et al. | 704/275 |
| 5,903,870 A | 5/1999 | Kaufman | 704/275 |
| 5,915,001 A | 6/1999 | Uppaluru | 379/88.22 |
| 5,917,891 A | 6/1999 | Will | 379/88.03 |
| 5,920,841 A | 7/1999 | Schottmuller et al. | 704/275 |
| 5,923,738 A | 7/1999 | Cardillo, IV et al. | 379/93.25 |
| 5,929,850 A | 7/1999 | Broadwin et al. | 345/327 |
| 5,930,341 A | 7/1999 | Cardillo, IV et al. | 379/93.25 |
| 5,933,835 A | 8/1999 | Adams et al. | 707/104 |
| 5,937,041 A | 8/1999 | Cardillo, IV et al. | 379/93.25 |
| 5,946,050 A | 8/1999 | Wolff | 348/553 |
| 5,953,700 A | 9/1999 | Kanevsky et al. | 704/246 |
| 5,960,399 A | 9/1999 | Barclay et al. | 704/270 |
| 5,963,940 A | 10/1999 | Liddy et al. | 707/5 |
| 5,970,457 A | 10/1999 | Brant et al. | 704/275 |
| 5,974,385 A | 10/1999 | Ponting et al. | 704/275 |
| 5,991,365 A | 11/1999 | Pizano et al. | 379/88.13 |
| 5,991,719 A | 11/1999 | Yazaki et al. | 704/251 |
| 5,999,970 A | 12/1999 | Krisbergh et al. | 709/217 |
| 6,003,072 A | 12/1999 | Gerritsen et al. | 709/218 |
| 6,009,398 A | 12/1999 | Mueller et al. | 704/275 |
| 6,009,470 A | 12/1999 | Watkins | 709/231 |
| 6,012,030 A | 1/2000 | French-St. George et al. | 704/275 |
| 6,018,711 A | 1/2000 | French-St. George et al. | 704/275 |
| 6,021,371 A | 2/2000 | Fultz | 701/200 |
| 6,026,388 A | 2/2000 | Liddy et al. | 707/1 |
| 6,034,678 A | 3/2000 | Hoarty et al. | 345/327 |
| 6,035,267 A | 3/2000 | Watanabe et al. | 704/1 |
| 6,035,275 A | 3/2000 | Brode et al. | 704/275 |
| 6,084,572 A | 7/2000 | Yaniger et al. | 345/159 |
| 6,100,883 A | 8/2000 | Hoarty | 345/327 |
| 6,173,279 B1 | 1/2001 | Levin et al. | 707/5 |
| 6,181,334 B1 | 1/2001 | Freemen et al. | 345/327 |
| 6,192,338 B1 | 2/2001 | Haszto et al. | 704/257 |
| 6,198,822 B1 | 3/2001 | Doyle et al. | 380/210 |

| | | | | |
|---|---|---|---|---|
| 6,204,843 | B1 | 3/2001 | Freemen et al. | 345/327 |
| 6,205,582 | B1 | 3/2001 | Hoarty | 725/93 |
| 6,215,484 | B1 | 4/2001 | Freemen et al. | 345/327 |
| 6,225,976 | B1 | 5/2001 | Yates et al. | 345/156 |
| 6,480,703 | B1 * | 11/2002 | Calderone et al. | 455/118 |
| 6,573,907 | B1 * | 6/2003 | Madrane | 715/719 |
| 6,785,653 | B1 * | 8/2004 | White et al. | 704/270.1 |

FOREIGN PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| WO | 98/26595 | 6/1998 | 7/173 |
| WO | 99/30501 | 6/1999 | 7/173 |
| WO | 00/24198 | 4/2000 | 7/173 |

OTHER PUBLICATIONS

*Sprint Begins Voice-Activated E-Mail*; May 23, 1001; Associated Press-New York Times.

John Dowding, Jean Mark Gawron, Doug Appelt, John Bear, Lynn Cherny, Robert Moore, and Douglas Moran; *Gemini: a Natural Language System for Spoken-Language Understanding*.

*Info Wiz: An Animated Voice Interactive Information System*; http://www.ai.sri.com/~oaa/infowiz.html.

Robert Moore, Douglas Appelt, John Dowding, J. Mark Gawron, and Douglas Moran; *Combining Linguistic and Statistical Knowledge Sources in Natural-Language Processing for ATIS*.

Amanda Stent, John Dowding, Jean Mark Gawron, eleizabeth Owen Bratt, and Robert Moore; *The CommandTalk Spoken Dialogue System*.

John Dowding, Elizabeth Owen Bratt and Sharon Goldwater;*Interpreting Language in Context in CommandTalk* Feb. 5, 1999.

Robert Moore, John Dowding, Harry Bratt, J. Mark Gawron, Yonael Gorfu, and Adam Cheyer; *CommandTalk: A Spoken-Language Interface for Battlefield Simulations*; Oct. 23, 1997.

John Dowding, Robert Moore, Francois Andry, and Douglas Moran; *Interleaving Syntax and Semantics in an Efficient Bottom-Up Parser*.

Robert C. Bedichek; *The Meerkat Multicomputer: Tradeoffs in Multicomputer Architecture*; Dissertatioin Given and University of Washington, 1994.

James Karney; *A Sound Proposition Even Early on, There are Already Ways to Voice-enable a Site*; Jan. 15, 2001; Internet World.

Sarah Roberts-Witt; *Talking to the Web*; Jan. 15, 2001; Internet World.

Hand out from SRI International; *Simple Ui to Retrieve Favorites*.

Email dated Jan. 15, 2001; Subject *Fwd: Large Linux Cluster*.

Email: *Cray inc. Announces Plans for Alpha Linux Supercluster System*; Feb. 12, 2001.

Email: *Fwd: Re: One Voice Technologies*; Feb. 15, 2001.

Email: *Fwd: Ars Technica: Inside the KLAT2 Supercomputer—p. 1-*.

53 Page printout from: http://www.ai.sri.com CommandTalk.

Printout: http://www.speech.sri.com/demos/atis.html.

Bruce Meyerson. *Vice Recognition Still Selective*, Jan. 15, 2000, Yahoo! News Alerts.

*Where can I get an inVoca?*, http://invoca.com/home/htm.

*Integrated Audio-Graphics User Interface*., Apr. 1991, IBM Technical Disclosure Bulletin.

Stephanie Miles, *Will Microsoft's next OS run your TV?*, Sep. 5, 2000, Yahoo! Daily News.

* cited by examiner




Fig. 1 Prior Art




Fig. 2 Prior Art


1002
1000
1100
1200
1300
HFCoax OPTICAL NODE
1400
SPEECH RECOGNITION PROCESSOR SYSTEM
3200
HFCoax OPTICAL NODE
3002
1510
ANALOG TELEVISION
3100
DIGITAL TELEVISION
1512
VIDEO ON DEMAND
1514
INTERACTIVE PROGRAM GUIDE
1516
1518
TELEPHONE SERVICES
3000
INTERNET ACCESS

FIG. 3

Case: 22-1093 Document: 19 Page: 160 Filed: 03/17/2022




FIG. 4

Comcast - Exhibit 1001, page 7


3100
3002
PCI BRIDGE
512K FLASH BOOT ROM
3110
1510
3130
3132
SCSI II RAID ARRAY DISK CONROLLER
DUAL 800 MHz CPUs INPUT PROCESOR
512 MB DDR-RAM INPUT BUFFER
512K FLASH BOOT ROM
3120
DUAL 800 MHz CPUs OUTPUT PROCESOR
512 MB DDR-RAM OUTPUT BUFFER
VIDEO/FONT GENERATOR
VIDEO/FONT GENERATOR
VIDEO/FONT GENERATOR
VIDEO/FONT GENERATOR
QAM256 MODULATOR
QAM256 MODULATOR
QAM256 MODULATOR
QAM256 MODULATOR

FIG. 5


3000
RAID
3130
1510
3132
1518
1300
Plex Node 0,0 3110
Plex Node 0,1
Plex Node 0,2
Plex Node 0,3
1516
1310
Plex Node 1,0
Plex Node 1,1
Plex Node 1,2
Plex Node 1,3
1514
1320
Plex Node 2,0
Plex Node 2,1
Plex Node 2,2
Plex Node 2,3
1512
1330
Plex Node 3,0
Plex Node 3,1
Plex Node 3,2
Plex Node 3,3 3120
1400
1410
1420
1430

Fig. 6


3100
RAID
3130
1510
3132
3002
1518
1300
1516
1310
1514
1320
1512
1330
Plex
Node
0,0
3110
Plex
Node
0,1
Plex
Node
0,2
Plex
Node
0,3
Plex
Node
1,0
Plex
Node
1,1
Plex
Node
1,2
Plex
Node
1,3
Plex
Node
2,0
Plex
Node
2,1
Plex
Node
2,2
Plex
Node
2,3
Plex
Node
3,0
Plex
Node
3,1
Plex
Node
3,2
Plex
Node
3,3
3120
1400
1410
1420
1430

Fig. 7


3200
1300
1310
1320
1330
Plex Node 0,0
Plex Node 0,1
Plex Node 0,2
Plex Node 0,3
Plex Node 1,0
Plex Node 1,1
Plex Node 1,2
Plex Node 1,3
Plex Node 2,0
Plex Node 2,1
Plex Node 2,2
Plex Node 2,3
Plex Node 3,0
Plex Node 3,1
Plex Node 3,2
Plex Node 3,3
1400
1410
1420
1430
3002

Fig. 8




Fig. 9



2000
Start
2002
2004
receiving back channel to create received back channel
2012
2014
partitioning received back channel into multiplicity of received identified voice channels
2010
2022
2024
processing multiplicity of received identified voice channels to create multiplicity of identified speech content
2020
2032
responding to identified speech content to create identified speech content response, for each of identified speech contents
2030
2034
2008
Exit
2006


Fig. 10




Fig. 11A




Fig. 11B




Fig. 11C


2000
Start
2122
determining associated user site from received identified speech channel
2120
2132
2134
determining associated user site from identified speech content
2130
2142
2144
determining associated user site from identified speech content and speaker identification library
2140
2152
determining associated user site from identified speech content and speech recognition library
2150
2154
2162
determining associated user site from identification within speech channel
2160
2164
2126
Exit
2124

Fig. 12




Fig. 13A




Fig. 13B



Start
2112
2210
2212
assessing speech response to create financial response identified as to user site
2214
2216
displaying financial response to create displayed financial response at user site
2218
2220
confirming displayed financial response from user site to create financial commitment
2222
2224
billing user site based upon financial commitment
2226
2228
Exit


Fig. 14




Fig. 15A




Fig. 15B


Start
2112
2290
2292
assessing speech response based upon identified user to create financial consequence for identified user
2294
2296
displaying financial consequence to create displayed financial consequence at user site
2298
2300
confirming displayed financial consequence from user site based upon identified user to create financial consequence commitment
2302
2304
billing identified user based upon financial consequence commitment
2306
2308
Exit

Fig. 16




Fig. 17B




Fig. 17A




Fig. 18A




Fig. 18B




Fig. 19A




Fig. 19B




Fig. 19C




Fig. 19D




Fig. 20A




Fig. 20B




Fig. 20C



Metropolitan Headend 1410
1408
1402
Headend 100
1406
Headend 1410
1404
Headend 106
1302
1308
Node 120
Node 124
Node 1310
1304
1306
1200
Interface 170
1002-180
176
Interface 174
Interface 178
172
STB 1100-180
1000-180
STB 1100-190
STB 1100-182
STB 1100-192
STB 1100-184
STB 1100-194


Fig. 21



Metropolitan Headend 1410
1408
1402
1406
1404
Headend 100
Headend 1414
Headend 106
1302
1308
Node 120
Node 124
Node 126
1304
1306
1200
Interface 170
176
Interface 174
Interface 178
172
STB 1100-180
STB 1100-190
STB 1100-182
STB 1100-192
STB 1100-184
STB 1100-194


Fig. 22

Case: 22-1093 Document: 19 Page: 179 Filed: 03/17/2022



Comcast - Exhibit 1001, page 26




Fig. 23

Case: 22-1093 Document: 19 Page: 180 Filed: 03/17/2022



Comcast - Exhibit 1001, page 27




Fig. 24

Case: 22-1093 Document: 19 Page: 181 Filed: 03/17/2022



Comcast - Exhibit 1001, page 28




Fig. 25 Prior Art




Fig. 26

Comcast - Exhibit 1001, page 29

Case: 22-1093 Document: 19 Page: 183 Filed: 03/17/2022

Comcast - Exhibit 1001, page 30




Fig. 27




Fig. 28A




Fig. 28B



1330
3200
1312
External gateway 1560
1326
Speech gateway 3100
1332
1334
Modulator interface 1570
1336
1338
Content interface 1574
1382
Secure interface 1578
1374
Speech network gateway 1582
Memory 1530
Program system 2000
1532
Speech Processor Computer 1520
1542
Mass storage 1540


Fig. 29

Case: 22-1093 Document: 19 Page: 186 Filed: 03/17/2022



Comcast - Exhibit 1001, page 33




Fig. 30

Case: 22-1093 Document: 19 Page: 187 Filed: 03/17/2022






Fig. 31

Comcast - Exhibit 1001, page 34




Fig. 32A




Fig. 32B Prior Art



1452
1454
Frequency conversion 1710
1762
1862
Amplifier detector 1760
Amplifier detector 1860
1752
1852
LPF2 1750
LPF2 1850
1772
1742
1872
1842
1744
1844
LO2 1770
Mixer2 1740
LO2 1870
Mixer2 1840
1732
1832
BPF1 1730
BPF1 1830
1762
1722
1862
1822
1724
1824
LO1 1760
Mixer1 1720
LO1 1860
Mixer1 1820
1718
1818
LPF1 1716
LPF1 1816
Power level sensor interface 1780
1714
1782
1712


Fig. 33


1452
1454
Frequency conversion 1710
1762
1862
Amplifier detector 1760
Amplifier detector 1860
1752
1852
LPF2 1750
LPF2 1850
1776
1742
1842
Dist2 1774
1744
1844
Mixer2 1740
Mixer2 1840
1772
LO2 1770
1732
1832
BPF1 1730
BPF1 1830
1766
1722
1822
Dist1 1764
1724
1824
Mixer1 1720
Mixer1 1820
1762
LO1 1760
1718
1818
LPF1 1716
LPF1 1816
Power level sensor interface 1780
1712
1714
1708

Fig. 34


9.0
9.1
9.2
9.3
9.4
9.5
CPU 8.0
CPU 8.1
CPU 8.2
CPU 8.3
CPU 8.4
CPU 8.5
CPU 8.6
CPU 8.7
CPU1 0.0 CPU2 0.1
CPU1 0.2 CPU2 0.3
CPU1 0.4 CPU2 0.5
CPU1 0.6 CPU2 0.7
CPU1 1.0 CPU2 1.1
CPU1 1.2 CPU2 1.3
CPU1 1.4 CPU2 1.5
CPU1 1.6 CPU2 1.7
CPU1 2.0 CPU2 2.1
CPU1 2.2 CPU2 2.3
CPU1 2.4 CPU2 2.5
CPU1 2.6 CPU2 2.7
CPU1 3.0 CPU2 3.1
CPU1 3.2 CPU2 3.3
CPU1 3.4 CPU2 3.5
CPU1 3.6 CPU2 3.7
CPU1 4.0 CPU2 4.1
CPU1 4.2 CPU2 4.3
CPU1 4.4 CPU2 4.5
CPU1 4.6 CPU2 4.7
CPU1 5.0 CPU2 5.1
CPU1 5.2 CPU2 5.3
CPU1 5.4 CPU2 5.5
CPU1 5.6 CPU2 5.7
CPU1 6.0 CPU2 6.1
CPU1 6.2 CPU2 6.3
CPU1 6.4 CPU2 6.5
CPU1 6.6 CPU2 6.7
CPU1 7.0 CPU2 7.1
CPU1 7.2 CPU2 7.3
CPU1 7.4 CPU2 7.5
CPU1 7.6 CPU2 7.7

Fig. 35

# SYSTEM AND METHOD OF VOICE RECOGNITION NEAR A WIRELINE NODE OF A NETWORK SUPPORTING CABLE TELEVISION AND/OR VIDEO DELIVERY

This application claims priority from Provisional Patent Application No. 60/210,440, entitled Method and Apparatus for Centralized Voice-Driven Natural Language Processing, filed 8 Jun. 2000.

This application is a continuation in part from application Ser. No. 09/679,115, entitled System and Method of a Multi-dimensional Plex Communication Network, filed 4 Oct. 2000;

Application Ser. No. 09/664,874, entitled Increased Bandwidth In Aloha-Based Frequency-Hopping Transmission Systems, filed 19 Sep. 2000 now Abandoned;

Application Ser. No. 09/661,486, entitled N-way Demultiplexor, filed 14 Sep. 2000; and

Application Ser. No. 09/708,315, entitled Common Carrier, Multiple Output RF Upconverter, filed 7 Nov. 2000 now U.S. Pat. No. 6,480,703.

## BACKGROUND OF THE INVENTION

1. Technical Field

This invention relates to speech recognition performed near a wireline node of a network supporting cable television and/or video delivery.

2. Background Art

Currently, speech operated functions using the latest speech recognition technologies are limited to a handful of applications, such as toys, appliances, some computers, speech dictation, cellular phones, and speech control of one's home. Most of these applications use speech recognition technology running on a computer or speech recognition chip technology. These speech recognition systems typically offer only a limited number of commands and the recognition efficiency is only fair and often require speech training.

There have been numerous patents issued regarding speech recognition. Many apply in a telephone context or other dial-up context such as an Automated Teller machine (ATM), including the following: Rabin, *Voice command control and verification system,* U.S. Pat. No. 6,081,782, issued Jun. 27, 2000, Basore, et al, *Voice activated device and method for providing access ro remotely retrieved data,* U.S. Pat. No. 5,752,232, issued May 12, 1998, and Kowalkowski, et al, *Voice-control integrated field support data communications system for maintenance, repair and emergency services,* U.S. Pat. No. 5,924,069, issued Jul. 13, 1999.

There is, however, another class of speech recognition technology referred to as natural language, which requires state of the art processing software and hundreds of megabytes of RAM to support. Natural language recognition is currently being used in high end systems, such as billing applications for utility companies and the New York Stock Exchange, because of its ability to recognize spoken words from any speech. Some natural language systems claim to be totally user independent and are also capable of recognizing speech in several different languages.

However, the problems of speech recognition at a centralized wireline node in a network supporting video delivery or cable television delivery have not been addressed by such prior art. For the purposes of the discussion herein, a centralized wireline node refers to a network node providing video or cable television delivery to multiple users using a wireline physical transport between those users at the node.



FIG. **1** depicts a typical network as found in a cable television and/or video delivery network employing a Hybrid Fiber-Coaxial (HFC) wiring scheme as disclosed in the prior art.

Each user site contains a Set Top Box, such as STB **180**, coupling to the network through a coaxial cable **172**, which interfaces **170** to a collective coaxial cable **160** which couples to a Node **126**. The interface **170** may include bi-directional signal amplification and possibly further include the filtering and/or frequency shifting of these signals.

The Node **126** is hierarchically coupled **128** to a Headend **104**, which in most cable television networks serves as the source of television programming and other signaling. The signals are sent through the Node **126** and couplings **160-170-172** to provide the STB **180** and others, with the television signaling. In certain large towns and cities, there may be a further hierarchical layer including a Metropolitan Headend **10** coupled **106** to Headend **104**. These higher layers of the network use fiber optics for the physical transport of couplings **102**, **106** and **108**, as well as for **122**, **126** and **128**.

The couplings between STB **180** and Node **126** support bi-directional communication. The couplings between STB **180**, Node **126** and Headend **104** may also support bi-directional communication. Such bi-directional communication allows the STB **180** to receive multiple television channels. This bi-directional communication allows STB **180** to signal at least limited information to the Node **126** and/or the Headend **104**. Such information in either case may support management of Pay-per-View and other services.

User site accounting information usually resides at the highest level of the network, which tends to be either the Headend **104** or Metropolitan Headend **10**.

In cable systems, several downstream data channels that send channel and synchronization information are often transmitted in a previously reserved band of frequencies. They are typically assigned for re-broadcasting FM channels over cable in the United States. Currently, most cable systems reserve some of the 88 to 108 MHz FM spectrum for set-top data transmission. The unused portion of that spectrum are left for barker channels or for additional video channels. The Open Cable Standard requires that the 70 to 130 MHz band be available for what's called Out-of-Band or (OOB) or Downstream transmission.

Most current cable systems use the popular HFC architecture so that the downstream video signals, digital or analog, are sent from the Headend to hubs or nodes via fiberoptic cable. At the receiving side of the node, the optical signal from the fiber gets converted to an electrical signal containing all of the analog, digital video RF carriers and program/service information. This signal, in turn, is amplified and distributed via coaxial cable to the appropriate subscribers connected to the node.

A major design objective for existing cable television set-top boxes was efficient downstream information delivery, i.e. from cable plant to subscriber. Provision for upstream data transmission, i.e. from subscriber to cable plant, is much more restrictive, supporting only limited bandwidth. As new classes of interactive services become available, efficient use of upstream transmission bandwidth grows in importance. For example, if it is necessary to pass

information from the subscriber to the cable headend (also known as the headend), sufficient upstream bandwidth must be made available.

One of the most popular digital set-top boxes, the General Instruments (now Motorola) DCT-2000, is a useful example. When this box was first deployed, upstream transmissions were restricted to user pay-per-view requests, and other simple, infrequent transmissions. As a consequence, the transmission format used for upstream transmissions was not required to be very efficient, and in fact, is not.

In this set-top box, the transmission hardware is capable of selecting twenty different 256K bps channels, each of which uses QPSK transmission coding. While the hardware is capable of frequency-hopping to avoid channels which are subject to interference, the scheme used is fairly static, with typical deployments only using two active upstream communications channels. This leads to an aggregate bandwidth of only 512K bps per cluster of set-top boxes converging in the network to a node, in cable television terms. The cable node typically supports between 500 and 2000 subscribers.

Upstream signals in the 5 to 40 MHz band from each subscriber connected to the node are collected, combined, and then sent to the Headend via either the same fiber used for the downstream video carriers, or a separate fiber.

Furthermore, the transmission control protocol used, referred to as Aloha, is one where an individual set-top box immediately transmits any pending request to the headend, without regard to whether or not the transmission channel is already in use. This transmission is repeated at regular intervals until the box receives an acknowledgement command from the headend, indicating successful receipt of the transmission.

This transmission control protocol is quite inefficient due to the number of collisions which ensue, e.g. simultaneous transmissions from different set-top boxes which interfere with one another, forcing all of the transmitters to repeat their transmissions again. This leads to typical channel utilization on the order of just 30%. As a consequence, the total bandwidth available for upstream transmission per node is only about 30% of 512K bps=~137K bps, on average.

Downstream control data transmission typically occurs in a separate frequency band from the upstream channels.

Typically, HFC networks employ an optical fiber from a central office, or Headend, to a neighborhood node. The fiber has forward and reverse transmission capability, which can alternatively be accommodated on separate fibers. Wavelength Division Multiplexing (WDM) can be used to implement both on a single fiber. At the node, coaxial cable connects the users through a shared frequency division multiplexing (FDM) scheme with contention resolution protocols used to manage upstream data flows.

Such communication schemes having both forward and backward paths, and which may or may not involve a user, are referred to as loops herein. An example of a loop is the communication between Headend **104** and Node **126**. Communication schemes having both forward and backward paths to multiple users are referred to as local loops. An example of a local loop is the communication between Node **126** and user site STBs **180**, **182** and **184**. Note that a loop may be constituted out of optical fiber or out of coaxial cable.

Hybrid-Fiber-Copper (HFCop) networks work in much the same manner, but substitute copper wire(s), often in twisted pairs, for coaxial cable. In such networks a local loop may further be constituted out of optical fiber, coaxial cable or twisted pairs.



Another alternative local loop configuration is commonly known as Switched Digital Video. It is a form of HFC coupling the fiber through a node to each user site with a distinct point-to-point coaxial cable. The node interfaces the user site coaxial cables with the optical fiber through a switch. The switch typically contains a network management unit which manages the switch, connecting the bandwidth service provider with multiple homes, today often in the range of five to 40 homes per switch.

The Synchronous Optical NETwork (SONET) scheme is also applied in the creation of high-speed networks for homes and businesses. This and similar communication schemes may be employed to deliver video streams to user sites.

FIG. **2** depicts a typical residential broadband network using local loop wiring of the network, as disclosed in the prior art.

As in FIG. **1**, each user site contains a Set Top Box, such as STB **180**, coupled to the network through a coaxial cable **172** which interfaces **170** to a collective coaxial cable **160** which is coupled to Node **126**. Interface **170** may include bi-directional signal amplification, and possibly further include the filtering and/or frequency shifting of these signals.

As in FIG. **1**, the couplings between STB **180** and Node **126** support bi-directional communication allowing the STB **180** to receive multiple television channels and allowing STB **180** to signal at least limited information to the Node **126**, which may well include management of Pay-per-View and other services. The couplings between STB **180**, Node **126** and Headend **104** may also support bi-directional communication allowing the STB **180** to receive multiple television channels and allowing STB **180** to signal at least limited information to the Headend **104**, which may well include management of Pay-per-View and other services.

FIG. **2** shows a loop coupling Headend **104** through coupling **130** to Node **120** through coupling **132** to Node **124** through coupling **134** to Node **126** which in turn couples **136** to Headend **104** forming the loop.

The hierarchical coupling of Node **126** with Headend **104** is carried out along distinct paths through this loop. Communication from Headend **104** to Node **126** follows a path **130-132-134**. Communication from Node **126** to Headend **104** follows the path **136**. The specific wiring schemes are dominated by the choice of physical transport, communication protocols and network level management. The description just given for FIG. **2** is provided as a simplified discussion of the basics of how high speed residential broadband networks incorporate loops and local loops supporting network level hierarchies.

There has been extensive research into the mechanics of speech recognition. The progress has been sufficient to allow speech trading by stock brokers using their desk top computers.

While these innovations have been substantial, they do not resolve several central questions of great importance to cable television, video delivery systems, and commerce. There is no present system providing speech recognition to a collection of users over a cable television network. There is no present system providing user identification based upon that speech recognition over a network that supports cable television and/or video delivery. There is no present system sufficient for real-time auctions and contracting to be conducted over a cable television and/or video delivery network, based on user identification through speech recognition.

## SUMMARY OF THE INVENTION

An embodiment of the invention provides speech recognition services to a collection of users over a network that supports cable television and/or video delivery. User identification based upon speech recognition is provided over a cable television and/or video delivery network. User identified speech contracting is provided over a cable television and/or video delivery network having sufficient bandwidth for real-time auctions and contracting.

The invention comprises a multi-user control system for audio visual devices that incorporates a speech recognition system that is centrally located in or near a wireline node, and which may include a Cable Television (CATV) Head-end. The speech recognition system may also be centrally located in or near a server farm a web-site hosting facility, or a network gateway.

In these embodiments of the invention, spoken commands from a cable subscriber are recognized and then acted upon to control the delivery of entertainment and information services, such as Video On Demand, Pay Per View, Channel control, on-line shopping, and the Internet. This system is unique in that the speech command which originates at the user site, often the home of the subscriber, is sent upstream via the return path (often five to 40 MHz) in the cable system to a central speech recognition and identification engine. The speech recognition and identification engine described herein is capable of processing thousands of speech commands simultaneously and offering a low latency entertainment, information, and shopping experience to the user or subscriber.

The system is capable of overlaying text on the subscriber's TV screen immediately after a word is recognized by the system as a verification of correct or incorrect recognition, thereby providing instant visual feedback and opportunity for acceptance or correction of speech messages.

The system can recognize and process speech so that the key words of spoken commands are recognized and displayed. This may be applied in navigation mode, in search context, or in other contexts and modes.

The system responds to a command with a visual indication of the spoken request. This visual feedback indicates recognition of key words may and be in the form of written text or icons.

The system may mask delays in upstream transmission or speech recognition. Upon depressing an optional talk button on the remote, a digital address may be appended to the beginning of the digital speech packets to be processed. The address tells the system not only the user site, but it also provides a mechanism for the system to begin generating masking screens or icons. Data are sent to the central location when the button on the microphone is depressed, alerting the system as to the user site and a potential input. This function allows the system to generate an icon or overlay to respond to the subscriber quickly. This function also supports site specific dictionaries, as well as data references to be loaded for speech recognition or user recognition.

At least two operations are performed at a server-center located at a central location: upstream recognition of speech commands and performing speech command protocol(s).

Low latency visual prompts are provided to support fast and accurate speech navigation. Thus, when a command is spoken and recognized the system returns the key word and optionally generates a list of visual prompts that guides the subscriber through the next navigation step. By using prompts, the system incorporates optimum recognition of the prompt words thus increasing the recognition accuracy and, at the same time, increasing satisfaction for user participation.

In this context of the invention, adaptive speech recognition is based on optimized word recognition by creating a subset of probable matches based on knowing what is in an entertainment database or the words on a Web page. This supports learning the user's habitual speech patterns.

Secure speech transactions provide a method of speech based contracting across a multimedia distribution system. Speech based contracting as used herein, refers to a process of generating and/or executing a contract, in which at least one step of that process is based upon the invention receiving, recognizing, and witnessing an identified user's speech.

Speech based contracting includes, but is not limited to, the following: a first identified user making an offer; a second identified user accepting an offer, which may or may not be acoustically presented; as well as the second identified user specifying acceptance particulars, such as payment arrangements and the number of units.

Speech based contacting also includes, but is not limited to, acknowledging receipt of goods or services of a tangible, and/or intangible nature, possibly involving real property, personal property and/or intellectual property, exercising options of the contract, as well as terminating a pre-existing contract. The acknowledgement of receipt may include, but is not limited to, a declaration of the condition of goods upon receipt or upon subsequent testing, which may include an estimate of damage.

Speech based contracting may also include at least one of the following: the second identified user making a counter-offer to the first identified user based upon the offer; and the first identified user responding to the counter offer. The response may include accepting the counter-offer, or making a second counter-offer to the second identified user.

Speech based contracting may also include the second identified user inviting offers. The invitation may or may not specify the first identified user and/or performance constraints such as time of delivery and/or the duration of the terms and/or optional terms which may be exercised after the contract has been accepted.

Speech based contracting may also include an identified user exercising one or more optional terms of a pre-existing contract. The exercise of the optional terms may further specify one or more amounts, delivery times, ranges of time and/or place during/over which a service may be performed or commodity delivered in accordance with the optional terms of the pre-existing contract.

The offer may originate at the offeror-user site, possibly involving speech, when it is sent to the central location and recognized at the central location, recorded, distributed, and presented to potential offeree user sites. The offer may be sent to the central location to be recorded and distributed to potential offeree user sites. The offeree may signal acceptance of the offer verbally at the offeree user site where the offeree is recognized. The system transmits the verbal acceptance to the central location, where it is recognized, recorded and then transmitted to the offeror.

Using the user site address accelerates speaker identification, increases reliability, enhances security and reduces latency in identifying a speaker. Using the user site address and user specific speech data references further accelerates speaker identification, increases reliability, enhances security, and reduces latency in identifying a speaker.

The invention supports automatic generation of serial-multiplexed video output streams, without additional video boards or multiplexers. The centrally located speech recog-

nition system employs extremely fast, efficient arrays of microprocessors, many of which may possess a frame buffer in locally accessible memory. Each microprocessor translates the frame buffer into an MPEG stream. Several MPEG streams are merged within a single microprocessor to form a multi-media stream for distribution to subscribers.

## BRIEF DESCRIPTION OF THE DRAWINGS

FIG. **1** depicts a typical network hierarchy as found in a cable television or video delivery network employing a Hybrid Fiber-Coaxial (HFC) wiring scheme as disclosed in the prior art;

FIG. **2** depicts a typical residential broadband network using local loop wiring of the network as disclosed in the prior art;

FIG. **3** depicts a remote control unit **1000** coupled **1002** to set-top apparatus **1100**, communicating via a two-stage wireline communications system containing a wireline physical transport **1200** through a distributor node **1300**, and through a high speed physical transport **1400**, possessing various delivery points **1510** and entry points **1512**–**1518** to a tightly coupled server farm **3000**, with one or more gateways **3100**, and one or more tightly coupled server arrays **3200**, in accordance the invention;

FIG. **4** depicts a coupled server array **3200** of FIG. **3**;

FIG. **5** depicts a gateway **3100** of FIG. **3**;

FIG. **6** depicts the tightly coupled server farm **3000** of FIG. **3** implemented in a two-dimensional plex communication network with N=4 plex nodes in each of two orthogonal directions of the node array;

FIG. **7** depicts a gateway **3100** of FIG. **3** implemented in a two-dimensional plex communication network with N=4 plex nodes in each of two orthogonal directions of the node array;

FIG. **8** depicts a coupled server array **3200** of FIG. **3** implemented in a two-dimensional plex communication network with N=4 plex nodes in each of two orthogonal directions of the node array;

FIG. **9** depicts a simplified block diagram using an array of processors as shown as **3200** in FIG. **3**;

FIG. **10** depicts a flowchart of a method using a back channel from a multiplicity of user sites containing a multiplicity of identified speech channels presented to a speech processing system at a wireline node in a network supporting cable television delivery in accordance with the invention;

FIG. **11**A depicts a detail flowchart of operation **2012** of FIG. **10** further partitioning of the received back channel;

FIG. **11**B depicts a detail flowchart of operation **2022** of FIG. **10** further processing the multiplicity of the received identified speech channels;

FIG. **11**C depicts a detail flowchart of operation **2032** of FIG. **10** further responding to the identified speech content;

FIG. **12** depicts a detail flowchart of operation **2000** of FIG. **10** further performing the method using the back channel from multiple user sites;

FIG. **13**A depicts a detail flowchart of operation **2112** of FIG. **11**C further responding to the identified speech content;

FIG. **13**B depicts a detail flowchart of operation **2112** of FIG. **11**C further responding to the speech content;

FIG. **14** depicts a detail flowchart of operation **2112** of FIG. **11**C further responding to the identified speech content from the associated user site;

FIG. **15**A depicts a detail flowchart of operation **2112** of FIG. **11**C further responding to the identified speech content from the associated user site;



FIG. **15**B depicts a detail flowchart of operation **2252** of FIG. **15**A identifying the user;

FIG. **16** depicts a detail flowchart of operation **2112** of FIG. **11**C further responding to the identified speech content from the associated user site;

FIG. **17**A depicts the speech content response **2350** including current response menu **2352** and cumulative user site response **2354** in accordance with the invention;

FIG. **17**B depicts a detail flowchart of operation **2112** of FIG. **11**C further responding to the identified speech content from the associated user site;

FIG. **18**A depicts a detail flowchart of operation **2112** of FIG. **11**C further responding to the identified speech content from the associated user site;

FIG. **18**B depicts a detail flowchart of operation **2092** of FIG. **11**B further processing the multiplicity of the received speech channels;

FIG. **19**A depicts a simplified block diagram of a hand held remote **1000**, containing microphone **1060** and keypad **1020** supporting user input which is organized and processed by embedded controller **1050** for communication by wireless interface **1040** coupled **1002** to set-top apparatus **1100**, as shown in FIG. **3**;

FIG. **19**B depicts a simplified block diagram of set-top apparatus **1100** as shown in FIG. **3** showing coupling **1002** and first wireline physical transport **1200** further comprised of downlink coupling **1202** and uplink coupling **1204**;

FIG. **19**C further depicts set-top apparatus **1100** as shown in FIG. **19**B containing a set-top appliance **1120** coupled **1002** with hand held remote **1000** and coupled **1112** with set-top box **1120** possessing downlink coupling **1202** and uplink coupling **1204**;

FIG. **19**D further depicts set-top apparatus **1100** as shown in FIG. **19**B containing a set-top appliance **1120** coupled **1002** with hand held remote **1000** and possessing downlink coupling **1202** and uplink coupling **1204** as well as providing processed downlink coupling **1114** to set-top box **1110** and receiving initial uplink coupling **1112** from set-top box **1110**;

FIG. **20**A depicts a simplified block diagram of set-top appliance **1120** as shown in FIG. **19**C supporting coupling **1002** with hand held remote **1000** and coupling **1112** with set-top box **1110**;

FIG. **20**B depicts a simplified block diagram of set-top appliance **1120** as shown in FIG. **19**D supporting coupling **1002** with hand held remote **1000** and couplings **1112** and **1114** with set-top box **1110**;

FIG. **20**C depicts a block diagram further depicting accessibly coupled **1162** memory **1160** as shown in FIGS. **20**A and **20**B;

FIG. **21** depicts a remote control unit **1000-180** coupled **1002-180** to set-top apparatus **1100-180**, communicating via a two-stage wireline communications system containing a wireline physical transport **1200** through an augmented distributor node **1310** interfacing to a wireline communications loop including an augmented Headend **1410** further supporting a communications loop including augmented metropolitan Headend **1410**, in accordance with the invention;

FIG. **22** depicts a remote control unit **1000-180** coupled **1002-180** to set-top apparatus **1100-180**, communicating via a two-stage wireline communications system containing a wireline physical transport **1200** through a distributor node **126** interfacing to a wireline communications loop including an augmented Headend **1414** further supporting a communications loop including augmented metropolitan Headend **1410**, in accordance with the invention;

FIG. **23** depicts a detail block diagram of an augmented distributor node **1310**, coupled to wireline physical transport **1200** and coupled to the wireline communications loop of FIG. **21**;

FIG. **24** depicts an alternative detail block diagram of an augmented distributor node **1310**, coupled to wireline physical transport **1200** and coupled to the wireline communications loop of FIG. **21**;

FIG. **25** depicts a generic block diagram of a prior art Headend **104** as shown in FIG. **3**;

FIG. **26** depicts an augmented Headend **1410** of FIG. **21** or an augmented Headend **1414** of FIG. **22** or an augmented metropolitan Headend **1410** of FIGS. **21** or **22**, in accordance with the invention;

FIG. **27** depicts an alternative augmented Headend **1410** of FIG. **21** or an alternative augmented Headend **1414** of FIG. **22** or an alternative augmented metropolitan Headend **1410** of FIGS. **21** or **22**, in accordance with the invention;

FIG. **28**A depicts a block diagram of a speech engine **1330** as shown in FIG. **23**;

FIG. **28**B depicts a block diagram of a speech engine **1330** as shown in FIG. **24**;

FIG. **29** depicts a more detailed block diagram of a speech engine **1330** as shown in FIG. **28**A;

FIG. **30** depicts an alternative detailed block diagram of a speech engine **1330** as shown in FIG. **28**A;

FIG. **31** depicts a second alternative detailed block diagram of a speech engine **1330** as shown in FIG. **28**A;

FIG. **32**A depicts a block diagram of modulator engine **1350** of FIGS. **23** and **24**, and modulator engine **1450** of FIGS. **26** and **27**;

FIG. **32**B depicts a block diagram of a local oscillator as is known in the art for use as a local oscillator depicted in FIGS. **33** and **34** as LO**1** **1760**, LO**1** **1860**, LO**2** **1770** or LO**2** **1870**;

FIG. **33** depicts a detail block diagram of frequency conversion circuitry **1710** of FIG. **32**A;

FIG. **34** depicts an alternative detail block diagram of frequency conversion circuitry **1710** of FIG. **32**A; and

FIG. **35** depicts a detailed diagram of speech engine **1330** as shown in FIG. **23** or speech engine **1430** as shown in FIG. **27** containing two plex communications grids with dual, redundant gateways.

## DETAILED DESCRIPTION OF THE INVENTION

FIG. **3** depicts a remote control unit **1000** coupled **1002** to set-top apparatus **1100**. Set-top apparatus **1100** communicates via a two-stage wireline communications system containing a wireline physical transport **1200** to a distributor node **1300**. Set-top apparatus **1100** communicates through distributor node **1300** across a high-speed physical transport **1400** to a tightly coupled server farm **3000**, possessing various delivery points **1510** and entry points **1512**–**1518**. Tightly coupled server farm **3000** contains one or more gateways **3100**, and one or more tightly coupled server arrays **3200**.

As used herein, a server farm refers to a collection of at least two server components communicatively coupled to one another. The server components may or may not all be directly communicatively coupled to each other. A server component refers to at least a gateway, server array, server computer, database engine, or disk farm.

As used herein, gateway refers to at least one of the following: A gateway may perform protocol conversion between different types of networks or applications; gateways may support complete conversion of one protocol to another, or support one protocol from within another protocol; a gateway may perform conversion between two messaging or mail protocols; a gateway may act as a go-between for two networks with similar protocols, providing an entry/exit point for one network in the other network. Such gateways include proxy servers; a gateway may switch speech and data between a terrestrial network and an orbiting satellite communications system; and a gateway may perform network layer switching tasks between at least two networks, coordinating the delivery of information, usually in the form of messages, packets or data streams to various destinations in the networks.

As used herein, a server array refers to a multi-dimensional lattice or array of server computers, each with an associated multi-dimensional array address, and a communication grid supporting communication between server computers based upon the multi-dimensional array addresses of the source and destination server computers. A tightly coupled server array is a server array possessing a very low latency communication grid.

The invention may include a remote control unit **1000** fitted with a microphone. Remote control unit **1000** may be fitted with such features as a special noise canceling microphone and/or a push-to-talk button.

The microphone in the remote relays the subscriber's speech commands to the central speech recognition engine. The push-to-talk button may begin the process of speech recognition by informing the system that the subscriber is about to speak and also to provide immediate address information. Address information identifies the user site at which the speaking occurs.

The invention may also include an array of microphones that are operated in conjunction with a remote control **1000** that is coupled to the set top box **1100**. The microphone array may further provide an echo-canceling capability in receiving speech signals within the area of usage.

Note that there may be more than one remote control unit **1000** with one or more microphones, each remote control unit under the control of a distinct, identified user. Such situations are particularly useful in game playing settings, where different users may wish to make commands to the game simulation like "arm the photon torpedoes", etc.

A given residence may include more than one set-top box **1100**, each of which has a distinct address in the network delivering video content and/or cable television. Each constitutes a distinct user site and may be parameterized differently. By way of example, a first set-top box in a recreation area for children may allow identified users, who are children, to select programming on only certain channels. Whereas a second set-top box in a private area of adults, such as a parental bedroom, may be parameterized so that child identifier users have no privileges.

Speech commands from the subscriber may be preprocessed. The analog signals picked up from the microphone are converted to digital signals where they undergo additional processing before being transmitted to the speech recognition and identification engine located in the cable Headend or other centralized location. Such speech preprocessing may include encryption, compression, or conversion to an alternative form of speech representation.

The preprocessing function may also take place in the remote control **1000** itself before being transmitted to the set-top box **1100**, or set-top appliance **1100**. Coupling **1002** may use a wireline or wireless physical transport. Coupling **1002** may use a wireless transport, including, but not limited to, at least one of the infra-red, microwave, or radio fre-

quency spectrum, as well as ultrasonic signaling. Coupling **1002** may support bi-directional communication between remote control **1000** and set-top box or appliance **1100**. The communication may be predominantly or strictly from remote control **1000** to set-top box or appliance **1100**.

The speech signal from the remote **1000** may be a digitally modulated RF signal whose properties may comply with Part 15 of the FCC rules. Alternatively, the set-top box **1100**, or set-top appliance **1100**, receives the speech signal from the remote **1000** and performs the preprocessing function mentioned above.

The set-top box **1100**, or set-top appliance **1100** may also be used to transmit speech and subscriber address data to the centralized location or Headend for speech recognition and identification. The Radio Frequency (RF) signal from the remote **1000** is received by the set-top appliance **1100** and then remodulated for upstream transmission **1200** on the 5 to 40 MHz cable return path. If a commercial set-top box **1100** is used to transmit the upstream speech data, then the upstream channel allocation and transmission protocol are controlled by the bi-directional communication system which is resident in the set-top box.

In certain embodiments, a commercial set-top box **1100** may not be used to transmit the digitized speech data upstream. The set-top appliance **1100** is then responsible for receiving the upstream channel allocation and synchronization information. The data receiver in the set-top appliance **1100** can be tuned to any one of several downstream data channels to receive channel and synchronization information.

The set-top appliance **1100** is also capable of receiving and decoding data in the downstream path. This function is required to organize and synchronize the transmission of upstream data which may include user feedback. Downstream data can contain upstream channel allocation information and speech verification overlay information coded as text.

The set-top box **1100** may be used for both upstream and downstream communication for the described speech command function. The function of the set-top appliance **1100** may be to receive the RF signal from the remote control and then digitize and compress the speech signal and prepare it for upstream transmission.

New RF protocol standards, such as Blue Tooth, allow the remote control's RF signal to transmit the speech signal directly to the set-top box where again, the preprocessing can either be done in the remote control **1000** or executed from firmware within the set-top box **1100**. Note that infrared signaling may be employed to transmit the speech signal to the set-top box.

Set-top boxes **1100** that employ the DOCSIS type cable modems such as Open Cable set-top boxes or the so called Heavy Set-top boxes from such companies as Scientific Atlanta and General Instruments are capable of sending and receiving speech data using efficient data transmission protocols. The DOCSIS protocol also incorporates error detection and correction capabilities as well as other transmission enhancements such as pre-equalization for more efficient and error free transmission.

FIG. **4** depicts a coupled server array **3200** of FIG. **3**.

FIG. **5** depicts a gateway **3100** of FIG. **3**.

The system uses the subscriber's address information as a mechanism by which the centrally located AgileTV™ Speech Processor can fetch a particular subscriber's parameter file. The parameter file contains speech training parameter data, speech identification parameters and user profiles for each user at that address. This file can also contain



parental control information in a residential setting and other specifics for that particular address, such as language preferences or movie preferences or even internet preferences.

The Addressed Subscriber Parameter File (ASPF) gives the system an extremely high probability of speech recognition and user identification. Such addressing supports secure transactions such as banking because the speech recognition and identification system has to only identify a few parameter files for any one physical address, resulting in a very high probability of recognizing a specific speaker's speech.

Financial transaction security, e.g. speech banking and e-commerce, can be realized with this system and, with the addition of speech encryption processing in the Speech Preprocessor, even higher levels of security can be attained. This directly supports a method of contracting based upon an offer presented to the user by the system, and a recognizable acceptance of the offer by the identified user. The method of contracting may further include storing the offer and acceptance as a recording mechanism for the contract.

The speech signal transmitted from a subscriber's set-top box, or set-top appliance, **1100** is received **1510** by the five to 40 MHz data receiving equipment within gateway **3100** in the central location. As used herein, a central location may include a node, Headend, or metropolitan Headend for a residential broadband network.

When the digitized speech signal comes from a commercial set-top box, such as a General Instruments or a Scientific Atlanta set-top, then the return path receiving equipment in the central location may be specific to that type of box. Therefore, the data coming from this equipment, which contain other upstream traffic, may be parsed in such a way that only the speech commands and address information from the subscriber are input to the speech recognition engine in the central location.

When the digitized speech signal sent upstream comes from another set-top appliance, the upstream data receiver in the central location may be a separate unit that receives only speech command signals from set-top appliances at the user sites. Using the set-top appliance as the upstream transmitter allows the use of custom upstream protocols such as FM, AM, PSK, or spread spectrum digital transmission. Digital transmission techniques such as QPSK or QAM can also be employed.

Upon receiving the digitized and preprocessed speech signal from the subscriber's set-top box or set-top appliance, the received upstream signal may be in the form of a data stream containing speech and address information. The data stream containing speech and address information may be Ethernet compatible. Because the AgileTV™ Voice Processing Unit (AVPU) is a high speed speech processing unit capable of processing the data from several nodes, the digital speech signals from each of these nodes may be combined in the AVPU input multiplexer. The combining of digital speech signals may result in a smaller number of high speed digital streams.

Upstream signals such as **1510** are received at the gateway **3100**. Speech and data signals may be received from commercial return path data receivers. Speech and data signals are also received and decoded by custom return path receivers using at least one of the following protocol options: FM or AM modulation/demodulation, FDMA, TDMA, FSK, PSK, or QPSK digital modulation/demodulation, Spread Spectrum modulation/demodulation, Telephony, cellular return, or Wireless.

The AVPU Engine may not be an application service, in and of itself. The system may provide new end user appli-

cations. The AVPU Engine may provide speech recognition and control services for existing applications, such as Interactive Program Guides, Video On Demand (VOD) services or access to the Internet or World Wide Web.

Near network system initialization time, applications such as Video On Demand or Interactive Program Guides, that request service access with the speech recognition services may be required first to register with the AVPU system. At least one standard program interface may then be used to enable each application to specify its complete menu hierarchy. The invention may use exactly one standard program interface to enable applications to specify their complete menu hierarchy.

A list structure specifies each application's menu hierarchy. This list structure may be a tree. It contains labels for each menu, along with the text of each button on each menu screen, information the system needs to provide speech navigation services independently through the menu hierarchy on behalf of the application. This menu hierarchy represents the static portion of the application's data.

In addition to the static menu structure, it may also be the responsibility of the application to inform the system of dynamic content, for example the names of movies in a Video On Demand system or of program names and times in an interactive program guide. Each time a user enters a menu context in which dynamic content appears, the application may inform the speech system of this context by passing a handle associated with the list of names that comprise the dynamic content. The speech system may combine the static menu content with the augmented dynamic content (see Similarity Searching below), to form a complete grammar. Also, application-independent keywords, such as HELP, may be combined with the static menu content and augmented dynamic content to form the complete grammar. This construct may then be passed to the speech system to maximize recognition accuracy.

Given that dynamic content, by definition varies, applications may be required to inform the system whenever the content changes. In an interactive TV guide application, for example, the application registers a new set of dynamic content every one-half hour. For a VOD system, this registration may be performed whenever the database of offered movies changes.

Once registration has been completed, and the system is being used, recognition of a spoken request may cause a signal to be sent back to the application. This signal informs the application to perform the requested action, and/or to update the contents of the screen as a result of the user's request. In this manner, the application can use the system's speech recognition services with minimal modifications to the application's code, while retaining the same graphical look and feel to which users have become accustomed.

In the subscriber's premises, a speech-enabled remote control may be employed, e.g. containing a microphone, as well as traditional universal remote control functionality. The remote control may further contain a Push-To-Talk (PTT) button. Conventional remote control functions are transmitted via infra-red (IR). The speech output may be wirelessly transmitted to a set top pod, module, or appliance located at the set-top box. The wireless transmission from the remote control may employ an electromagnetic physical transport layer or ultrasonic physical transport layer. The electromagnetic physical transport layer may use a radio frequency carrier or an infra-red carrier.

When the PTT button is pushed by the user, the remote control sends a PTT active command to the set top appliance. The appliance may then inform the set-top box to place an icon on the screen, or otherwise indicate to the user that the system is listening to them. Next, as the user speaks into the microphone, the speech is digitized, compressed, and transmitted to the set top appliance.



The set top appliance may perform any or all of the following: encrypt the speech sample to provide security; add subscriber address information; add a message length code; add error control coding to the assembled information. The error control coding may include a Cyclical Redundancy Code (CRC), enabling data transmission errors to be detected.

In homes with set-top boxes having the necessary features, the set top appliance may transmit speech information to the set-top box, which then transmits it to the central location as a series of packets.

Alternatively, the set top appliance may directly transmit the speech stream to the central location itself. This may continue until the set top appliance receives a PTT Release from the remote, indicating end of speech. This information is also transmitted to the central location, signaling end of spoken request.

Each individual consumer's interface, i.e. set-top box or set-top appliance, may have a unique address. The address of the individual consumer's interface may be determined during the manufacturing process. As speech packets are transmitted upstream, this address information may be appended to the speech packets. The address information enables rapid determination of the user site from which the speech sample is received. The address information may precede the speech packets. The address information improves the efficiency of at least some of the central location processing stages.

Assignment of an input buffer address to the speech sample may be based upon the user site address. This input buffer collects incoming speech packets until the final packet of a spoken request has been received. Recognition of the final speech packet receipt may be encoded in that speech packet. Final speech packet receipt recognition may include a delay in speech of greater than a predetermined amount of time. The speech delay amount may be one or more of at least the following: a globally defined constant, a user site defined constant, an identified user defined constant, or an application-defined constant for an application serviced by the speech recognition system. The final speech packet may be generated based upon the release of the PTT button in the remote control unit. The final speech packet may be generated at the remote control unit, set top pod, set top appliance, set top box, node, Headend or metropolitan Headend, or by the serviced application. The final speech packet may be generated by the serviced application based upon a time schedule, e.g. a fixed period in which participants may respond, a privilege scheme, and/or other application related scheme.

On-the-fly Cyclical Redundancy Code (CRC) error checking generation may be used. Each time a packet is read in, CRC in the processor registers may be computed as each byte is read, then the partial CRC is stored with the stored packet. The CRC may be stored at the end of the packet, at the beginning of the packet or in specifically designated locations within the packet. When the next packet arrives, the partial CRC is read from where it was stored, and the new packet data may be appended to the end of the previous packet, overwriting the temporary CRC. This continues until a complete speech sample has been received. This approach to CRC calculation cuts memory accesses in half compared to first storing the string, then making a second pass to generate the CRC.

Once a complete spoken request has been received, the speech input processor may use the sample's source address identifying a user site to target the speech data to a specific speech processing processor. This direct correspondence between the source address and a specific speech processor allows speech processors to cache user-specific parameters for the user sites they serve. The mapping of source addresses to speech processor reduces the bandwidth necessary to move user site-specific data to each speech processor. In other embodiments of the invention, a translation table may be used to allow speech to processor assignments to be changed dynamically in the event of a hardware or other failure, e.g. capacity overload, while retaining the efficiency advantages of directly mapping the speech channel to the processor.

To process a speech sample by the speech processor into speech content, the speech processor must first contain in its local memory a copy of the grammar definition associated with the user site. A grammar is a structure often containing the words which are most likely to be spoken, the order in which these words may appear, and the meaning of various sequences of words. This structure may be a hardware configuration, software program, data structure, or a combination of two or more of these.

Before transferring the new speech sample to a speech processor, the grammar associated with the speech sample is transferred to the target speech processor. The grammar transfer may use a simple Least Recently Used (LRU) queue. If the speech processor contains enough empty space in its memory, then the indicated grammar is transferred directly to the empty memory from mass storage. Mass storage may include, but is not limited to, a disk, disk farm, or Redundant Array of Independent Disks (RAID), a high bandwidth disk farm. If not, then the least-recently-used grammar entry may be discarded, and the new grammar information loaded into the vacated memory.

The next step in processing the speech sample ensures that the current parameters associated with this user site are already cached in the specific speech processor's RAM. If these parameters are not present, then the least-recently-used parameter cache entry may be evicted from the cache.

To do this, the oldest cache entry on this speech processor is first examined to see if it has been modified. If it has, the cache entry is stored to mass storage, and the cache slot is then declared vacant. Next, the user site speech parameters associated with the new speech sample are loaded into the vacated cache block. During the relatively long access times needed to load a new set of user site parameters from mass storage (and optionally to write the old parameters to the disk, etc.), the current speech sample may be held in the input buffer in a waiting state.

After the new household speech parameters are loaded into the targeted speech processor, the speech sample is moved into the work queue for the speech processor. This minimizes speech processor delay for processing other speech requests during disk accesses. Instead, the speech processor may process other speech samples associated with user sites whose parameters are already in the cache.

Once the speech parameters associated with a speech sample are available in the speech processor, the speech sample may be assigned to the speech processor by placing a description of the speech sample into the target speech processor's work queue. As speech samples are processed, they may be removed from the front of the work queue by the speech processor.

Eventually, the speech processor reaches the current input sample. The speech sample is transferred into the speech processor's local memory, and the status of this speech sample changed to Next. This transfer may occur in parallel with the processing of the prior speech sample, ensuring that speech processor utilization is maximized.

Once this transfer is complete, and the speech processor completes processing of the prior sample, the status of this speech sample changes to Current, and the speech recognition engine begins processing this sample.

Successful processing of a speech sample requires that both the proper grammar and the proper user site parameter information be simultaneously accessible by the speech processor.

The possibility exists in which a recently-loaded grammar or speech parameter file is erased prior to its use, in the process of loading the grammar or speech parameters for the current speech sample. To eliminate this condition, the total number of speech samples sitting in the waiting and working queues of a speech processor preferably should not exceed the number of cache entries in the speech processor.

The first step in recognizing the current speech sample may determine which individual person pronounced the current spoken request. The Speaker Identification software module running on the targeted speech processor compares the spoken characteristics of this speech sample with the characteristics of the speakers who have been previously identified in this user site.

In many spoken requests, the incoming speech sample matches the characteristics of a previously identified speaker. When this occurs, the speech sample is passed on to the next phase, speech recognition.

If the speech sample is not identified with an existing speaker, then a new user routine is invoked, enabling a new user to be associated with this household. This routine records the new individual's speech parameters into this user site's speech parameters, so that the new speaker may be identified during subsequent spoken requests. Optionally, the system may offer the user site manager the opportunity to erase or modify the new speaker parameters.

The inputs to the speech recognition software module may include a speech sample, an individual user's speech parameters, and the grammar to be recognized. The speech engine determines the most likely spoken request based on statistical analysis, and may return a text string corresponding to the spoken request. This matching process is probabilistic: along with the returned text string, the speech engine may also return a confidence measure, or percentage of match likelihood. The returned text string and confidence measure enables different applications to respond differently based on the calculated confidence in the recognition result.

For recognition results having a low cost to the user, such as a request to display listings for a particular movie, lower confidence criteria may be applied. For recognition results with a high cost to the user, such as a request to purchase a movie, higher confidence thresholds may be required. Furthermore, purchase verification may be requested.

When recognition accuracy is particularly low, the speech recognition engine may determine partial matches to more than one possible phrase, returning the text of several possible matches. This process enables an application or user to select from several alternative recognition results.

In cases where a transaction results in a charge to the user, the system may record the speech sample representing the purchase request onto mass storage. This speech sample recording is performed to provide verification that a purchase request was made, should a user dispute their intent to purchase. This further supports speech-based methods of contracting. Note that the recording may be compressed in

either a standard or non-standard manner, which may further include encryption technology.

Due to the statistical nature of speech recognition, spoken requests are occasionally mis-recognized. Recognition errors have been a primary hindrance to further exploitation of speech recognition systems. This system provides a mechanism by which the user receives rapid visual feedback regarding the recognition process. Soon after the speech recognition engine has returned a result, visual text corresponding to the recognized spoken request is displayed on the display, e.g. television, screen.

This rapid visual feedback may be accomplished by transmitting the recognized text string back to the set-top box. Software executing within the set-top box displays the text information in a special window on top or overlaying of the existing application display. In cases where limitations in the set-top box prevent the window from appearing on top of existing content, software executing within the set-top box may select an alternative feedback display, for example, a different channel containing a background field, and displays the overlay information on top of this background.

In cases where the recognition accuracy is particularly poor, and the speech engine returns several possible recognition results, this overlay display capability may be used to help refine the user's query. By displaying the text of the possible recognition results, the user can easily select from the returned list.

If none of the recognized text strings match the user's spoken request, the user may elect to start again. However, more commonly, one of the displayed strings match, or be likely to readily lead to the user's speech request with appropriate modification. When this is the case, the user can readily select from the displayed alternatives, enabling improved productivity in low-recognition situations.

One key feature which can be used with applications such as Pay-Per-View and Video-On-Demand, is similarity searching. When the system is scanning for dynamic content, i.e. movie titles and actor names, a similarity search feature may be available. This enables searches for names which are only partially matched, or which resemble the recognized phrase, without requiring precise specification of the exact title or name. The technique used to deliver similarity searching is to augment the dynamic content list specified by the application. Words similar in meaning, content, or spelling to words in the content list may be automatically added to the dynamic content list whenever the application informs the system of a content update. This enables the recognition grammar to be extended to support a broader array of matches without requiring bandwidth-intensive text searches each time a user's speech request has been received. Links between similar and target words may be maintained in the internal representation of the grammar, thereby providing direct access to target names. This further enhances system performance.

Note that as used herein, similarity databases may be constructed from at least one or more of the following database architectures: relational, SQL, knowledge-based, inferential knowledge bases including Horn clause and extended Horn clause fact bases, fuzzy versions of the above, as well as neural networks and combinations of these techniques. Also, manual additions may be made at the AgileTV™ central office.

The entire system may provide fault tolerance for robust performance. For individual components, such as speech processors and associated memory, the system may automatically recognize most component failures, and disable faulty processors.

In addition, many system installations may require multiple AgileTV™ Voice Processing Unit (AVPU) boxes **3000** to meet the performance needs of the subscriber base. To ensure maximum operating time, even the total failure of an AVPU engine may not be catastrophic. The remaining AVPU engines continue to service the incoming speech traffic at a reduced performance level. This failover is carried out by a negotiation protocol between the AVPU boxes.

In addition to these internal diagnostics functions, the system may also communicate continuously with a network operations center, enabling rapid identification of system errors, as well as rapid service dispatch to correct any problems.

A speech command preprocessor may perform the function of speech filtering, digitizing, data compression, encoding pauses in speech, and address insertion. Preprocessing speech commands at user sites results in a lower upstream data rate. This processing can be located in the remote **1000**, the Set-top appliance **1100**, or the set top box.

A Speech Packet Processor may be centrally located in or near a wireline node specifically to capture and prepare the upstream speech packets that are to be fed to the Speech Recognition Engine.

A speech processor system may be centrally located in or near a wireline node, which may include a Cable Television (CATV) central location. The speech recognition system may be centrally located in or near a server farm. The speech recognition system may be centrally located in or near a web-site hosting location. The speech recognition system may be centrally located in or near a gateway.

The speech recognition engine processes speech packets to create speech content and formulate the response to the speech content for each of the user sites.

The system also performs address decoding for routing and latency reduction. It also performs the function of decoding the pauses between words or sounds originally encoded on the preprocessor at the user site.

A method is provided for a very high level of security based on the ability of being able to precisely recognize a parent's speech or a child's speech based on a limited subset of choices. The ability to recognize an individual speaker with a very high probability of identifying the specific speaker is based on knowing the address of the user site.

A large capacity, centrally located, natural speech recognition engine can readily identify a specific speaker from among a small set of choices, allowing a parent to voice print and therefore control the type, or amount or timing of content a child may request. A child may be able to learn PIN numbers but cannot readily fool the voice print. Speaker recognition is particularly appealing in this parental control application, and can be applied with very high accuracy, due to the limited number of speakers per user site. Parents may control the specific viewing times, total time, or content that a child can watch television through this system and its use.

The operational discussion just presented regarding FIGS. **3**–**5** is applicable to the relevant operational system embodiments based upon any and all of the FIGS. **19**A to **24**, as well as, FIGS. **26** to **31**.

A parallel processor system supporting this sort of system is disclosed in U.S. Patent Application Ser. No. 60/210,440, entitled "System and Method of a Multi-dimensional Plex Communication Network", which describes plex processor networks and which is incorporated herein by reference.

A plex communications network has M orthogonal directions that support communications between an M dimensional lattice that may include N^M plex-nodes, where M is at least two and N is at least four. Each plex-node pencil in

a first orthogonal direction contains at least four plex-nodes and each plex-node pencil in a second orthogonal direction contains at least two plex-nodes. Each of the plex-nodes contains a multiplicity of ports.

A plex-node pencil refers to a 1-dimensional collection of plex-nodes differing from each other in only one dimensional component, i.e. the orthogonal direction of the pencil. By way of example, a nodal pencil in the first orthogonal direction of a two-dimensional array contains the plex-nodes differing in only the first dimensional component. A nodal pencil in the second orthogonal direction of a two-dimensional array contains the plex-nodes differing in only the second dimensional component.

The plex communications network is comprised of a communication grid interconnecting the plex-nodes. The communications grid may include N^(M−1) communication pencils, for each of the M directions. Each of the communication pencils in each orthogonal direction is coupled with a corresponding plex-node pencil containing a multiplicity of plex-nodes coupling every pairing of plex-nodes of the corresponding plex-node pencil directly.

Communication between two plex-nodes of a nodal pencil coupled with the corresponding communication pencil comprises traversal of the physical transport layer(s) of the communication pencil.

Such plex communications networks support direct communication between any two plex-nodes belonging to the same communication pencil. This supports communication between any two plex-nodes in at most M hops between plex-nodes.

FIG. **6** depicts a tightly coupled server farm **3000** of FIG. **3** implemented in a two-dimensional plex communication network with N=4 plex-nodes in each of two orthogonal directions of the plex-node array.

Consider the plex-node pencil in the first orthogonal direction containing Plex-node 0,0, Plex-node 1,0, Plex-node 2,0 and Plex-node 3,0. The communication pencil **400** in the first orthogonal direction couples to the plex-nodes of this plex-node pencil. Plex-node 0,0 is coupled **402** to communication pencil **4100**. Plex-node 1,0 is coupled **404** to communication pencil **400**. Plex-node 2,0 is coupled **406** to communication pencil **400**. Plex-node 3,0 is coupled **408** to communication pencil **400**.

Consider the plex-node pencil in the first orthogonal direction containing Plex-node 0,1, Plex-node 1,1, Plex-node 2,1 and Plex-node 3,1. The communication pencil **410** in the first orthogonal direction couples to the plex-nodes of this plex-node pencil. Plex-node 0,1 is coupled **412** to communication pencil **410**. Plex-node 1,1 is coupled **414** to communication pencil **410**. Plex-node 2,1 is coupled **416** to communication pencil **410**. Plex-node 3,1 is coupled **418** to communication pencil **410**.

Consider the plex-node pencil in the first orthogonal direction containing Plex-node 0,2, Plex-node 1,2, Plex-node 2,2 and Plex-node 3,2. The communication pencil **420** in the first orthogonal direction couples to the plex-nodes of this plex-node pencil. Plex-node 0,2 is coupled **422** to communication pencil **420**. Plex-node 1,2 is coupled **424** to communication pencil **420**. Plex-node 2,2 is coupled **426** to communication pencil **420**. Plex-node 3,2 is coupled **428** to communication pencil **420**.

Consider the plex-node pencil in the first orthogonal direction containing Plex-node 0,3, Plex-node 1,3, Plex-node 2,3 and Plex-node 3,3. The communication pencil **430** in the first orthogonal direction couples to the plex-nodes of this plex-node pencil. Plex-node 0,3 is coupled **432** to communication pencil **430**. Plex-node 1,3 is coupled **434** to communication pencil **430**. Plex-node 2,3 is coupled **436** to communication pencil **430**. Plex-node 3,3 is coupled **438** to communication pencil **430**.

Three of these ports on each plex-node are devoted to providing a direct interconnect to the other plex-nodes of its row through a collection of communication paths forming the communication pencil in the second orthogonal direction. These plex-nodes belong to the same row as the plex-nodes of the plex-node pencil in the second orthogonal direction.

A plex-node may have at least one additional port. At least one of the additional ports may be connected to an external network. Further, at least one of the additional ports may be connected to an external mass storage system. In other embodiments of the invention, at least one of the additional ports may be connected to an external database system.

A plex-node may contain at least one instruction processor. As used herein, an instruction processor includes but is not limited to instruction set processors, inference engines and analog processors. An instruction set processor refers to instruction processors changing state directly based upon an instruction, and which change an internal state by executing the instruction. The instruction may include, but is not limited to, direct or native instructions and interpreted instructions. An inference engine changes state when presented an instruction, which may include an assertion, an assumption, or an inference rule. Inference engines include, but are not limited to, Horn clause engines such as Prolog requires, constraint based systems and neural network engines. As referred to herein, analog processors include, but are not limited to, optical signal processors, CCD's, and resonant cavity devices responding to data and/or controls asserted in the analog domain.

Communication includes, but is not limited to, communication using a digital communications protocol. Communication also includes a messaging protocol using the digital communications protocol. Communications also includes a messaging protocol supporting TCP-IP, supporting the Internet, and/or supporting the World Wide Web.

Communications may also include at least one video stream protocol using a digital communications protocol. Communications may include at least one multi-media stream protocol using the video stream protocols including motion JPEG and/or at least one form of MPEG.

The invention may support Wavelength Division Multiplex (WDM) through the physical transport of the communication paths of the communication pencils.

Each plex-node may include a communication processor. Each plex-node may further include M communications processors. The ports of each communications processor may be connected to each one of the pencils supporting pencil communications processing.

FIG. **7** depicts a gateway **3100** of FIG. **3** implemented in a two-dimensional plex communication network with N=4 plex-nodes in each of two orthogonal directions of the plex-node array.

In FIGS. **6** and **7**, upstream signals **1510** may be received at the Plex-node 0,0, performing functions similar in nature to processor node **3110** of FIGS. **3**, **4** and **5**. Plex-node 0,1 may couple **3142** to RAID **3130** subsystem, providing high-speed access to a high capacity disk farm. Various signals **1512** to **1518** may be generated by various plex-nodes. Note that because of the uniformity of the communication structure, there is great flexibility in choosing which plex-node generates which communication signals.

FIG. **7** also shows coupling **3002** to a speech recognition server array **3200**.

FIG. **8** depicts a coupled server array **3200** of FIG. **3** implemented in a two-dimensional plex communication network with N=4 plex-nodes in each of two orthogonal directions of the plex-node array.

Each plex-node of FIG. **8** may include a plex communications network supporting a two or more dimensional array of internal plex-nodes, each including at least one instruction processor.

FIG. **9** depicts a simplified block diagram using an array of processors as shown as **3200** in FIG. **3**.

Consider an array of plex-nodes, where each plex-node uses multiple-processor IC's labeled CPU. Each CPU may possess three or more high speed serial protocol channels C**1**-**3**, a high speed interconnect bus B**1**, a low speed interconnect bus PCI and a local memory access bus R. Each CPU may include at least two processors. Each processor may be an instruction processor. Each CPU may be an integrated circuit. The integrated circuit may be a BCM12500 manufactured by Broadcom Corporation of Irvine, Calif.

CPU**1** and CPU**2** are locally coupled via at least one of the interconnect buses. Each CPU possesses locally accessible memory via an R bus. Each CPU may further access locally accessible memory via its own R bus. The R bus accessed memory may include DDR SDRAM (Double Data Rate Synchronous DRAM).

Three serial protocol channels for the first CPU of each CPU pair are dedicated to communication within each row of CPU pairs. Three serial protocol channels for the second CPU of each CPU pair are dedicated to communication within each column of CPU pairs.

Assume each CPU contains at least two processors. Assume each processor is operating at K billion integer operations/second and L billion floating point operations/second. Assume the high speed serial channels support a gigabit/second bidirectional transfer rates. The DDR DRAMs support M gigabyte/second access rates. This system provides 64*K billion integer operations, 64*L billion floating point operations, 128 gigabits/second interconnect communication bandwidth throughout the array through the high speed serial channels, as well as 64*M gigabytes/second local memory access. By decoupling the tasks running on each processor, making them independent and concurrent, this system architecture achieves the dream of Multiple-Instruction Multiple Datapath computing (MIMD), providing essentially linear speed up with the increase in processors for up to 64 processors.

Such architectures can support each processor generating a frame in a local frame buffer and rendering it into a motion video stream, which is merged into a multiplexed video content stream suitable for a variety of multi-media applications. This apparatus meets or exceeds the requirements of a number of teraflop-class computing applications, which today have no cost effective solution. Note that the processors may each be dual instruction processors housed in a single package.

Each of these arrays will process over 1K speakers concurrently and fit into a single rack mount enclosure. Standard 72 inch, tall racks could then hold 4 such speech engines, also known herein as an AVPU, supporting up to 140,000 subscribers. Each server contains at least dual, redundant, hot-swappable power supplies, and redundant, hot-swappable disks with automatic recovery for failed disk drives. The hot-swappable power supplies may further be half-sized, each supporting the power requirements of half the server engine.

Real-time, extensive diagnostics and continuous connectivity to a 24 hours per day, seven days per week (24×7) Network Operations Center insuring timely failure detection and service dispatch. In systems with more than one speech engine, the server automatically handles catastrophic failures gracefully. Even if an entire speech engine fails, the remaining ones pick up the workload.

FIG. **10** depicts a flowchart of a method that uses a back channel containing a multiplicity of identified speech channels for speech recognition at a wireline node in a network supporting video or cable television delivery in accordance with the invention. The back channel is from a multiplicity of user sites and is presented to a speech processing system at the wireline node in the network. The speech processing system performs the operations of the method.

Operation **2000** starts the operations of this flowchart. Arrow **2002** directs the flow of execution from operation **2000** to operation **2004**. Operation **2004** performs receiving the back channel to create a received back channel. Arrow **2006** directs execution from operation **2004** to operation **2008**. Operation **2008** terminates the operations of this flowchart.

Arrow **2010** directs the flow of execution from starting operation **2000** to operation **2012**. Operation **2012** performs partitioning the received back channel into a multiplicity of received identified speech channels. Arrow **2014** directs execution from operation **2012** to operation **2008**. Operation **2008** terminates the operations of this flowchart.

Arrow **2020** directs the flow of execution from starting operation **2000** to operation **2022**. Operation **2022** performs processing the multiplicity of the received identified speech channels to create a multiplicity of identified speech content. Arrow **2024** directs execution from operation **2022** to operation **2008**. Operation **2008** terminates the operations of this flowchart.

Arrow **2030** directs the flow of execution from starting operation **2000** to operation **2032**. Operation **2032** performs responding to the identified speech content to create an identified speech content response, for each of the multiplicity of the identified speech contents. Arrow **2034** directs execution from operation **2032** to operation **2008**. Operation **2008** terminates the operations of this flowchart.

Portions of the flowchart of FIG. **10** related to operations **2022** and **2032** may operate a speech processing system coupled to a wireline node in a network. The wireline node provides multiple received identified speech channels to the speech processing system. The received identified speech channels are based upon a received back channel at the wireline node from multiple user sites coupled to the network. The network supports video delivery to the user sites and/or cable television delivery to the user sites.

The speech processing system may include at least one computer. Operations **2022** and **2032** may be implemented as program steps of a program system operating at least part of the computers included in the speech processing system. Implementations of these operations as program steps may reside in memory accessibly coupled to at least one computer in the speech processing system.

Note that operations **2002** and **2012** may be implemented in hardware and/or implemented as program steps used in operating computers located at the wireline node. Such computers may or may not be part of the speech processing system.

At least one, and possibly all, of the identified speech channels may have an associated user site.

FIG. **11**A depicts a detail flowchart of operation **2012** of FIG. **10** further partitioning the received back channel.

Arrow **2070** directs the flow of execution from starting operation **2012** to operation **2072**. Operation **2072** performs partitioning the received back channel into a multiplicity of received identified speech channels from the associated user site. Arrow **2074** directs execution from operation **2072** to operation **2076**. Operation **2076** terminates the operations of this flowchart.

FIG. **11**B depicts a detail flowchart of operation **2022** of FIG. **10** further processing the multiplicity of the received identified speech channels.

Arrow **2090** directs the flow of execution from starting operation **2022** to operation **2092**. Operation **2092** performs processing the multiplicity of the received identified speech channels from the associated user site to create multiple identified speech contents. Arrow **2094** directs execution from operation **2092** to operation **2096**. Operation **2096** terminates the operations of this flowchart.

FIG. **11**C depicts a detail flowchart of operation **2032** of FIG. **10** further responding to the identified speech content.

Arrow **2110** directs the flow of execution from starting operation **2032** to operation **2112**. Operation **2112** performs responding to the identified speech content from the associated user site to create the identified speech content response for the associated user site. Arrow **2114** directs execution from operation **2112** to operation **2116**. Operation **2116** terminates the operations of this flowchart.

FIG. **12** depicts a detail flowchart of operation **2000** of FIG. **10** further performing the method using the back channel from multiple user sites.

Arrow **2120** directs the flow of execution from starting operation **2000** to operation **2122**. Operation **2122** performs determining the associated user site from the received identified speech channel. Arrow **2124** directs execution from operation **2122** to operation **2126**. Operation **2126** terminates the operations of this flowchart.

Arrow **2130** directs the flow of execution from starting operation **2000** to operation **2132**. Operation **2132** performs determining the associated user site from the identified speech content. Arrow **2134** directs execution from operation **2132** to operation **2126**. Operation **2126** terminates the operations of this flowchart.

Arrow **2140** directs the flow of execution from starting operation **2000** to operation **2142**. Operation **2142** performs determining the associated user site from the identified speech content and a speaker identification library. Arrow **2144** directs execution from operation **2142** to operation **2126**. Operation **2126** terminates the operations of this flowchart.

Arrow **2150** directs the flow of execution from starting operation **2000** to operation **2152**. Operation **2152** performs determining the associated user site from the identified speech content and a speech recognition library. Arrow **2154** directs execution from operation **2152** to operation **2126**. Operation **2126** terminates the operations of this flowchart.

Arrow **2160** directs the flow of execution from starting operation **2000** to operation **2162**. Operation **2162** performs determining the associated user site from an identification within the speech channel. Arrow **2164** directs execution from operation **2162** to operation **2126**. Operation **2126** terminates the operations of this flowchart.

Note that the determination of the associated user site may be provided by an identification within the speech channel. By way of example, a technician may be recognizable at many user sites, and may identify the user site as Room 432 or 10 Main Street in the process of activities at that user site.

The invention can include at least one of the operations **2120**, **2132**, **2142**, **2152** and **2162**.

FIG. **13**A depicts a detail flowchart of operation **2112** of FIG. **11**C further responding to identified speech contents.

Arrow **2170** directs the flow of execution from starting operation **2112** to operation **2172**. Operation **2172** performs processing the identified speech content response to create the identified user site response. Arrow **2174** directs execution from operation **2172** to operation **2176**. Operation **2176** performs sending the identified user site response to the identified user site. Arrow **2178** directs execution from operation **2176** to operation **2180**. Operation **2180** terminates the operations of this flowchart.

FIG. **13**B depicts a detail flowchart of operation **2112** of FIG. **11**C further responding to the identified speech content.

Arrow **2190** directs the flow of execution from starting operation **2112** to operation **2192**. Operation **2192** performs assessing the speech content response identified as to the user site to create a financial consequence identified as to the user site. Arrow **2194** directs execution from operation **2192** to operation **2196**. Operation **2196** performs billing the user site based upon the financial consequence. Arrow **2198** directs execution from operation **2196** to operation **2200**. Operation **2200** terminates the operations of this flowchart.

FIG. **14** depicts a detail flowchart of operation **2112** of FIG. **11**C further responding to the identified speech content from the associated user site.

Arrow **2210** directs the flow of execution from starting operation **2112** to operation **2212**. Operation **2212** performs assessing the speech response to create a financial consequence identified as to the user site. Arrow **2214** directs execution from operation **2212** to operation **2216**. Operation **2216** performs displaying the financial consequence to create a displayed financial consequence at the user site. Arrow **2218** directs execution from operation **2216** to operation **2220**. Operation **2220** performs confirming the displayed financial consequence from the user site to create a financial commitment. Arrow **2222** directs execution from operation **2220** to operation **2224**. Operation **2224** performs billing the user site based upon the financial commitment. Arrow **2226** directs execution from operation **2224** to operation **2228**. Operation **2228** terminates the operations of this flowchart.

FIG. **15**A depicts a detail flowchart of operation **2112** of FIG. **11**C further responding to the identified speech content from the associated user site.

Arrow **2250** directs the flow of execution from starting operation **2112** to operation **2252**. Operation **2252** performs identifying a user based upon the speech content identified with the user site to create an identified user. Arrow **2254** directs execution from operation **2252** to operation **2256**. Operation **2256** terminates the operations of this flowchart.

FIG. **15**B depicts a detail flowchart of operation **2252** of FIG. **15**A further identifying the user.

Arrow **2270** directs the flow of execution from starting operation **2252** to operation **2272**. Operation **2272** performs fetching a user profile list based upon the user site and the user profile list containing at least one user profile. Arrow **2274** directs execution from operation **2272** to operation **2276**. Operation **2276** performs identifying the user based upon the speech content and based upon the user profile list to create an identified user. Arrow **2278** directs execution from operation **2276** to operation **2280**. Operation **2280** terminates the operations of this flowchart.

FIG. **16** depicts a detail flowchart of operation **2112** of FIG. **11**C further responding to the identified speech content from the associated user site.

Arrow **2290** directs the flow of execution from starting operation **2112** to operation **2292**. Operation **2292** performs assessing the speech response based upon the identified user

to create a financial consequence for the identified user. Arrow **2294** directs execution from operation **2292** to operation **2296**. Operation **2296** performs displaying the financial consequence to create a displayed financial consequence at the user site. Arrow **2298** directs execution from operation **2296** to operation **2300**. Operation **2300** performs confirming the displayed financial consequence from the user site based upon the identified user to create a financial commitment. Arrow **2302** directs execution from operation **2300** to operation **2304**. Operation **2304** performs billing the identified user based upon the financial commitment. Arrow **2306** directs execution from operation **2304** to operation **2308**. Operation **2308** terminates the operations of this flowchart.

FIG. **17**A depicts the speech content response **2350**, including the current response menu **2352** and the cumulative user site response **2354**, in accordance with the invention.

The speech content response may include a current response menu and a cumulative user site response identified as to the user site for at least one of the user sites.

FIG. **17**B depicts a detail flowchart of operation **2112** of FIG. **11**C further responding to the identified speech content from the associated user site.

Arrow **2330** directs the flow of execution from starting operation **2112** to operation **2332**. Operation **2332** performs responding to the speech contents based upon the current response menu and based upon the cumulative user site response to create a new cumulative user site response. Arrow **2334** directs execution from operation **2332** to operation **2336**. Operation **2336** terminates the operations of this flowchart.

Arrow **2340** directs the flow of execution from starting operation **2112** to operation **2342**. Operation **2342** performs assessing the speech contents based upon the current response menu and based upon the cumulative user site response to create a new current response menu. Arrow **2344** directs execution from operation **2342** to operation **2336**. Operation **2336** terminates the operations of this flowchart.

At least one of operations **2332** or **2342** may be performed.

FIG. **18**A depicts a detail flowchart of operation **2112** of FIG. **11**C further responding to the identified speech content from the associated user site.

Arrow **2370** directs the flow of execution from starting operation **2112** to operation **2372**. Operation **2372** performs responding to the speech content, identified as to the user site, based upon a natural language, to create a speech content response of the speech content identified as to user site. Arrow **2374** directs execution from operation **2372** to operation **2376**. Operation **2376** terminates the operations of this flowchart.

FIG. **18**B depicts a detail flowchart of operation **2092** of FIG. **11**B further processing the multiplicity of the received speech channels.

Arrow **2390** directs the flow of execution from starting operation **2092** to operation **2392**. Operation **2392** performs processing the received speech channels from the user site based upon a natural language for the user site to create the speech content identified as to the user site. Arrow **2394** directs execution from operation **2392** to operation **2396**. Operation **2396** terminates the operations of this flowchart.

FIG. **19**A depicts a simplified block diagram of a hand held remote **1000**, containing microphone **1060** and keypad **1020** supporting user input organized and processed by embedded controller **1050** for communication by wireless interface **1040** coupled **1002** to set-top apparatus **1100**, as shown in FIG. **3**.



FIG. **19**B depicts a simplified block diagram of set-top apparatus **1100** as shown in FIG. **3** showing coupling **1002** and first wireline physical transport **1200** comprised of downlink coupling **1202** and uplink coupling **1204**.

Note that microphone **1060** may include more than one audio-sensor and/or a microphone array of two or more microphone units.

FIG. **19**C further depicts set-top apparatus **1100** as shown in FIG. **19**B containing a set-top appliance **1120** coupled **1002** with hand held remote **1000**. Set-top appliance **1120** is coupled **1112** with set-top box **1110** possessing downlink coupling **1202** and uplink coupling **1204**.

FIG. **19**D further depicts set-top apparatus **1100** as shown in FIG. **19**B containing a set-top appliance **1120** coupled **1002** with hand held remote **1000** and possessing downlink coupling **1202** and uplink coupling **1204**. Set-top appliance **1120** provides processed downlink coupling **1114** to set-top box **1110** and receives initial uplink coupling **1112** from set-top box **1110**.

Regarding FIG. **19**A–**19**D, the following observations may be made.

The invention supports uni-directional communication via coupling **1002**, supporting communicative transfer from the remote **1000** via coupling **1002** to set-top apparatus **1100**.

The invention supports bi-directional communication via coupling **1002**. Note that noise-canceling microphones **1060** may use bi-directional communication on coupling **1002**. Noise cancellation may be performed within set-top apparatus **1100**, by at least one of the set-top box **1110** and set-top appliance **1120**.

Wireless interface **1040** interacts with coupling **1002**. Coupling **1002** may use a wireless transport, including, but not limited to, at least one of infra-red, microwave or radio frequency spectrum regions, as well as ultrasonic signaling. Embedded controller **1050** controls **1042** wireless interface **1040**. Embedded controller **1150** communicates via **1042** with wireless interface **1040** to direct communication across coupling **1002**.

FIG. **20**A depicts a simplified block diagram of set-top appliance **1120** as shown in FIG. **19**C supporting coupling **1002** with hand held remote **1000** and coupling **1112** with set-top box **1110**.

Computer **1150** is coupled **1132** to remote interface **1130** and also coupled **1142** to set-top box interface **1140**. Computer **1150** executes a program system including program steps residing in accessibly coupled **1162** memory **1160**.

The program system executed by computer **1150** includes program steps maintaining hand held remote **1000** communication through remote interface **1130** and maintaining set-top box **1120** communication through set-top box interface **1140**.

Remote interface **1130** couples **1002** with hand held remote **1000** (not shown in FIG. **20**A).

Remote interface **1130** incorporates the necessary device or devices to provide communications using the embodiment's physical transport layer.

Set-top box interface **1140** couples **1112** with set-top box **1120**, as shown in FIG. **19**C. Coupling **1112** may use a wireline or wireless physical transport. Coupling **1112** may use a wireless transport, including, but not limited to, at least one of the infra-red, microwave or radio frequency spectrum, as well as ultrasonic signaling. Set-top box interface

**1140** incorporates the necessary device or devices to provide communications using the embodiment's physical transport layer.

FIG. **20**B depicts a simplified block diagram of set-top appliance **1120** as shown in FIG. **19**D supporting coupling **1002** with hand held remote **1000** and couplings **1112** and **1114** with set-top box **1110**.

Set-top box interface **1140** provides processed downlink coupling **1114** to set-top box **1110** and receives initial uplink coupling **1112** from set-top box **1110** as shown in FIG. **19**D. Set-top box interface **1140** incorporates the necessary device or devices to provide these communications.

FIG. **20**C depicts a block diagram further depicting accessibly coupled **1162** memory **1160** as shown in FIGS. **20**A and **20**B.

Accessibly coupled **1162** memory **1160** may contain RAM memory **1180** coupled **1182** to computer **1150**. Accessibly coupled memory **1160** may include more than one RAM memory **1180**. Distinct RAM memories **1180** may be distinctly coupled to computer **1150**. One or more RAM memories **1180** may act as a cache memory for computer **1150**.

Accessibly coupled **1162** memory **1160** may contain non-volatile memory **1190** coupled **1192** to computer **1150**. Accessibly coupled memory **1160** may include more than one non-volatile memory **1190**. Distinct non-volatile memories **1190** may be distinctly coupled to computer **1150**. A non-volatile memory may be organized as file management system.

Note that the coupling **1182** of RAM memory **1180** may be distinct from coupling **1192** of non-volatile memory **1190** with computer **1150**. Either RAM memory and/or non-volatile memory components may be packaged with computer **1150**.

FIG. **21** depicts a remote control unit **1000-180** coupled **1002-180** to set-top apparatus **1100-180**. Set-top appliance **1100-180** communicates via a one- or two-stage wireline communications system containing a wireline physical transport **1200** to an augmented distributor node **1310**. The communications traverse augmented distributor node **1310** interfaced to a wireline communications loop including an augmented Headend **1410**. The network may further support a communications loop including augmented metropolitan Headend **1410**.

As used herein, the adjective augmented is used to refer to a node incorporating at least one embodiment of the invention.

Augmented node **1310** may control and support optimized upstream communication as disclosed in the co-pending application Ser. No. 09/679,115, entitled "Increased Bandwidth in Aloha-based Frequency Hopping Transmission Systems" by Calderone and Foster, both inventors of this application and commonly assigned to AgileTV, and incorporated herein by reference.

Augmented node **1310** may provide cached content such as popular videos for a VOD service.

Speech processing may be performed in many situations at augmented node **1310**.

Augmented Headend **1410** and augmented metropolitan Headend **1410** provide speech processing capabilities. Augmented Headend **1410** may be used to handle speech processing for nodes **120** and **124**. Augmented metropolitan Headend **1410** may be used to handle speech processing for Headends **100** and **106**. Headends **100** and **106**, and nodes **120** and **124** are not augmented by this invention.

Alternatively, augmented Headend **1410** may control the optimized upstream communication as disclosed in the co-pending application Ser. No. 09/679,115, entitled "Increased Bandwidth in Aloha-based Frequency Hopping Transmission Systems". Node **1310** may support the optimized upstream communication. Upstream communication from augmented node **1310** and from augmented Headend **1410** may employ the same upstream communications protocol, or different upstream communications protocol.

Note that metropolitan Headend **1410** may not be involved in the optimized upstream communication scheme.

Alternatively, metropolitan Headend **1410** may be involved in the optimized upstream communication scheme. Augmented metropolitan Headend **1410** may further control the optimized upstream communication as disclosed in the co-pending application Ser. No. 09/679,115, entitled "Increased Bandwidth in Aloha-based Frequency Hopping Transmission Systems". Augmented Headend **1410** may support the optimized upstream communication between node **1310** and set-top apparatus **1100-180**. Node **1310** may then carry out the optimized upstream communication. Upstream communication from augmented node **1310** and from augmented Headend **1410** may employ the same upstream communications protocol, or different upstream communication protocols.

Note that in certain network installations, there may be no metropolitan Headend, augmented or otherwise. Further, in certain network installations, there may only be one Headend.

FIG. **22** depicts a remote control unit **1000-180** coupled **1002-180** to set-top apparatus **1100-180**, communicating via a two-stage wireline communications system containing a wireline physical transport **1200** to a distributor node **126**. Distributor node **126** interlaces to a wireline communications loop including an augmented Headend **1414**. The network may further support a communications loop including augmented metropolitan Headend **1410**, in accordance with the invention.

Augmented Headend **1414** may control and support optimized upstream communication as disclosed in the co-pending application Ser. No. 09/679,115, entitled "Increased Bandwidth in Aloha-based Frequency Hopping Transmission Systems" by Calderone and Foster, both inventors of this application and commonly assigned to AgileTV, incorporated herein by reference.

Augmented Headend **1414** may provide cached content such as popular videos for a VOD service. Speech processing may be performed in many situations at augmented Headend **1414**

Augmented metropolitan Headend **1410** may further provide speech processing capabilities. Augmented metropolitan Headend **1410** may be used to handle speech processing requirements for Headends **100** and **106**, which are not augmented by this invention.

The couplings between STB **1100-180**, Node **126** and Headend **1410** may also support bi-directional communication allowing the STB **1100-180** to receive multiple television channels and allowing STB **1100-180** to signal at least limited information to augmented Headend **1410**, which may well include management of Pay-per-View and other services.

Alternatively, augmented metropolitan Headend **1410** may control the optimized upstream communication as disclosed in the co-pending application Ser. No. 09/679,115, entitled Increased Bandwidth in Aloha-based Frequency Hopping Transmission Systems. Augmented Headend **1414** may then support the optimized upstream communication. Upstream communication from augmented node **126** and

from augmented Headend **1410** may employ the same upstream communications protocol, or a different upstream communications protocol.

Note that metropolitan Headend **1410** may not be involved in the optimized upstream communication scheme.

Alternatively, metropolitan Headend **1410** may be involved in the optimized upstream communication scheme. Augmented metropolitan Headend **1410** may further control the optimized upstream communication as disclosed in the co-pending application Ser. No. 09/679,115, entitled Increased Bandwidth in Aloha-based Frequency Hopping Transmission Systems. Augmented Headend **1410** may support the optimized upstream communication between node **126** and set-top apparatus **1100-180**. Node **126** may then carry out the optimized upstream communication. Upstream communication from node **126** and from augmented Headend **1410** may employ the same upstream communications protocol, or different upstream communication protocols.

Note that in certain network installations, there may be no metropolitan Headend, augmented or otherwise. Further, in certain network installations, there may only be one Headend.

FIG. **23** depicts a detail block diagram of an augmented distributor node **1310**, coupled to wireline physical transport **1200** and coupled to the wireline communications loop of FIG. **21**.

Note that there may be one transport **1200**. Transceiver **1320** couples to transport **1200** to provide uplink **1204** and downlink **1202** communications between STB's **1100** of FIG. **21**.

There may be multiple transports **1200** corresponding to wireline circuits servicing combinations of at least one of the interfaces **170**, **174** and **178**, as shown in FIGS. **1**, **2**, **21** and **22**. Transceiver **1320** couples to transport **1200** to provide uplink **1204** and downlink **1202** communications between STB's **1100** of FIGS. **21** and **22**. Note that transceiver **1320** may provide multiple uplinks **1204**. Transceiver **1320** may provide multiple downlinks **1202**.

Transceiver **1320** may include transmitter **1324** providing downlink **1202** communications to wireline physical transport **1200**. Multiple downlinks **1202** may be provided by transmitter **1324**. Alternatively, multiple downlinks **1202** may be provided by more than one transmitter **1324**.

Transceiver **1320** may include receiver **1322** providing uplink **1204** communications from wireline physical transport **1200**. Multiple uplinks **1204** may be provided by receiver **1322**. Alternatively, multiple uplinks **1204** may be provided by more than one receiver **1322**.

Wireline physical transport **1200** may further include separate uplink physical transport **1204** and downlink physical transport **1202**. Various embodiments of the invention may include multiple uplink physical transports **1204**. Various embodiments of the invention may include multiple downlink physical transports **1202**. There may be a difference in the number of uplink physical transports **1204** and the number of downlink physical transports **1202**.

Note that there may be a difference in the number of transmitters **1324** and the number of receivers **1322**.

By way of example, referring to FIG. **21**, one downlink stream **1202** may be sent to interface **170**, and a second downlink stream, not shown in FIG. **21** or FIG. **23**, may be sent to interface **174**. One uplink stream **1204** may be received from interface **170**, and a second uplink stream, not shown in FIG. **21** or FIG. **23**, may be received from interface **174**.

Hereafter, the discussion focuses on a single transmitter **1324** providing as many downlinks **1202** and on a single receiver **1322** providing as many uplinks **1204** as required. This is done strictly to simplify the discussion and is not meant to imply any limitation on the invention.

Uplink **1204** communication includes a back channel. This back channel includes multiple identified speech channels from multiple user sites (STBs) **1100**, as shown in FIGS. **21** and **22**. Receiver **1322** provides **1326** a back channel to speech engine **1330**. Speech engine **1330** performs at least the operations of FIG. **10**.

Speech engine **1330** further communicatively interacts **1374** with network interface **1370**. Network interface **1370** couples **1372** to other network components. Network coupling **1372** may further include a predominantly input coupling **1306** and a predominantly output coupling **1308**.

Network interface **1370** may communicatively interact **1376** with local system management and billing **1380**. Local system management and billing **1380** may include systems management and billing data relevant to the elements of the overall network managed or controlled through the local node.

Local system management and billing **1380** may further maintain systems management and billing data relevant to the elements of the overall network managed or controlled through the local node.

Local system management and billing **1380** may include a cache of systems management and billing data relevant to the elements of the overall network managed or controlled through the local node.

Receiver **1322** provides **1326** a back channel to speech engine **1330**. Speech engine **1330** performs at least the operations of FIG. **10**. Speech engine **1330** further communicatively interacts **1374** with network interface **1370**.

Speech engine **1330** may communicatively interact **1382** with system management and billing **1380**. Speech engine **1330** may send **1382** system management and billing **1380** requests for user account information, including, but not limited to, credit information, authorization profiles for channel viewing, credit limits, and parental safeguards. Speech engine **1330** may send **1382** system management and billing **1380** user passwords, confirmation of commitments, commands regarding authorization levels of other users, such as children within a user's household.

Speech engine **1330** may receive **1382** from system management and billing **1380** credit information, authorization profiles for channel viewing, credit limits and parental safeguards. Speech engine **1330** may receive **1382** from system management and billing **1380** confirmation of acceptance of contracts from financial engines. Acceptance of contracts from external financial engines may be received in a number of different ways, including through interactions with network interface **1370** or other external communications networks **1312**.

System management and billing **1380** may further include interfaces to other external communications networks. Such circuitry is not the subject of this invention and is not discussed further herein.

Similarly, the mechanism of contract acceptance between system management and billing **1380** and financial engines is not the subject of this invention and is not discussed further herein.

Speech engine **1330** may receive **1338** from content engine **1340** content status information. Content status information may include a list of available services through the coupled network(s). Content status information may further include a list of services available within the node.

Content status information may include a list of content items cached through the network. Content status informa-

tion may further include a list of content items cached at the node. Cached content items may include Interactive Program Guide (IPG) listings for some period of time. Cached content items may include one or more video sequences provided through Video On Demand (VOD) or Pay-Per-View services.

Content engine **1340** communicatively interacts **1378** with network interface **1370**. Content engine **1340** may provide at least one locally generated multi-media stream **1342** to Multiplexor engine **1360** as well as at least one multi-media stream **1344** received **1378** through network interface **1370**. Content engine **1340** may modify multi-media stream **1344** received **1378** from network interface **1370** through network input **1306**. Content engine **1340** may stimulate **1378** network interface **1370**, altering network output **1308** from network interface **1370**.

Content engine **1340** may have more than one registered application server each presenting static menu content and dynamic content. A speech processor within speech engine **1330** may be presented a grammar based upon the static and dynamic content of multiple registered application servers. The merged services may be presented to the users as specialized, multi-application service menus provided by the speech engine **1330** to the users.

Speech engine **1330** may generate one or more channels of speech response content through coupling **1332** to modulator engine **1350**. Modulator engine **1350** may further provide **1334** status and reliability information to speech engine **1330**. Speech response content channels presented through coupling **1332** may be digital. Speech response content channels may be presented as bits or clusters of bits of a specific bit width.

Multiple channels may be multiplexed onto coupling **1332** by speech engine **1330**. The multiplexing mechanism onto channel **1332** may perform time division multiplexing. Modulator engine **1350** may demultiplex multiple multiplexed channels received through coupling **1332**. Modulator engine **1250** may convert one or more demultiplexed channels into modulated channels, or modulated collections of channels, presented **1352** and **1354** to multiplexor engine **1360**.

Multiplexor engine **1360** accepts the multiple locally generated channels **1352**, **1354** and **1342** as well as the locally received, and possibly modified, external stream **1344** to create at least one merged stream **1362**. Multiplexor engine **1360** may create more than one merged stream, e.g. **1364**.

Transmitter **1324** receives at least one merged stream **1362** from multiplexor engine **1360** to generate at least one downlink stream **1202** of physical transport **1200**. Transmitter **1324** may receive more than one merged stream **1364** from multiplexor engine **1360**.

Speech engine **1330** may further interact **1312** with an external network. Such an interaction may involve at least one wireline physical transport layer. The wireline physical layer may support at least one or a combination of communication protocols using optical, infra-red and radio frequency regions of the electromagnetic spectrum. Network interactions **1312** may support message passing protocols, including, but not limited to, TCP-IP. Network interactions **1312** may further support communications with the Internet and World Wide Web.

FIG. **24** depicts an alternative detail block diagram of an augmented distributor node **1310**, coupled to wireline physical transport **1200** and coupled to the wireline communications loop of FIG. **21**.

Receiver **1322** provides a back channel to speech engine **1330** through interactions **1328** with switch **1390** delivering **1392** the back channel to speech engine **1330**.

Speech engine **1330** communicatively interacts **1374** with network interface **1370** by the speech engine **1330** interacting **1392** with switch **1390** which interacts **1398** with network interface **1370**.

Network interface **1370** may communicatively interact with local system management and billing **1380** by communicatively interacting **1398** with switch **1390**, which communicatively interacts **1396** with system management and billing **1380**.

Speech engine **1330** may communicatively interact **1382** with system management and billing **1380** by communicatively interacting **1392** with switch **1390**, which communicatively interacts with system management and billing **1380**.

Speech engine **1330** may receive content status information from content engine **1340** by content engine **1340** interacting **1394** with switch **1390**, which delivers **1392** the content status information to speech engine **1330**.

Content engine **1340** communicatively interacts with network interface **1370** by content engine **1340** communicatively interacting with switch **1390** and network interface **1370** communicatively interacting with switch **1390**.

Switch **1390** may support digital interfaces. Switch **1390** may include a circuit switch. The circuit switch may support Ethernet protocols. Switch **1390** may include an ATM switch. Switch **1390** may support analog interfaces. Such analog interfaces may include wavelength division multiplexing. Switch **1390** may be composed of more than one switch.

The invention may include various combinations of direct interconnections and switch networks as shown in FIGS. **23** and **24**.

FIG. **25** depicts a generic block diagram of a prior art Headend **104** as shown in FIG. **3**.

Uplink **138** communication includes a back channel.

This back channel includes multiple response channels from multiple user sites STBs, as shown in FIGS. **1** and **2**. Receiver **1422** provides **1427** a back channel to content engine **1440**.

Network interface **1470** may communicatively interacts **1476** with Headend system management and billing **1480**. Headend system management and billing **1480** may include systems management and billing data relevant to the elements of the overall network managed or controlled through the Headend.

Headend system management and billing **1480** may further maintain systems management and billing data relevant to the elements of the overall network managed or controlled through the Headend.

Headend system management and billing **1480** may include a cache of systems management and billing data relevant to the elements of the overall network managed or controlled through the Headend.

System management and billing **1480** may further include interfaces to other external communications networks. Such circuitry is not the subject of this invention and is not discussed further herein.

Content status information may include a list of content items cached through the network. Content status information may further include a list of content items cached at the node. Cached content items may include Interactive Program Guide (IPG) listings for some period of time. Cached content items may include one or more video sequences provided through Video On Demand (VOD) or Pay-Per-View services.

Content engine **1440** communicatively interacts **1478** with network interface **1470**. Content engine **1440** may provide at least one locally generated multi-media stream **1442** to Multiplexor engine **1460** as well as at least one multi-media stream **1444** received **1478** through network interface **1470**. Content engine **1440** may modify multi-media stream **1444** received **1478** from network interface **1470** through network input **1406**. Content engine **1440** may stimulate **1478** network interface **1470**, altering network output **1408** from network interface **1470**.

Content engine **1340** may include, but is not limited to, one or more standard components of a head-end, OTA Receivers: Over The Air Receivers and Satellite receivers and Set-Top Box Controller. A Set-Top Box Controller is the transmission equivalent of the Headend receiver. This box sends commands from the head-end to the individual user's set-top box. Those commands may include change channel, set decryption key to the following, enable the set-top box to present a pay channel.

Multiplexor engine **1460** accepts the multiple locally generated channels **1452**, **1454** and **1442** as well as the locally received, and possibly modified, external stream **1444** to create at least one merged stream **1462**. Multiplexor engine **1460** may create more than one merged stream, e.g. **1464**.

Transmitter **1424** receives at least one merged stream **1462** from multiplexor engine **1460** to generate at least one downlink stream **132** of physical transport **1200**. Transmitter **1424** may receive more than one merged stream **1464** from multiplexor engine **1460**.

FIG. **26** depicts an augmented Headend **1410** of FIG. **21** or an augmented Headend **1414** of FIG. **22** or an augmented metropolitan Headend **1410** of FIGS. **21** or **22**, in accordance with the invention.

Note that there may be one transport **1200**. Transceiver **1420** couples to transport **1200** to provide uplink **1204** and downlink **1202** communications between STB's **1100** of FIG. **21**.

There may be multiple transports **1200** corresponding to wireline circuits servicing combinations of at least one of the interfaces **170**, **174** and **178**, as shown in FIGS. **1**, **2**, **21** and **22**. Transceiver **1420** couples to transport **1200** to provide uplink **1204** and downlink **1202** communications between STB's **1100** of FIGS. **21** and **22**. Note that transceiver **1420** may provide multiple uplinks **1204**. Transceiver **1420** may provide multiple downlinks **1202**.

Transceiver **1420** may include transmitter **1424** providing downlink **1202** communications to wireline physical transport **1200**. Multiple downlinks **1202** may be provided by transmitter **1424**. Alternatively, multiple downlinks **1202** may be provided by more than one transmitter **1424**.

Transceiver **1420** may include receiver **1422** providing uplink **1204** communications from wireline physical transport **1200**. Multiple uplinks **1204** may be provided by receiver **1422**. Alternatively, multiple uplinks **1204** may be provided by more than one receiver **1422**.

Wireline physical transport **1200** may further include separate uplink physical transport **1204** and downlink physical transport **1202**. Various embodiments of the invention may include multiple uplink physical transports **1204**. Various embodiments of the invention may include multiple downlink physical transports **1202**. There may be a difference in the number of uplink physical transports **1204** and the number of downlink physical transports **1202**.

Note that there may be a difference in the number of transmitters **1424** and the number of receivers **1422**.

As earlier, the discussion focuses on a single transmitter **1424** providing as many downlinks **1202** and on a single receiver **1422** providing as many uplinks **1204** as required. This is done strictly to simplify the discussion and is not meant to imply any limitation on the invention.

Uplink **1204** communication includes a back channel. This back channel includes multiple identified speech channels from multiple user sites (STBs) **1100**, as shown in FIGS. **21** and **22**. Receiver **1422** provides **1426** a back channel to speech engine **1430**. Speech engine **1430** performs at least the operations of FIG. **10**.

Speech engine **1430** further communicatively interacts **1474** with network interface **1470**. Network interface **1470** couples **1472** to other network components. Network coupling **1472** may further include a predominantly input coupling **1406** and a predominantly output coupling **1408**.

Network interface **1470** may communicatively interact **1476** with Headend system management and billing **1480**. Headend system management and billing **1480** may include systems management and billing data relevant to the elements of the overall network managed or controlled through the Headend node.

Headend system management and billing **1480** may further maintain systems management and billing data relevant to the elements of the overall network managed or controlled through the Headend node.

Headend system management and billing **1480** may include a cache of systems management and billing data relevant to the elements of the overall network managed or controlled through the Headend node.

Speech engine **1430** may communicatively interact **1482** with system management and billing **1480**. Speech engine **1430** may send **1482** system management and billing **1480** requests for user account information, including, but not limited to, credit information, authorization profiles for channel viewing, credit limits and parental safeguards. Speech engine **1430** may send **1482** system management and billing **1480** user passwords, confirmation of commitments, commands regarding authorization levels of other users, such as children within a user's household.

Speech engine **1430** may receive **1482** from system management and billing **1480** credit information, authorization profiles for channel viewing, credit limits and parental safeguards. Speech engine **1430** may receive **1482** from system management and billing **1480** confirmation of acceptance of contracts from financial engines. Acceptance of contracts from external financial engines may be received in a number of different ways, including through interactions with network interface **1470**, or other external communications networks.

System management and billing **1480** may further include interfaces to other external communications networks. Such circuitry is not the subject of this invention and is not discussed further herein.

Similarly, the mechanism of contract acceptance between system management and billing **1480** and financial engines is not the subject of this invention and is not discussed further herein.

Speech engine **1430** may receive **1438** from content engine **1440** content status information. Content status information may include a list of available services through the coupled network(s). Content status information may further include a list of services available within the node.

Content status information may include a list of content items cached through the network. Content status information may further include a list of content items cached at the node. Cached content items may include Interactive Pro-

gram Guide (IPG) listings for some period of time. Cached content items may include one or more video sequences provided through Video On Demand (VOD) or Pay-Per-View services.

Content engine **1440** communicatively interacts **1478** with network interface **1470**. Content engine **1440** may provide at least one locally generated multi-media stream **1442** to Multiplexor engine **1460** as well as at least one multi-media stream **1444** received **1478** through network interface **1470**. Content engine **1440** may modify multi-media stream **1444** received **1478** from network interface **1470** through network input **1406**. Content engine **1440** may stimulate **1478** network interface **1470**, altering network output **1408** from network interface **1470**.

Speech engine **1430** may generate one or more channels of speech response content through coupling **1432** to modulator engine **1450**. Modulator engine **1450** may further provide **1434** status and reliability information to speech engine **1430**. Speech response content channels presented through coupling **1432** may be digital. Speech response content channels may be presented as bits or clusters of bits of a specific bit width.

Multiple channels may be multiplexed onto coupling **1432** by speech engine **1430**. The multiplexing mechanism onto channel **1432** may perform time division multiplexing. Modulator engine **1450** may demultiplex multiple multiplexed channels received through coupling **1432**. Modulator engine **1250** may convert one or more channels into modulated channels or modulated collections of channels then presented **1452** and **1454** to multiplexor engine **1460**.

Multiplexor engine **1460** accepts the multiple locally generated channels **1452**, **1454** and **1442** as well as the locally received, and possibly modified, external stream **1444** to create at least one merged stream **1462**. Multiplexor engine **1460** may create more than one merged stream, e.g. **1464**.

Transmitter **1424** receives at least one merged stream **1462** from multiplexor engine **1460** to generate at least one downlink stream **1202** of physical transport **1200**. Transmitter **1424** may receive more than one merged stream **1464** from multiplexor engine **1460**.

FIG. **27** depicts an alternative augmented Headend **1410** of FIG. **21** or an alternative augmented Headend **1414** of FIG. **22** or an alternative augmented metropolitan Headend **1410** of FIGS. **21** or **22**, in accordance with the invention.

Receiver **1422** provides a back channel to speech engine **1430** through interactions **1428** with switch **1490** delivering **1492** the back channel to speech engine **1430**.

Speech engine **1430** communicatively interacts **1474** with network interface **1470** by the speech engine **1430** interacting **1492** with switch **1490** which interacts **1498** with network interface **1470**.

Network interface **1470** may communicatively interact with Headend system management and billing **1480** by communicatively interacting **1498** with switch **1490**, which communicatively interacts **1496** with system management and billing **1480**.

Speech engine **1430** may communicatively interact **1482** with system management and billing **1480** by communicatively interacting **1492** with switch **1490**, which communicatively interacts with system management and billing **1480**.

Speech engine **1430** may receive content status information from content engine **1440** by content engine **1440** interacting **1494** with switch **1490**, which delivers **1492** the content status information to speech engine **1430**.

Content engine **1440** communicatively interacts with network interface **1470** by content engine **1440** communicatively interacting with switch **1490** and network interface **1470** communicatively interacting with switch **1490**.

Switch **1490** may support digital interfaces. Switch **1490** may include a circuit switch. The circuit switch may support Ethernet protocols. Switch **1490** may include an ATM switch. Switch **1490** may support analog interfaces. Such analog interfaces may include wavelength division multiplexing. Switch **1490** may be composed of more than one switch.

The invention may include various combinations of direct interconnections and switch networks as shown in FIGS. **23** and **24**.

Note that a single computer may perform the operations of the speech engine as shown in FIG. **10**. The computer performs these operations as controlled by a program system including program steps residing in accessibly coupled memory.

FIG. **28**A depicts a block diagram of a speech engine **1330** as shown in FIG. **23**.

Receiver **1322** provides **1326** a back channel to speech processor computer **1520**. Speech processor computer **1520** further communicatively interacts **1374** with network interface **1370**.

Speech processor computer **1520** may communicatively interact **1382** with system management and billing **1380**. Speech processor computer **1520** may send **1382** system management and billing **1380** requests for user account information, including, but not limited to, credit information, authorization profiles for channel viewing, credit limits and parental safeguards. Speech processor computer **1520** may send **1382** system management and billing **1380** user passwords, confirmation of commitments, commands regarding authorization levels of other users, such as children within a user's household.

Speech processor computer **1520** may receive **1382** from system management and billing **1380** credit information, authorization profiles for channel viewing, credit limits and parental safeguards. Speech processor computer **1520** may receive **1382** from system management and billing **1380** confirmation of acceptance of contracts from financial engines. Acceptance of contracts from external financial engines may be received in a number of different ways, including through interactions with network interface **1370** or other external communications networks **1312**.

Speech processor computer **1520** may receive **1338** from content engine **1340** content status information. Content status information may include a list of available services through the coupled network(s). Content status information may further include a list of services available within the node.

Speech processor computer **1520** may generate one or more channels of speech response content through coupling **1332** to modulator engine **1350**. Modulator engine **1350** may further provide **1334** status and reliability information to speech processor computer **1520**. Speech response content channels presented through coupling **1332** may be digital. Speech response content channels may be presented as bits or clusters of bits of a specific bit width.

Multiple channels may be multiplexed onto coupling **1332** by speech processor computer **1520**. The multiplexing mechanism onto channel **1332** may perform time division multiplexing. Modulator engine **1350** may demultiplex multiple multiplexed channels received through coupling **1332**. Modulator engine **1250** may convert one or more demultiplexed channels into modulated channels or modulated collections of channels then presented **1352** and **1354** to multiplexor engine **1360**.

Speech processor computer **1520** may further interact **1312** with an external network. Such an interaction may involve at least one wireline physical transport layer. The wireline physical layer may support at least one or a combination of communication protocols using optical, infra-red and radio frequency regions of the electromagnetic spectrum. Network interactions **1312** may support message passing protocols, including, but not limited to, TCP-IP. Network interactions **1312** may further support communications with the Internet and World Wide Web.

Speech processor computer **1520** communicatively couples with mass storage **1540**. Mass storage **1540** may include, but is not limited to, a disk, disk farm, or RAID. Mass storage **1540** may be organized by a file management system, or by one or more database management systems, or by a combination of file management and at least one database management system.

FIG. **28**B depicts a block diagram of a speech engine **1330** as shown in FIG. **24**.

Receiver **1322** provides a back channel to speech processor computer **1520** through interactions **1328** with switch **1390** delivering **1392** the back channel to speech engine **1520**.

Speech processor computer **1520** communicatively interacts **1374** with network interface **1370** by the speech processor computer **1520** interacting **1392** with switch **1390** which interacts **1398** with network interface **1370**.

Speech processor computer **1520** may communicatively interact **1382** with system management and billing **1380** by communicatively interacting **1392** with switch **1390**, which communicatively interacts with system management and billing **1380**.

Speech processor computer **1520** may receive content status information from content engine **1340** by content engine **1340** interacting **1394** with switch **1390**, which delivers **1392** the content status information to speech processor computer **1520**.

As in FIG. **24**, switch **1390** may support digital interfaces. Switch **1390** may include a circuit switch. The circuit switch may support Ethernet protocols. Switch **1390** may include an ATM switch. Switch **1390** may support analog interfaces. Such analog interfaces may include wavelength division multiplexing. Switch **1390** may be composed of more than one switch.

The operational discussions found in FIGS. **3**, **4**, **5** and **28**A are directly applicable to systems implementing the invention and resembling the block diagram of FIG. **28**B. They will not be presented regarding FIG. **28**B. This is done simply to clarify the disclosure and is not intended in any way to limit the scope of the claims.

The invention may include various combinations of direct interconnections and switch networks as shown in FIGS. **23** and **24**.

FIG. **29** depicts a more detailed block diagram of a speech engine **1330** containing gateway **3100** and tightly coupled server array **3200** as shown in FIG. **28**A.

Server array **3200** includes at least speech processor computer **1520** communicatively coupled with at least speech gateway **3100**.

Receiver **1322** provides **1326** a back channel to speech processor computer **1520** via speech gateway **3100**. Speech gateway **3100** may further cache speech utterances from various user sites for speech processor computer **1520**.

Speech processor computer **1520** further communicatively interact **1374** with network interface **1370** via speech network gateway **1582**.

Speech processor computer **1520** may communicatively interact **1382** with system management and billing **1380** via secure interface **1578**. Speech processor computer **1520** may send **1382** via secure interface **1578** requests for user account information, including, but not limited to, credit information, authorization profiles for channel viewing, credit limits and parental safeguards. Speech processor computer **1520** may send **1382** via secure interface **1578** user passwords, confirmation of commitments, commands regarding authorization levels of other users, such as children within a user's household.

Speech processor computer **1520** may receive **1382** via secure interface **1578** credit information, authorization profiles for channel viewing, credit limits and parental safeguards. Speech processor computer **1520** may receive **1382** via secure interface **1578** confirmation of acceptance of contracts from financial engines. Acceptance of contracts from external financial engines may be received in a number of different ways, including through interactions with network interface **1370** or other external communications networks **1312**.

Speech processor computer **1520** may receive **1338** from content engine **1340** content status information. Content status information may include a list of available services through the coupled network(s). Content status information may further include a list of services available within the node.

Speech processor computer **1520** may generate one or more channels of speech response content through coupling **1332** to modulator engine **1350**. Modulator engine **1350** may further provide **1334** status and reliability information to speech processor computer **1520**. Speech response content channels presented through coupling **1332** may be digital. Speech response content channels may be presented as bits or clusters of bits of a specific bit width.

Multiple channels may be multiplexed onto coupling **1332** by speech processor computer **1520**. The multiplexing mechanism onto channel **1332** may perform time division multiplexing.

Speech processor computer **1520** may further interact **1312** with an external network. Such an interaction may involve at least one wireline physical transport layer, each using at least one of optical, infra-red and radio frequency regions of the electromagnetic spectrum. Network interactions **1312** may support message passing protocols, including, but not limited to, TCP-IP and may further support communications with the Internet and World Wide Web.

FIG. **30** depicts an alternative detailed block diagram of a speech engine **1330** as shown in FIG. **28**A.

Speech engine **1330** includes server array **3200**. Server array **3200** includes at least speech processor computer **1580** and speech processor computer **1590**. At least one of speech processor computer **1580** and speech processor computer **1590** communicatively couples with speech gateway **3100**.

Receiver **1322** provides **1326** a back channel to server array **3200** via speech content gateway **3100**. Speech content gateway **3100** may further cache speech utterances from various user sites for server array **3200**.

Speech content gateway **3100** may further include a computer accessibly coupled **3102** with memory **3104**. Speech content gateway **3100** may be controlled by a program system containing program steps residing in memory **3104** for at least one of the operations of FIG. **10**.

Speech processor computer **1580** and/or **1590** may communicatively interact **1382** with system management and billing **1380** via secure interface **1578**. Speech processor computer **1580** and/or **1590** may send **1382** via secure

interface **1578** requests for user account information, including, but not limited to, requests for credit information, authorization profiles for channel viewing, credit limits and parental safeguards. Speech processor computer **1580** and/or **1590** may send **1382** via secure interface **1578** user passwords, confirmation of commitments, commands regarding authorization levels of other users, such as children within a user's household.

Speech processor computer **1580** and/or **1590** within server array **3200** may receive **1382** via secure interface **1578** credit information, authorization profiles for channel viewing, credit limits, parental safeguards as well as confirmation of acceptance of contracts from financial engines.

Acceptance of contracts from external financial engines may be received in a number of different ways, including speech processor computer **1580** and/or **1590** interacting through network gateway **1560** with network interface **1374** and/or other external communications networks **1312**.

Either speech processor computer **1580** or **1590** within server array **3200** may receive **1338** from content engine **1340** content status information.

Either speech processor computer **1580** or **1590** within server array **3200** may generate one or more channels of speech response content through modulator interface **1570** coupling **1332** to modulator engine **1350**. Modulator engine **1350** may provide **1334** status and reliability information through modulator interface **1570** to at least one of speech processor computer **1580** and **1590** within server array **3200**. Speech response content channels presented through modulator interface **1570** to coupling **1332** may be digital, presented as bits or clusters of bits of a specific bit width.

Multiple channels may be multiplexed through modulator interface **1570** onto coupling **1332** by server array **3200**. The multiplexing mechanism onto channel **1332** may perform time division multiplexing. The multiplexing mechanism may be performed by modulator interface **1570**.

At least one speech processor computer **1580** and **1590** within server array **3200** may communicatively interact **1374** with network interface **1370** via network gateway **1560**.

At least one speech processor computer **1580** and **1590** within server array **3200** may interact **1312** with an external network involving at least one wireline physical transport layer. The wireline physical layer may support one or a combination of communication protocols using optical, infra-red and radio frequency regions of the electromagnetic spectrum. Network interactions **1312** may support message passing protocols, including but not limited to, TCP-IP, possibly including communications with the Internet and World Wide Web.

Speech processor computer **1580** and/or **1590** communicatively couples with mass storage **1540**. Mass storage **1540** may include, but is not limited to, a disk, disk farm, or RAID organized by a file management system and/or by one or more database management systems.

Speech processor computer **1580** and/or Speech processor computer **1590** may perform at least some of the operations of FIG. **10** and be directed by program system **2000** containing program steps residing in memory **1586** and/or **1596** accessibly coupled **1585** and/or **1595** to the respective speech processor computer.

Speech processor computer **1580** may perform the same operations of FIG. **10** as speech processor computer **1590**, possibly processing speech from different user sites.

Speech processor computer **1580** may perform different operations of FIG. **10** than speech processor computer **1590**. By way of example, speech processor computer **1580** may perform receiving the back channel **2004** and partitioning the back channel into the multiple received identified speech channels **2012**. Speech processor computer **1590** may perform processing the multiple received identified speech channels to create multiple identified speech contents **2022** and responding to the multiple identified speech contents **2032**.

Speech engine **1330** may be controlled by a program system **2000** implementing the operations of FIG. **10** distributed as program steps residing in at least one of the memories **3104**, **1586** and **1596**. Each of the operations **2004**, **2012**, **2022**, and **2032** may be implemented as program steps residing in memories **3104**, **1586** and **1596**.

By way of example, speech content gateway **3100** receives the back channel **2004**. Speech processor computer **1580** partitions the back channel into the multiple received identified speech channels **2012**. Speech processor computer **1590** processes the multiple received identified speech channels to create multiple identified speech contents **2022** and responds to the multiple identified speech contents **2032**.

By way of an alternative example, speech content gateway **3100** receives the back channel **2004** and partitions the back channel into the multiple received identified speech channels **2012**. Speech processor computers **1580** and **1590** each process the multiple received identified channels to create multiple identified speech contents **2022** and respond to the multiple identified speech contents **2032**. Speech processor computers **1580** and **1590** perform these operations upon different identified speech channels based upon allocation decisions performed by speech content gateway **3100**. To process a speech sample by the allocated speech processor computer into speech content, the processor computer must first contain in its local memory a copy of the grammar definition associated with the user site.

FIG. **31** depicts a second alternative detailed block diagram of a speech engine **1430**.

Server array **3200** at least includes speech processor computer networks **1640** and **1650**. At least one computer contained in speech processor computer network **1640** and/or **1650** communicatively couples with speech gateway **3100**.

At least one computer contained in speech processor computer network **1640** and/or **1650** performs at least some of the operations of FIG. **10** and may be directed by program system **2000** containing program steps residing in memory accessibly coupled to that computer.

Speech processor computer network **1640** may perform different operations of FIG. **10** than speech processor computer network **1650**. By way of example, speech processor computer network **1640** processes the multiple received identified speech channels to create multiple identified speech contents **2022**. Speech processor computer network **1650** responds to the multiple identified speech contents **2032**.

Speech engine **1430** may be controlled by a program system implementing FIG. **10**, distributed as program steps residing in memories accessibly coupled to at least one computer in one or more of the following: speech content gateway **3100**, speech processor computer network **1640** and/or speech processor computer network **1650**. Each of the operations **2004**, **2012**, **2022**, and **2032** may be implemented as program steps residing in at least one of these memories.

By way of example, one or more computers in the speech content gateway **3100** receive the back channel **2004** and partition the back channel into the multiple received identified speech channels **2012**. Computers in speech processor

computer networks **1640** and/or **1650** process the multiple received identified speech channels to create multiple identified speech contents **2022** and respond to the multiple identified speech contents **2032**. Computers in the speech processor computer networks perform these operations upon identified speech channels based upon allocation decisions performed by speech content gateway **3100**.

At least one computer in speech processor computer network **1640** and/or **1650** communicatively interacts **1482** with system management and billing **1480** via secure interface **1630**. That computer(s) may send **1382** via secure interface **1630** requests for user account information as well as commands regarding authorization levels of other users, such as children within a user's household. The user account information may include, but is not limited to, credit information, authorization profiles for channel viewing, credit limits, parental safeguards, user passwords, and confirmation of commitments. A computer in speech processor computer network **1640** and/or **1650** may receive **1482** via secure interface **1630** credit information, authorization profiles for channel viewing, credit limits, parental safeguards, as well as confirmation of acceptance of contracts from financial engines.

Acceptance of contracts from external financial engines may be received in a number of different ways, including through at least one computer in speech processor computer network **1640** and/or **1650** interacting through network gateway **1560** with network interface **1474** or with other external communications networks **1412**.

At least one computer in speech processor computer network **1640** and/or **1650** may receive **1438** from content engine **1440** content status information.

At least one computer in speech processor computer network **1640** and/or **1650** generates one or more channels of speech response content through modulator interface **1620** coupling **1432** to modulator engine **1450**. Modulator engine **1450** may provide **1434** status and reliability information through modulator interface **1620** to at least one computer in speech processor computer network **1640** and/or **1650**.

At least one computer in speech processor computer network **1640** and/or **1650** communicatively interact **1474** with network interface **1470** via network gateway **1610**. At least one computer in speech processor computer network **1640** and/or **1650** may interact **1412** with an external network.

Note that AgileTV™ Voice Processing Unit (AVPU) boxes **3000** may be included in speech engine **1430** and/or in speech processor computer network **1640** and/or **1650**.

FIG. **32**A depicts a block diagram of modulator engine **1350** of FIGS. **23** and **24**, and modulator engine **1450** of FIGS. **26** and **27**.

Speech engine **1330** or **1450** generates one or more channels of speech response content through coupling **1332** or **1432** to modulator engine **1350** or **1450**, respectively. For the sake of simplifying the discussion, from the discussion of FIG. **32**A focuses on its application in FIGS. **23** and **24**. This is done strictly to clarify the discussion and is not meant to limit the scope of the claims.

Modulator engine **1350** may provide **1334** status and reliability information to speech engine **1330**. Speech response content channels presented through coupling **1332** may be digital, presented as bits or clusters of bits.

Multiple channels are multiplexed onto coupling **1332** by speech engine **1330**. The multiplexing mechanism onto channel **1332** may perform time division multiplexing. Modulator engine **1350** demultiplexes the multiple multiplexed channels received through coupling **1332**, converting one or more demultiplexed channels into modulated channels or modulated collections of channels presented **1352** and **1354** to multiplexor engine **1360**.

Note that the invention may target specific layers of a residential broadband network serving at least cable television needs for a user community. Modulator engine **1350** may satisfy specific requirements for a wireline node serving a Hybrid Fiber/Coaxial HFCOax node. Modulator engine **1450** may satisfy specific requirements for a wireline node serving a Headend or serving a metropolitan Headend.

Modulator engine **1350** may include modulator input and control circuit **1700** receiving one or more channels of speech response content through coupling **1332** and possibly providing **1334** status and reliability information to speech engine **1330**.

Modulator input and control circuit **1700** may perform operations as disclosed in application Ser. No. 09/661,486, entitled N-way Demultiplexor, docket number AGLE0008, filed 14 Sep. 2000, and incorporated herein by reference.

Modulator input and control circuit **1700** generates at least one channel code stream **1702** provided to modulator circuit **1706**. Modulator circuit **1706** uses the channel code stream **1702** to generate an intermediate frequency channel stream **1712** presented to frequency conversion circuit **1710**.

By way of example, FIG. **32**A depicts modulator input and control circuit **1700** generating a second channel code stream **1704** presented to modulator circuit **1706**. Modulator circuit **1706** uses this second provided channel code stream **1704** to generate a corresponding intermediate frequency channel stream **1714** presented to frequency conversion circuit **1710**.

Frequency conversion circuit **1710** receives at least one intermediate frequency channel stream **1712** and generates a frequency channel output stream **1352** presented to multiplexor engine **1360**, as shown in FIGS. **23** and **24**. Similarly in FIGS. **26** and **27**, frequency conversion circuit **1710** receives at least one presented intermediate frequency channel stream **1712** and generates a frequency channel output stream **1452** presented to multiplexor engine **1460**.

Frequency conversion circuit **1710** may receive a second presented intermediate frequency channel stream **1714** and generate a second frequency channel output stream **1354** presented to multiplexor engine **1360**, as shown in FIGS. **23** and **24**. Similarly in FIGS. **26** and **27**, frequency conversion circuit **1710** may receive a second presented intermediate frequency channel stream **1714** and generate a second frequency channel output stream **1454** presented to multiplexor engine **1460**.

Frequency conversion circuit **1710** may provide feedback **1708** to modulator input and control **1700**, which may be part or all of the status and reliability information **1334** provided to speech engine **1330**.

Alternatively feedback **1708** may be status and reliability information **1334** directly provided to speech engine **1330**, rather than through modulator input and control **1700**. This alternative has not been diagramed to simplify the discussion, but is not intended to limit the scope of the claims.

Modulator circuit **1706** generates intermediate frequency channel stream **1712** using provided channel code stream **1702**.

Intermediate frequency channel stream **1712** may include presentation of a sinusoidal waveform represented as a digital stream, or as an analog stream. Presented channel code stream **1702** may include phase control information and/or include frequency control information include ampli-

tude control information. The frequency control information may further regard an intermediate frequency carrier.

Control information may be presented in a separate channel stream.

The intermediate frequency channel stream generation mechanism may support coherent detection and use of the intermediate frequency carrier in a downstream user site receiver. The intermediate frequency channel stream generation mechanism may support modulation mechanisms, including at least, Phase Shift Keying (PSK), Frequency Shift Keying (FSK), Amplitude Shift Keying (ASK), Continuous Phase Modulation (CPM), hybrid combinations, Offset Quadrature PSK (OQPSK), Minimum Shift Keying (MSK), Quadrature Amplitude Modulation (QAM), Coded Orthogonal Frequency Division Multiplexing (COFDM) and Vestiginal Side Band (VSB), in particular 8 level VSB (8-VSB).

The intermediate frequency channel stream generation mechanism may support noncoherent detection in downstream user site receivers of the intermediate frequency carrier and/or detection mechanisms not requiring a carrier reference. The intermediate frequency channel stream generation mechanism may support modulation mechanisms, including at least, Differential Phase Shift Keying (DPSK), Frequency Shift Keying (FSK), Amplitude Shift Keying (ASK), and certain hybrid schemes of these mechanisms not requiring a carrier reference.

Intermediate frequency channel stream **1712** may include presentation of a wavelet function represented as a digital stream or as an analog stream, which may further include dilation control information and/or temporal offset control information and/or amplitude control information.

Intermediate frequency channel stream **1712** may include presentations of both sinusoidal and wavelet functions.

The invention may include multiple frequency conversion circuitry instances **1710** and multiple modulator circuitry instances **1706** in modulator engine **1350** with possibly different numbers of instances of frequency conversion circuitry **1710** and of modulator circuitry **1706**.

The invention may include multiple frequency conversion circuitry instances **1710** and modulator circuitry instances **1706** in modulator engine **1450** with possibly different numbers of instances of frequency conversion circuitry **1710** and of modulator circuitry **1706**.

Demultiplexing a 2.5 gigabit per second bit stream leaving the speech engine **1330** or **1430** may be performed by a preprocessor CPU creating two 16 bit streams. The preprocessor CPU may be part or all of a Broadcom BCM 12500 integrated circuit converting the Ethernet links, with approximately three gigabit bits per second, into two 16 bit 150–160 MHz digital streams.

Modulator input and control **1700** may include two preprocessor CPUs parsing the dual 16 bit interface streams into 96 channels of data, or alternatively, include this function performed by hardware.

Modulator circuitry **1706** may include multiple modulators and may include multiple instances of multiple channel modulators, which may implement an octal QAM (Quadrature Amplitude Modulator).

Clusters of 8 channels of data may be sent to each Octal QAM for conversion to a intermediate frequency signal presented to an associated multi-channel frequency upconverter **1710** to generate 8 discrete channels sharing the same output frequency. Each channel output is supplied to one or more nodes to the exclusion of other nodes.

One system wide channel may be devoted to the audio-video feedback of the speech recognition system, of which there are 96 instances of that single channel which are then multiplexed into 96 different fiber transmission lines, each with a unique speech recognition related television channel.

This is exploited much more efficiently than any known prior art. Because all these frequency up conversions target the same frequency band, the frequency conversion mechanism for multiple channels can share several critical components, such as local reference oscillators, which must otherwise be instantiated for each channel separately.

By performing the frequency conversion mechanism upon blocks of channels, an optimization is available in neighborhoods with extensive Internet usage. In such situations, a neighborhood may be allocated a second TV channel for Internet presentation. By reconfiguring one block of frequency converters to that second channel, up to 8 neighborhoods could receive a second television channel.

Configuring these frequency conversion mechanisms as a frequency agile block changes the channel frequency bands of all the channels of the frequency agile block simultaneously.

The cost savings are dramatic. Regarding reliability issues: there are far fewer parts, a simpler design and less heat, all tending to increase reliability.

There may be a hierarchy of multiplexors operating within content engine **1340** or **1440**. System wide channels are multiplexed in the one set of multiplexors within the content engine **1340** or **1440**. Node specific channels may be multiplexed in a second set of multiplexors within the content engine **1340** or **1440**, which may be within a multiplexor engine such as **1460**.

In a cable TV system using a VOD server, 8 to 16 channels per node are often used for delivery of video on demand. These node specific channels are multiplexed in a second set of multiplexors within the content engine **1340** or **1440** and may be further multiplexed in multiplexor engine **1460**.

Each NTSC television channel has approximately 6 MHz of bandwidth, which through the use of the QAM64 modulators, delivers 27 M bps. The 2.5 Gigabit per second being delivered supports about 4500 Internet users.

FIG. **32**B depicts a block diagram of a local oscillator as is known in the art for use as a local oscillator depicted in FIGS. **33** and **34** as LO**1** **1760**, LO**1** **1860**, LO**2** **1770** or LO**2** **1870**.

The first Local Oscillator (LO**1**) **1760** or **1860** may operate at a fixed frequency **1762** in the range from 900 MHz to 1100 MHz. A second Local Oscillator (LO**2**) **1770** or **1870** may operate **1772** in a variable range from 1 to 2 GHz, depending on the desired output frequency range.

The Local Oscillators each comprise a voltage controlled oscillator, a frequency synthesizer and a loop filter. The frequency synthesizer requires a frequency reference. The output of the voltage controlled oscillator is amplified to create local oscillator output, which in various instances is labeled **1762**, **1772**, **1862** and **1872**.

The frequency synthesizers are required to meet the demanding phase noise, frequency stability and frequency settability requirements of a modern digital cable television network. A substantial portion of the circuitry in the typical Upconverter **1710** is dedicated to the synthesizers of the local oscillators **1760**, **1770**, **1860** and **1870**.

Specific applications in cable television require a common frequency but with multiple RF outputs such as broadcasting node specific video content or data over multiple nodes using a fixed channel frequency the current practice is to rely on individual RF modulators/Upconverters **1710** per node. Using individual modulator/Upconverters consumes a large

amount of equipment rack space which, for many nodes, including most CATV headends, is a rare commodity.

FIG. **33** depicts a detail block diagram of frequency conversion circuitry **1710** of FIG. **32**A.

A substantial portion of the circuitry in the typical Upconverter is dedicated to the synthesizers of the local oscillators **1860** and **1870**.

The invention includes methods implementing a Common Carrier, Multiple Output RF Upconverter **1710**, which include at least one of two methods by which to distribute Local Oscillator signals. The distribution methods provide a local oscillator signal from one local oscillator to multiple upconverter sections simultaneously, eliminating the frequency synthesizers and Voltage Controlled Oscillators typically required for each individual upconverter section. Eliminating these frequency synthesizers and local oscillators substantially reduces the board space and component count normally required for these functions.

By providing a distributed LO, only two LO synthesizers and VCO's are required per board where a board might support anywhere from 2 to 12 or more, upconverter sections.

FIG. **34** depicts an alternative detail block diagram of frequency conversion circuitry **1710** of FIG. **32**A.

For the purposes of simplifying the discussion, the two methods of distributing local oscillator signals will be discussed as associated with the first and second local oscillator, respectively. This is done strictly to simplify the discussion and is not meant to limit the scope of the claims. The first distribution mechanism may be used to distribute the second local oscillator signal(s). The second distribution mechanism may be used to distribute the first local oscillator signal(s).

The first mechanism **1764** distributes the local oscillator signal using hybrid splitters **1766** where the RF output of each tap **1724** and **1824** is fed to the respective frequency conversion sections.

A second mechanism **1774** distributing local oscillator signals uses a distributive signal splitting scheme comprised of a series of hybrid directional couplers equally spaced along a signal distribution path. The Local Oscillator signal from the tap of each coupler is then fed to the LO input **1744** and **1844** of each upconverter section. At the 950 to 1100 MHz LO frequencies mentioned above, a directional coupler may be implemented using circuit board traces **1776** in specific geometric pattern, eliminating the need for additional physical components.

Both methods require the LO signals from the splitters or the directional couplers undergo amplification immediately after splitting using a common Monolithic Microwave Integrated Circuit (MMIC) and/or may be incorporated into mixers **1720**, **1740**, **1820** and **1840**.

The Local Oscillator signal levels fed to the mixers are adjusted through the use of resistive attenuators to accommodate the LO drive level specified by the mixer manufacturer. For passive type mixers, the LO drive levels range from +13 dBm to +17 dBm. For active mixers such as a Gilbert Cell based devices, the LO drive levels vary widely, according to the configuration of the mixer. Many Gilbert Cell type mixers incorporate a LO amplifier, thereby requiring very low external LO drive levels, typically in the range from −10 dBm to +2 dBm.

The Common Carrier, Multiple Output type upconverter differs from the conventional CATV upconverter in that typically, conventional Upconverters are set up to output a separate frequency for each upconverter unit. In contrast, The Common Carrier, Multiple Output Upconverter outputs the same frequency for each upconverter unit.

The Intermediate Frequency (IF) inputs **1712** and **1724** to the Common Carrier, Multiple Output Upconverter may be either a 44 MHz or a 43.75 MHz (Center Frequency) Intermediate Frequency. The bandwidth of the IF is typically 6 MHz for U.S. applications and 7 to 8 MHz for international applications. The 55 MHz Low Pass Filters **1716** and **1816** serve two functions. First, they remove any second or third harmonics generated in the amplifier chain or D/A converter as in the case of QAM modulation in **1706**. Second, they serve as de-glitching filters for applications that use a D/A converter to generate the 44 MHz IF such as a QAM modulator **1706**.

The filtered 44 MHz IF **1718** and **1818** at the output of the 55 MHz filter **1716** and **1816** is fed to the RF input of the First Mixer **1720** and **1820** where it is mixed with the first Local Oscillator **1760**. By way of example, assume the frequency of the First Local Oscillator **1760** is 903 MHz. The output **1722** and **1822** of First Mixer **1720** and **1820** contain an upper and lower sideband around this Local Oscillator frequency. These sidebands, located at 44 MHz above and 44 MHz below the 903 MHz Local Oscillator frequency, are amplified and fed to the 947 MHz bandpass filter BPF**1** **1730** and **1830**. The 947 MHz bandpass filter **1730** and **1830** passes the 903+44 MHz (947 MHz) upper sideband and rejects the 903−44 MHz (859 MHz) lower sideband.

The filtered output **1732** and **1832** from 947 MHz filter **1730** and **1830** is fed into the RF input of second mixer **1740** and **1840** where it is mixed with the Local Oscillator **1770**. The second Local Oscillator **1770** includes a wide bandwidth VCO controlled by a frequency synthesizer. The Second Local Oscillator **1770** may operate from 1.0 GHz to a little over 1.8 GHz with a frequency step size of 250 KHz. Output **1742** and **1842** from the second mixer **1740** and **1840** contains several frequency products, including the upper and lower sidebands.

The upper sideband is formed by adding 947 MHz to the frequency of the Second Local Oscillator **1770**. If the frequency of the Second Local Oscillator **1770** is set to 1000 MHz, then the frequency of the upper sideband coming from the Second Mixer **1750** and **1850** is 947 MHz+Frequency of the Second Local Oscillator **1770** (1000 MHz) or 1947 MHz.

This sideband, which is unwanted, may be filtered out by the 950 MHz Lowpass filter **1750** and **1850** and is not seen at the RF output **1452** and **1454** of the frequency conversion circuitry. The frequency of the lower sideband, which is desired, is determined by the frequency of the second LO (1000 MHz) −947 MHz producing an output frequency of 53 MHz, which easily passes through the 950 MHz Lowpass filter.

If the frequency of the Second Local Oscillator **1770** was increased to 1807 MHz, then the lower sideband from the second mixer **1740** and **1840** would be 860 MHz, still able to pass through the 950 MHz Lowpass output filter **1750** and **1850**. The outputs **1752** and **1852** from the 950 MHz Lowpass filter **1750** and **1850** are amplified in amplifier detector **1760** and **1860** to obtain the desired output level and sent **1452** and **1454** to the output connector. The amplifier detector may further include tapping off a small portion of the output power, using a directional coupler, to facilitate power measurement **1762** and **1862**.

The Common Carrier, Multiple Output method differs from the conventional upconverter in at least the following ways. In the Common Carrier system, a single first Local

Oscillator and second Local Oscillator drive each upconverter section in a multiple upconverter system. This is accomplished by splitting the Local Oscillator signal into as many lines as needed to drive the mixer in each section. After splitting the LO signal N times, the LO power is reduced and requires amplification to bring the level up for the respective mixer. By splitting both first and second Local Oscillator signals in this manner, the number of upconverter sections for a given board size can be increased dramatically.

Splitting the Local Oscillator can also be achieved using directional couplers. To maintain essentially consistent LO power along the distribution path, the directional coupler method uses couplers with varying tap values. Couplers closest to the VCO's have the highest tap values (Highest tap attenuation) and the couplers closest to the end have the lowest tap values.

The operations of the vertical chains of mixers and filters are essentially the same as described in FIG. **33**.

In the first frequency conversion section of upconverter **1710** of both FIGS. **33** and **34**, the second Local Oscillator (LO**2**) **1770** may comprise a wide bandwidth Voltage Controlled Oscillator, providing the frequency setting agility to span the 50 to 860 MHz frequency range mentioned above. Both Local Oscillators **1760** and **1770** may require high stability frequency synthesizers to meet phase noise, frequency stability and frequency settability requirements of a modern digital cable television network, by way of example.

Consider the second frequency conversion section of FIG. **34**. Received intermediate frequency channel stream **1714** may be filtered **1816** to present a filtered intermediate frequency signal **1818** to Mixer**1** **1820**.

Unlike FIG. **33**, there is no first Local Oscillator (LO**1**) **1860** in the second frequency conversion section typically operates at a fixed frequency **1862** in the range from 900 MHz to 1100 MHz.

Unlike FIG. **33**, there is no second Local Oscillator (LO**2**) **1870** operates **1872** in the range from 1 to 2 GHz, depending on the desired output frequency range.

Substantial circuitry of this Upconverter section is released from supporting the local oscillators **1860** and **1870**, of FIG. **33**.

FIG. **35** depicts a detailed diagram of speech engine **1330** as shown in FIG. **23** or speech engine **1430** as shown in FIG. **27** containing two plex communications grids with dual, redundant gateways.

The numbering scheme is consistent with plex.cpp, an appendix to application Ser. No. 09/679,115, entitled "System and Method of a Multi-dimensional Plex Communication Network", docket number AGLE0003, filed 14 Oct. 2000, which is incorporated by reference herein.

ROM and mass storage is coupled to CPU 8.0, which is associated with node 0.0 of the first plex network. CPU 8.0 is reserved for certain control and security activities, such as maintaining the mass storage system and its interface, as well as initializing the rest of the plex communication grid to which it is coupled. Mass storage may include RAID mass storage systems.

Note that CPU 8.0 is coupled with both CPU**1** 0.0 and CPU**2** 0.1. This coupling may be achieved by various mechanisms, including but not limited to, a bridge circuit interface to a bus tightly coupling CPU**1** and CPU**2**, implementing a bus standard such as LDT or PCI.

Similar couplings are shown for the following: CPU 8.1 coupled with CPU**1** 1.2 and CPU**2** 1.3. CPU 8.2 coupled with CPU**1** 2.4 and CPU**2** 2.5. CPU 8.3 coupled with CPU**1** 3.6 and CPU**2** 3.7. CPU 8.4 coupled with CPU**1** 4.0 and CPU**2** 4.1. CPU 8.5 coupled with CPU**1** 5.2 and CPU**2** 5.3. CPU 8.6 coupled with CPU**1** 6.4 and CPU**2** 6.5. CPU 8.7 coupled with CPU**1** 7.6 and CPU**2** 7.7.



ROM and mass storage are redundantly coupled to CPU 8.4, associated with the second plex network. This removes the possibility of a failure in the coupling between either the ROM or mass storage causing systemic failure in the speech engine as a whole. Software running on CPU 8.0 and CPU 8.4 may further support fail-over in the event of a failure of either CPU.

CPUs 8.0 and 8.4 act as dual, redundant secure interface gateways.

The control processors of the AgileTV™ engines may be treated differently by the message routing algorithms: No messages may be routed through the control processors, CPU 8.0 and 8.4, headed for a different destination. The CPU 8.0 and 8.4 IO lines may support internal management functions within the node of the cable network, specifically management and billing. This is advantageous for security, making it harder for hacker attacks to penetrate to the management and billing communications, since such attacks will not be able to directly communicate with CPU 8.0 and 8.4 or their IO lines.

Alternatively, special classes of communications may route through the control processor with defined protocols. Other types of communications may transit the node to which the control processor belongs, but may not terminate at the control processor. While it is common for large-scale networks to be partitioned, this partitioning approach is novel, providing very well characterized data paths for both management and billing communications.

It is advantageous that the control processor owns the disk resources, so that sensitive information such as credit card information does not go through less secure components of the plex network. Sensitive information goes directly from the disk resource through the control processor to the billing application.

Security may be heightened by use of at least one encryption standard including the AES algorithm recently proposed by the US government.

Input processors (8.1 and 8.5) perform the following: receiving incoming speech packets; buffering the received speech packets; detecting last packet of the received packet sequence to create a complete packet-sequence; and translating the received packet sequence to create a complete audio utterance.

The content gateway includes processors 8.1 and/or 8.5. After registering the application with the AgileTV™ engine, static menu content and dynamic content are provided to the AgileTV™ engine. A speech processor within the AgileTV™ engine sends messages to an application server within the content engine through the content gateway, indicating the current user location in the menu structure and the requested user actions. This triggers events in a real-time event driven program operating system executing within the application server.

CPUs 8.1 and 8.5 may also run a job assignment manager. The job assignment manager may further behave much like a finite state machine.

The IO and control CPUs, 8.1 to 8.7, may be seen as separate from the plex array of processors, or as components of specialized plex-nodes within the plex. The invention may include placing control and IO CPUs as a row of processing resources arranged on a diagonal of the array. The array may be square. Boot ROMs, RAID interfaces, additional communication and image processing capabilities may be additionally coupled to one or more of the IO and control CPUs.

A service modem may connect to a line outside the building of a node or head-end. Each installation may have this modem as a final backup communication channel to a remote service center. CPUs 8.0 and 8.4 may also have the dual modems on a telephone line connected to a remote service center.

CPUs 8.1 and 8.5 are input CPUs communicating the head-end receivers, local content servers such as VOD servers and IPG servers.

CPUs 8.2 and 8.6 are Internet interface processors providing firewall capability.

CPUs 8.3 and 8.7 drive the AgileTV™ modulator system **1350** or **1450** as shown in FIGS. **23**, **24**, **26** and **27**.

External network interfaces **1312** and **1412** may include External OC-48 (2.5 Gigabit) and/or Gigabit Ethernet Internet lines. This is a central linkage to the Internet supporting 100M bit Ethernet or other communications protocol.

AgileTV™ engine **3000**, **1330**, and **1430** may include two planes of processors, connected by tunnels, each processor plane containing a row of processors coupled by the tunnels and positioned about the diagonal of each processor plane. A diagonal as used herein refers to a collection of locations within an array of at least two dimensions which collective contain nodes coupled to every pencil in every orthogonal pencil ###

Carrier class reliability of 99.999% is the baseline reliability for the plex communications networks. Simulation analyses by one of the inventors confirm that the redundancy inherent in multiple communication pencils intersecting at a plex-node provides significant fault tolerance. These simulations, using the plex.cpp program, indicate that for up to 25 system element failures, there were no message routing failures for 42 out of 43 experiments. The independent power supplies driving dual, plex planes further support these reliability objectives, since if one power supply fails, only half of the system fails. The other half of the system continues to perform, though performance is reduced.

A scaling methodology including another reliability mechanism is desirable. It is achieved at no appreciable increase in the usual systems overhead issues, latency, bandwidth, creating communication bottlenecks or adding significant additional computational loads to the network node components. Another IO processor is added for inter-engine plex-ing to couple multiple plex network hierarchies by the following method: Pick a plex-node, add an inter-processor communication interface internal to the plex-node and an another IO processor coupled to the inter-processor communications interface. The inter-processor communications interface may support a bus, which may be an LDT-compliant bus.

Putting two of these IO processors into the network shown in FIG. **35** supports another 6 gigabit Ethernet fibers. This supports a 4 by 4 plex of AgileTV™ engines or speech engines. Plex-nodes of this plex network would each contain an AgileTV™ engine or speech engine, containing two planes of 4 by 4 plex networks of plex-nodes each having at least two CPU's. Each CPU may contain at least dual instruction processors.

Such a system supports extremely large computing requirements, such as quantum mechanical modeling of long chain hydrocarbons, or a video server for a population such as a district of a city, e.g. Brooklyn.

The 4 by 4 plex of AgileTV™ speech engines readily fits into an 8 ft (2.6 meter) by 10 ft (3.3 meter) closet by 8 foot (2.6 meter) ceiling. The system is estimated to handle speech recognition for 560,000 cable subscribers with more than 30,000 users talking, with 20–30 gigabits bandwidth exchanged for the user community being served by such cable television systems. The system would exceed the raw compute performance of ASCI White, the world's fastest supercomputer installed at Lawrence Livermore Laboratories in the year 2000.

The AgileTV™ engine provides MPEG throttling techniques enabling support of more users than would otherwise be possible without such intelligent bandwidth management.

The AgileTV™ engine further supports designating a specific subset of plex-nodes, and coupling each plex-node of the subset to at least one additional processor. This provides communication to additional communication pencils connecting to other systems components, which may be additional plex communication networks of processor plex-nodes and may also enhance the security of multiple applications through partitioning.

Communication pencils intersecting at a plex-node provide a hierarchical connection methodology supporting arbitrarily large collections of concurrent computing resources. The communication delay to traverse such a system may grow on the order of the logarithm of the number of computing resource plex-nodes interconnected by these communication pencils.

The methodology using these innovations provides a remarkably large amount of computing resources coupling to almost any communications protocol.

The application of this methodology to cable television networks, with extremely limited upstream communication bandwidth, enables speech recognition over cable television, in turn enabling a breakthrough in user friendliness unattainable in the home entertainment environment today.

The further application of this methodology supporting user site addressing and the identification of user speech associated with the user site aids the responsiveness of such systems.

An internet browser may execute on a processor in the AgileTV™ engine, decomposing the browser view into pixel frames, which are processed into a MPEG stream, and sent to the frequency up converters, etc.

Consider speech actuated interactive game playing. Large motion video sequences may be placed on a game server. The playing of the appropriate motion video sequences may be controlled by speech commands using the game server as a local VOD server to the head-end node, communicating through a sufficiently high-speed and responsive communication mechanism, which could be the Internet.

Interactive gambling is supported across cable television networks.

Interactive shopping, based upon shopping content placed on a VOD server and activated through the speech recognition responses of the AgileTV™ engine, is supported.

Interactive auctioning is supported across cable television networks.

Interactive speech communications applications are supported across cable television networks.

The preceding embodiments of the invention have been provided by way of example and are not meant to constrain the scope of the following claims.

The invention claimed is:

**1**. A method of using a back channel containing a multiplicity of identified speech channels from a multiplicity of user sites presented to a speech processing system at a wireline node in a network supporting at least one of cable television delivery and video delivery, comprising the steps of:

receiving said back channel to create a received back channel;

partitioning said received back channel into a multiplicity of received identified speech channels;

processing said multiplicity of said received identified speech channels to create a multiplicity of identified speech content; and

responding to said identified speech content to create an identified speech content response that is unique, for each of said multiplicity of identified speech contents.

**2**. The method of claim **1**,

wherein at least one of said identified speech channels has an associated user site; and

wherein the step partitioning said received back channel is further comprised of the step of:

partitioning said received back channel into a multiplicity of said received identified speech channels from said associated user site;

wherein the step processing said multiplicity of said received identified speech channels is further comprised the step of:

processing said multiplicity of said received identified speech channels from said associated user site to create a multiplicity of said identified speech contents; and

wherein the step responding to said identified speech content is further comprised the step of:

responding to said identified speech content from said associated user site to create said identified speech content response for said associated user site.

**3**. The method of claim **2**,

further comprising at least one member of the collection containing the steps of:

determining said associated user site from said received identified speech channel;

determining said associated user site from said identified speech content;

determining said associated user site from said identified speech content and a speaker identification library;

determining said associated user site from said identified speech content and a speech recognition library; and

determining said associated user site from an identification within said speech channel.

**4**. The method of claim **2**,

wherein the step responding to said identified speech contents from said associated user site is comprised of the steps of:

processing said identified speech content response to create said identified user site response; and

sending said identified user site response to said identified user site.

**5**. The method of claim **2**,

wherein the step responding to said identified speech contents from said associated user site is comprised of the steps of:

assessing said speech content response identified as to said user site to create a financial consequence identified as to said user site; and

billing said user site based upon said financial consequence.

**6**. The method of claim **2**,

wherein the step responding to said identified speech contents from said associated user site is comprised of the steps of:

assessing said speech response to create a financial consequence identified with said user site;

displaying said financial consequence to create a displayed financial consequence at said user site;

confirming said displayed financial consequence from said user site to create a financial commitment; and

billing said user site based upon said financial commitment.

**7**. The method of claim **6**,

wherein the step responding to said identified speech contents from said associated user site is comprised of the steps of:

identifying a user based upon said speech content identified as to said user site to create an identified user.

**8**. The method of claim **7**,

wherein the step identifying said user is comprised of the steps of:

fetching a user profile list based upon said user site, said user profile list containing at least one user profile;

identifying said user based upon said speech content and based upon said user profile list to create an identified user.

**9**. The method of claim **8**,

wherein the step assessing said speech response is further comprised of the step of:

assessing said speech response based upon said identified user to create a financial consequence for said identified user.

**10**. The method of claim **2**,

wherein said speech content response is comprised of a current response menu and a cumulative user site response is identified as to said user site for at least one of said user sites.

**11**. The method of claim **10**,

wherein the step responding to said identified speech content from said associated user site further comprising at least one member of the collection comprising the steps of:

responding to said speech content based upon said current response menu and based upon said cumulative user site response to create a new cumulative user site response; and

assessing said speech content based upon said current response menu and based upon said cumulative user site response to create a new current response menu.

**12**. The method of claim **2**,

wherein the step responding to said identified speech content from said associated user site is further comprised of the step of:

responding to said speech content identified as to said user site based upon natural language to create a speech content response of said speech content identified with said user site.

**13**. The method of claim **2**,

wherein the step processing said multiplicity of said received speech channels is further comprised for at least one of said user sites is further comprised of the step of:

processing said received speech channels from said user site based upon natural language for said user site to create said speech content identified as to said user site.

**14**. A program system controlling at least part of a speech recognition system coupled to a wireline node in a network, said program system comprising the program steps of:

processing a multiplicity of received identified speech channels to create a multiplicity of identified speech content; and

responding to said identified speech content to create an identified speech content response that is unique to each of said multiplicity of identified speech contents;

wherein said speech recognition system is provided said multiplicity of received identified speech channels based upon a received back channel at said wireline node from a multiplicity of user sites coupled to said network;

wherein each of said program steps reside in memory accessibly coupled to at least one computer included in said speech recognition system;

wherein said at least one computer communicatively couples through said wireline node to said multiplicity of user sites; and

wherein said network supports at least one of the collection comprising: cable television delivery to said multiplicity of user sites; and video delivery to said multiplicity of user sites.

**15**. The program system of claim **14**,

wherein at least one of said identified speech channels has an associated user site; and

wherein the program step processing said multiplicity of said received identified speech channels is further comprised of the program step of:

processing said multiplicity of said received identified speech channels from said associated user site to create a multiplicity of said identified speech content; and

wherein the program step responding to said identified speech content is further comprised of the program step of:

responding to said identified speech content from said associated user site to create said identified speech content response for said associated user site.

**16**. The program system of claim **15**,

further comprising at least one member of the collection containing the program steps of:

determining said associated user site from said received identified speech channel;

determining said associated user site from said identified speech content;

determining said associated user site from said identified speech content and a speaker identification library;

determining said associated user site from said identified speech content and a speech recognition library; and

determining said associated user site from an identification within said speech channel.

**17**. The program system of claim **15**,

wherein the program step responding to said identified speech content from said associated user site is comprised of the program steps of:

processing said identified speech content response to create said identified user site response; and

sending said identified user site response to said identified user site.

**18**. The program system of claim **15**,

wherein the program step responding to said identified speech content from said associated user site is comprised of the program steps of:



assessing said speech content response identified as to said user site to create a financial consequence identified as to said user site; and

billing said user site based upon said financial consequence.

**19**. The program system of claim **15**,

wherein the program step responding to said identified speech content from said associated user site is comprised of the program steps of:

assessing said speech response to create a financial consequence identified as to said user site;

displaying said financial consequence to create a displayed financial consequence at said user site;

confirming said displayed financial consequence from said user site to create a financial commitment; and

billing said user site based upon said financial commitment.

**20**. The program system of claim **19**,

wherein the program step responding to said identified speech contents from said associated user site is comprised of the program steps of:

identifying a user based upon said speech content identified as to said user site to create an identified user.

**21**. The program system of claim **20**,

wherein the program step identifying said user is comprised of the program steps of:

fetching a user profile list based upon said user site, said user profile list containing at least one user profile;

identifying said user based upon said speech content and based upon said user profile list to create an identified user.

**22**. The program system of claim **21**,

wherein the program step assessing said speech response is further comprised of the program step of:

assessing said speech response based upon said identified user to create a financial consequence for said identified user.

**23**. The program system of claim **15**,

wherein said speech content response is comprised of a current response menu and a cumulative user site response identified as to said user site for at least one of said user sites.

**24**. The program system of claim **23**,

wherein the program step responding to said identified speech contents from said associated user site is further comprised of at least one member of the collection comprising the program steps of:

responding to said speech contents based upon said current response menu and based upon said cumulative user site response to create a new cumulative user site response; and

assessing said speech contents based upon said current response menu and based upon said cumulative user site response to create a new current response menu.

**25**. The program system of claim **15**,

wherein the program step responding to said identified speech content from said associated user site is comprised, for at least one of said user sites, of the program step of:

responding to said speech content identified as to said user site based upon natural language to create a speech content response of said speech contents identified as to said user site.

26. The program system of claim 15,

wherein the program step processing said multiplicity of said received speech channels is further comprised, for at least one of said user sites, of the program step of:

processing said received speech channels from said user site based upon natural language for said user site to create said speech content identified as to said user site.

27. A system supporting speech recognition in a network, said system comprising:

a speech recognition system coupled to a wireline node in said network for receiving a back channel from a multiplicity of user sites coupled to said network, further comprising

a back channel receiver, for receiving said back channel to create a received back channel;

a speech channel partitioner, for partitioning said received back channel into a multiplicity of received identified speech channels; and

a processor network executing a program system comprised of program steps residing in memory accessibly coupled to at least one computer in said processor network;

wherein said program system is comprised of the program steps of:

processing said multiplicity of said received identified speech channels to create a multiplicity of identified speech content;

responding to said identified speech content to create an identified speech content response, for each of said multiplicity of said identified speech contents; and

wherein said network supports at least one of the collection comprising: cable television delivery to said multiplicity of user sites; and video delivery to said multiplicity of user sites.

28. The system of claim 27,

wherein at least one of said identified speech channels has an associated user site; and

wherein partitioning said received back channel is further comprised of:

partitioning said received back channel into a multiplicity of said received identified speech channels from said associated user site;

wherein the program step processing said multiplicity of said received identified speech channels is further comprised of the program step of:

processing said multiplicity of said received identified speech channels from said associated user site to create a multiplicity of said identified speech content; and

wherein the program step responding to said identified speech content is further comprised of the program step of:

responding to said identified speech content from said associated user site to create said identified speech content response for said associated user site.

29. The system of claim 28,

wherein said program system is further comprised of at least one of the collection comprising the program steps of:

determining said associated user site from said received identified speech channel;

determining said associated user site from said identified speech content;

determining said associated user site from said identified speech content and a speaker identification library;

determining said associated user site from said identified speech content and a speech recognition library; and

determining said associated user site from an identification within said speech channel.

30. The system of claim 28,

wherein the program step responding to said identified speech contents from said associated user site is comprised of the program steps of:

processing said identified speech content response to create said identified user site response; and

sending said identified user site response to said identified user site.

31. The system of claim 28,

wherein the program step responding to said identified speech contents from said associated user site is comprised of the program steps of:

assessing said speech content response identified as to said user site to create a financial consequence identified as to said user site; and

billing said user site based upon said financial consequence.

32. The system of claim 28,

wherein the program step responding to said identified speech content from said associated user site is comprised of the program steps of:

assessing said speech response to create a financial consequence identified as to said user site;

displaying said financial consequence to create a displayed financial consequence at said user site;

confirming said displayed financial consequence from said user site to create a financial commitment; and

billing said user site based upon said financial commitment.

33. The system of claim 32,

wherein the program step responding to said identified speech content from said associated user site is comprised of the program steps of:

identifying a user based upon said speech content identified as to said user site to create an identified user.

34. The system of claim 33,

wherein the program step identifying said user is comprised of the program steps of:

fetching a user profile list based upon said user site, said user profile list containing at least one user profile;

identifying said user based upon said speech content and based upon said user profile list to create an identified user.

35. The system of claim 34,

wherein the program step assessing said speech response is further comprised of the program step of:

assessing said speech response based upon said identified user to create a financial consequence for said identified user.

36. The system of claim 28,

wherein said speech content response is comprised of a current response menu and a cumulative user site response identified as to said user site for at least one of said user sites.

37. The system of claim 36,

wherein the program step responding to said identified speech content from said associated user site is further

comprised of at least one member of the collection comprising the program steps of:

responding to said speech content based upon said current response menu and based upon said cumulative user site response to create a new cumulative user site response; and

assessing said speech contents based upon said current response menu and based upon said cumulative user site response to create a new current response menu.

**38**. The system of claim **28**,

wherein the program step responding to said identified speech content from said associated user site is comprised, for at least one of said user sites, of the program step of:

responding to said speech content identified as to said user site based upon natural language to create a speech content response of said speech contents identified as to said user site.

**39**. The system of claim **28**,

wherein the program step processing said multiplicity of said received speech channels is further comprised, for at least one of said user sites, of the program step of:

processing said received speech channels from said user site based upon natural language for said user site to create said speech content identified as to said user site.

**40**. The system of claim **28**,

wherein said network includes a wired residential broadband network servicing at least part of said multiplicity of user sites.

**41**. The system of claim **40**,

wherein said wired residential broadband network is a fiber-to-the-curb residential broadband network.

**42**. The system of claim **40**,

wherein said wired residential broadband network is a fiber-to-the-home residential broadband network.

**43**. The system of claim **40**,

wherein said wired residential broadband network is a switched-digital-video residential broadband network.

**44**. The system of claim **40**,

wherein said wireline node is located proximate to a node in said wired residential broadband network.

**45**. The system of claim **40**,

wherein said wireline node is located proximate to a Headend in said wired residential broadband network.

**46**. The system of claim **40**,

wherein said wireline node is located proximate to a central office in said wired residential broadband network.

**47**. The system of claim **27**,

wherein said speech recognition system further comprises a two-dimensional plex communication network communicatively coupled with a two-dimensional array of plex-nodes.

**48**. The system of claim **47**,

wherein at least one of said plex-nodes is comprised of at least one computer communicatively coupled through said two-dimensional plex communication network to at least one of said multiplicity of user sites;

wherein said computer executes at least one of said program steps residing in memory accessibly coupled to said computer.

**49**. The system of claim **47**,

wherein said back channel receiver is implemented in a first of said plex-nodes.



**50**. The system of claim **47**,

wherein said speech channel partitioner is implemented in a second of said plex-nodes.

**51**. The system of claim **47**,

wherein said two-dimensional communicatively coupled plex-node array and plex communications network contains said processor network.

**52**. The system of claim **47**,

wherein said processor network contains said two-dimensional communicatively coupled plex-node array and plex communications network.

**53**. A method of operating at least part of a speech recognition system coupled to a wireline node in a network, comprising the steps of:

processing a multiplicity of received identified speech channels to create a multiplicity of identified speech content; and

responding to said identified speech content to create an identified speech content response that is unique to each of said multiplicity of identified speech contents;

wherein said speech recognition system is provided said multiplicity of received identified speech channels based upon a received back channel at said wireline node from a multiplicity of user sites coupled to said network;

wherein said network supports at least one of the collection comprising: cable television delivery to said multiplicity of user sites; and video delivery to said multiplicity of user sites.

**54**. The method of claim **53**,

wherein at least one of said identified speech channels has an associated user site; and

wherein the step processing said multiplicity of said received identified speech channels is further comprised of the step of:

processing said multiplicity of said received identified speech channels from said associated user site to create a multiplicity of said identified speech content; and

wherein the step responding to said identified speech content is further comprised of the step of:

responding to said identified speech content from said associated user site to create said identified speech content response for said associated user site.

**55**. The method of claim **54**,

wherein the step responding to said identified speech content from said associated user site is comprised of the steps of:

assessing said speech response to create a financial consequence identified as to said user site;

displaying said financial consequence to create a displayed financial consequence at said user site;

confirming said displayed financial consequence from said user site to create a financial commitment; and

billing said user site based upon said financial commitment.

**56**. The method of claim **55**,

wherein the step responding to said identified speech contents from said associated user site is comprised of the steps of:

identifying a user based upon said speech content identified as to said user site to create an identified user.

**57**. The method of claim **56**,

wherein the step identifying said user is comprised of the steps of:

fetching a user profile list based upon said user site, said user profile list containing at least one user profile;

identifying said user based upon said speech content and based upon said user profile list to create an identified user.

**58**. The method of claim **57**,

wherein the step assessing said speech response is further comprised of the step of:

assessing said speech response based upon said identified user to create a financial consequence for said identified user.

**59**. The method of claim **54**,

wherein said speech content response is comprised of a current response menu and a cumulative user site response identified as to said user site for at least one of said user sites.

**60**. The method of claim **59**,

wherein the step responding to said identified speech contents from said associated user site is further comprised of at least one member of the collection comprising the steps of:

responding to said speech contents based upon said current response menu and based upon said cumulative user site response to create a new cumulative user site response; and

assessing said speech contents based upon said current response menu and based upon said cumulative user site response to create a new current response menu.

**61**. The method of claim **54**,

wherein the step responding to said identified speech content from said associated user site is comprised, for at least one of said user sites, of the step of:

responding to said speech content identified as to said user site based upon natural language to create a speech content response of said speech contents identified as to said user site.

**62**. The method of claim **54**,

wherein the step processing said multiplicity of said received speech channels is further comprised, for at least one of said user sites, of the step of:



processing said received speech channel from said user site based upon natural language for said user site to create said speech content identified as to said user site.

**63**. The method of claim **54**,

further comprising at least one member of the collection containing the steps of:

determining said associated user site from said received identified speech channel;

determining said associated user site from said identified speech content;

determining said associated user site from said identified speech content and a speaker identification library;

determining said associated user site from said identified speech content and a speech recognition library; and

determining said associated user site from an identification within said speech channel.

**64**. The method of claim **54**,

wherein the step responding to said identified speech content from said associated user site is comprised of the steps of:

processing said identified speech content response to create said identified user site response; and

sending said identified user site response to said identified user site.

**65**. The method of claim **54**,

wherein the step responding to said identified speech content from said associated user site is comprised of the steps of:

assessing said speech content response identified as to said user site to create a financial consequence identified as to said user site; and

billing said user site based upon said financial consequence.

**66**. The method of claim **54**,

wherein each of said identified speech channels has an associated user site.

* * * * *

# CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMITATION, TYPEFACE REQUIREMENTS, AND TYPE STYLE REQUIREMENTS

1. This brief complies with the type-voume limitations of Federal Rule of Appellate Procedure 32 and Federal Circuit Rule 32

This brief contains 10,602 words, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(f) and Federal Circuit Rule 32.

2. This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type style requirements of Federal Rule of Appellate Procedure 32(a)(6).

This brief has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point font, Times New Roman.

/s/ *Jacob A. Schroeder*
Jacob A. Schroeder
Counsel for Promptu Systems Corp.